IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

FILED

2025 MAR -3 P 3: 19

|  |  |  |
|---|---|---|
| RICKY SINGLETON,<br>    Plaintiff, | ) ) ) ) | Case No.: 1:24-cv-00025-PTG-LRV |
| v. | ) ) ) | Jury Trial Requested: YES |
| IKEA US RETAIL, LLC, *dba* IKEA, IKEA<br>WOODBRIDGE (*aka* IKEA NEW<br>WASHINGTON) *dba* IKEA, RAQUEL ELY,<br>MICHELLE CHENARD, JONATHAN SCOTT,<br>and RONDA KNIGHT<br>    Defendants. | ) ) ) ) ) ) ) | |

# AMENDED COMPLAINT FOR EMPLOYMENT DISCRIMINATION AND RETALIATION, VIOLATION OF CIVIL RIGHTS, CONSPIRACY, DEFAMATION, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## I.    PARTIES TO THIS COMPLAINT:

### A.    The Plaintiff:

1.    Plaintiff Ricky Singleton is a former employee of IKEA and a resident of Virginia. At all

relevant times, Mr. Singleton met the definition of an "employee" under all applicable statutes.

### B.    The Defendants:

2.    Defendant No. 1
            IKEA US Retail, LLC, *doing business as* IKEA
            (Defendant 1)
            420 Allen Wood Road
            Conshohoken, Montgomery County, Pennsylvania, 19428

3.          Defendant No. 2
            IKEA Woodbridge (*aka*. IKEA New Washington), *doing business as* IKEA
            2901 Potomac Mills Cir
            Woodbridge, Prince William County
            Virginia, 22192
            703-492-1222

4.          Defendant No. 3
            Raquel Ely
            Last known job: Store Manager, IKEA Woodbridge
            2901 Potomac Mills Cir
            Woodbridge, Prince William County
            Virginia, 22192
            703-492-1222 x1333
            raquel.ely@ikea.com

5.          Defendant No. 4
            Michelle Chenard
            Last known job: BNOM (*fka* Operations Manager), IKEA Woodbridge
            2901 Potomac Mills Cir
            Woodbridge, Prince William County
            Virginia, 22192
            703-492-1222 x1330
            michelle.chenard@ikea.com

6.          Defendant No. 5
            Jonathan Scott
            Last known job: HRBP, IKEA College Park / IKEA Woodbridge
            2901 Potomac Mills Cir
            Woodbridge, Prince William County
            Virginia, 22192
            703-492-1222 x1320
            jonathan.scott@ikea.com

7.          Defendant No. 6
            Ronda Knight
            Last known job: Risk and Compliance Manager, IKEA Woodbridge
            2901 Potomac Mills Cir
            Woodbridge, Prince William County
            Virginia, 22192
            703-492-1222 x1550
            ronda.knight@ikea.com

8.      Defendant IKEA is a limited liability company with headquarters and a principal place of

business located in Conshohocken, Pennsylvania.

9.      Defendant IKEA has been, and continues to be, engaged in an industry affecting interstate

commerce, with retail stores throughout the U.S., including the location in Woodbridge, VA.

10.     At all relevant times, the Defendants met the definition of an "employer" and/or a

"covered employer" under all relevant statutes and undertook and participated in the unlawful

conduct described herein.

### C.      Place of Employment

11.         IKEA Woodbridge *doing business as* IKEA
            2901 Potomac Mills Cir
            Woodbridge, Prince William County
            Virginia, 22192
            703-492-1222


## II.     Jurisdiction and Venue

### A.      Subject Matter Jurisdiction

12.     This Court has jurisdiction under 28 USC § 1331. Federal question jurisdiction arises

pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C §§ 2000e to 2000e-17

(race, color, gender, religion, national origin),  42 U.S. Code § 1981, 42 U.S. Code § 1985, 42

U.S. Code § 1986, and this Court has supplemental jurisdiction over claims under the relevant

state and local laws, including the Virginia Human Rights Act, VA Code § 18.2-499, and Virginia

Common Law pursuant to 28 U.S.C. § 1367(a).

### B.      Personal Jurisdiction

13.     This court has personal jurisdiction over all of the defendants of this complaint, as all

defendants have either domicile and physical presence, or they have minimum contacts with the

state providing general jurisdiction through their systematic and continuous operations therein.

C.    **Venue**

14.    Venue is proper pursuant to 28 U.S.C § 1391, because the events of this complaint

happened in this district.

III.    **Statement of Facts**

**A. Pertinent Background Facts**

15.    The Plaintiff, Ricky Singleton (Mr. Singleton), worked for IKEA located in Woodbridge,

VA from December 1997 - January 2022  and had a clean record and reputation the entire time.

His position was Risk and Compliance Agent at the time of termination.

16.    Mr. Singleton was beloved by most, if not every coworker, regularly praised by visitors

and customers, and generally looked to for guidance and leadership. His presence provided

comfort, safety, and stability, and he was regularly sought by coworkers and managers alike for

his encouragement, support, and advice, in full trust that he maintained the strictest

confidentiality.

17.    Mr. Singleton was known for his integrity, had a flawless reputation, and was highly

respected for both his personal and business knowledge and acumen. His conduct was presented

as that of a model coworker, whom others could look to for a good example and assistance

through difficult situations. His managers continually stated that he constantly exemplified the

IKEA Values and his conduct was always in line with protecting IKEA's assets and mitigating

risk for the company.

18.    Not only aware and knowledgeable of the policies and guidelines surrounding his

 position, Mr. Singleton was known to be knowledgeable about the policies and guidelines that

governed the other departments as well, including general store and management policies.

19.    Raquel Ely ( Ms. Ely) became the Woodbridge location Store Manager in 2021, and she formed and encouraged a trusting relationship with Mr. Singleton. She regularly sought him out for private conversations and meetings, and she told him he could trust her and come to her anytime for anything he needed.

20.    When Javier Quiñones (Javi), IKEA US CEO, visited the Woodbridge location in or around 2021, Ms. Ely introduced Javi directly to Mr. Singleton and praised him as the best security representative in the store. She told Javi that Mr. Singleton was knowledgable about all of the policies and was the best person to ask for clarification.

21.    Mr. Singleton filed numerous reports, as required by IKEA and his position, and retaliation was a common occurrence for him, as well as the other Black coworkers who were willing to report management and discrimination.

22.    Mr. Singleton held himself to a high standard and was never deterred from doing the right thing, even at great personal cost; he always performed his duties with the utmost diligence, and to the guidelines and policies set by IKEA.

23.    IKEA Woodbridge had a culture, and fostered an environment, of Pattern and Practice Discrimination. Mr. Singleton experienced numerous incidents of direct racial discrimination over his career, and he has witnesses to the discrimination, who can attest the unfair pay practices and employment actions taken against him going back for years.

**B. Background History of Pattern and Practice Discrimination**

24.    Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs of this Complaint as though fully recounted herein. This is not an exhaustive list. It includes, but is not

limited to the following:

25.    Denise "Dee" Selman (Dee) excused racist comments made by another coworker to and against Mr. Singleton regarding his hair and appearance, and instead of an investigation, she responded that he should be more understanding, made disparaging comments about his culture, and gave him advice on how to change his appearance to be tolerated and accepted:

26.    Mr. Singleton reported the discriminatory incident to HR manager, Dee, when an older white coworker, Lisa Nigg (Lisa), approached him while he was conducting an audit, and asked him why he doesn't cut "those tree branches" off his head, because they make him look like a criminal or drug dealer. Dee's response was that an old white woman, as herself, sees a black man with dreads and is afraid, because it's intimidating. She continued that Lisa is German and even met Hitler when she was a little girl, so she understands her fear of black men with dreads. Dee said Mr. Singleton should cut his hair because it does look intimidating to an older white woman. She told Mr. Singleton that he knows Lisa is from a different era, so he should not hold it against her and understand where she is coming from, and he shouldn't be offended so easily.

27.    Dee said she looked up Mr. Singleton's religion and culture and found out it was about black men going against the system with their hair, to rebel against the government, and they were considered criminals, marijuana smokers, and rioters. She said people are afraid of Mr. Singleton because of his hair and because he is quiet, so it comes off as though he's up to no good. She said he should cut his hair because he wears nice clothes and cool polo shirts, and with how he acts, he would be considered a conservative.

28.    Dee physically assaulted a Black coworker:

29.    Mr. Singleton witnessed Dee assault a black coworker when she blocked another black male security agent from leaving the building with his keys, and while she was obstructing his path, she was kicking and choking him.

30.    Dee excused a coworker who was reported for drawing swastikas on the security desk. She said he told her he was drawing forks that looked like swastikas, and he was just having fun:

31.    Mr. Singleton and his manager, Les Hendricks (Les H), witnessed a white security agent, Mike, drawing Neo-Nazi swastikas at the security desk. Les H reported him to the HR Manager, Dee, and showed her the drawings. She talked to Mike and asked him about the incident. She told Les he said he was drawing forks that looked like swastikas, and that he was just having fun and didn't mean anything by it. He was later promoted to a Team Leader position in VA Beach.

32.    Mr. Singleton reported Dee's racist comments and the other discriminatory incidents to his manager and the store manager, Jackie DeChamp (Jackie D). Jackie D contacted corporate to have corporate HR representatives investigate Dee's comments and conduct.

33.    The corporate HR representatives, Kelly Norwalk and Mark Biller (Kelly and Mark), were a previous HR manager and generalist from the Woodbridge store, who transferred to corporate and were already friends with Dee.

34.    After Kelly and Mark's corporate investigation, Dee was promoted to corporate to protect her job and cover up the discriminatory incidents.

35.    Four of Mr. Singleton's direct managers, throughout his career, told him of the direct discriminatory actions management pushed them to take against him and the discriminatory decisions management made against him themselves.

36.     There were numerous White coworkers placed in the security department by management with the intention of preventing Mr. Singleton from receiving promotions, including Aaron K, Christy Babcock (Christy B), Mike, Andrew Hansen (Andrew H), Heidi Becker (Heidi B), and Ronda Knight (Ms. Knight).

37.     While Davara Worthy (DK) was Mr. Singleton's manager, he advocated for Mr. Singleton to get a raise and be promoted to Security Team Lead to Dee.

38.     Dee responded that Mr. Singleton shouldn't be the face of the department; Christy B, a white coworker, should be put in the department for the Team Lead position and Mr. Singleton should be put out of the department.

39.     Instead of giving Mr. Singleton a raise, Dee gave a raise to another White male security agent in the department.

40.     Christy B was placed in the Security Department to replace Mr. Singleton as a candidate for the Security Team Lead position.

41.     Before she could be promoted to Team Lead, Christy B was reported for breaking store policy, and instead of facing any corrective action or investigation, Dee had her promoted to an administrative position in stock control.

42.     When the Security Manager of the Orlando store, Dave, had an opening for a Team Lead position, he wanted to recruit Mr. Singleton, as he had established a good working relationship with him when Mr. Singleton trained him.

43.     Dee blocked the promotion in order to stop Mr. Singleton from taking the position, on the grounds that Dave did not go through the Woodbridge management first for Mr. Singleton.

44.     Dee blocked Mr. Singleton's promotion to the Team Lead position when it became

available at the North Carolina store as well.

45.    Aaron K, an associate of Michelle Chenard (Ms. Chenard), was terminated following an investigation into a racial slur, sand nigger, he said to Mr. Singleton in reference to another coworker, which was reported by Mr. Singleton, as his manager instructed:

46.    Aaron K, who was friends with Dee and Ms. Chenard, used a racial slur describing the Indian Operations Manager, Shilpa, as a sand nigger.

47.    Mr. Singleton reported the racial slur to his manager, DK, and was told to report it to the store manager, Fredrick Rabe (Frederick R).

48.    After Frederick's investigation, in which Aaron K admitted his racist language, he was terminated.

49.    Following his termination, Aaron K made threatening calls to Mr. Singleton at work, and promised his friend would get into position to fire Mr. Singleton for getting Aaron K fired:

50.    Aaron K's friend, Ms. Chenard, then became the Operations Manager over Mr. Singleton's department, and she was sitting at the security desk when Mr. Singleton was being escorted out of the store following his termination in 2022.

51.    Safety measures were put in place by previous store manager, Frederick R, to protect Mr. Singleton's safety following workplace stalking and threats made against him in the course of his duties following Aaron's termination based on the racial discrimination investigation.

52.    In 2017 there was a major company reorganization called O4G, and Risk and Compliance fell under its' new manager, Ms. Chenard.

53.    Ms. Chenard became the manager over Mr. Singleton's department in 2017, and took employment actions against Mr. Singleton for the remainder of his career.

54.     In 2018 Mr. Singleton took Parental Leave following the birth of his child with another coworker, Danielle Goodman (Ms. Goodman). Both coworkers had to provide the birth documents to the same upper managers: Ms. Chenard, BNOM, and Dianna Abilmona, HRBP.

55.     Mr. Singleton had direct communication with the corporate HRSC, Human Resources Service Center, to protect his Parental Leave, as Ms. Chenard harassed him with constant calls and attempts to prevent him from taking his full parental leave benefit, though already approved.

56.     Ms. Chenard reversed the safety measures put in place by Frederick R for Mr. Singleton's safety:

57.     Though previously safeguarded and inaccessible to other coworkers, Ms. Chenard had Mr. Singleton's address, phone number, and schedule made available for other coworkers to access.

58.     While Frederick R had made it okay for Mr. Singleton's official mail to be sent directly to the store, Ms. Chenard wanted him to update his address to his physical home address.

59.     Frederick R had Mr. Singleton park secluded away from coworker parking and in front of security cameras. Ms. Chenard told Les H Mr. Singleton had to park in the coworker areas and even blocked the secluded area where he parked his car in 2020.

60.     Mr. Singleton's car was vandalized after he began parking near the coworker parking area, which didn't have the same video surveillance as where he previously parked, because not all of the cameras were working.

61.     Following the vandalism, Les H agreed for Mr. Singleton to park away from the coworker parking, in clear view of working security cameras, as Frederick R established, and Mr. Singleton's vehicles were not vandalized again.

62.     Les H endorsed Mr. Singleton for the new security team lead position in 2017 and pushed him to apply for it.

63.     Ms. Chenard had already decided to hire her White associate, Andrew H, even though he didn't have the same qualifications as Mr. Singleton. She denied Mr. Singleton the promotion on pretext, as her White associate was not held to the same prerequisites as Mr. Singleton.

64.     Mr. Singleton reported Ms. Chenard's discrimination from the interview to the store manager, Martin, yet there was no investigation or follow up.

65.     Ms. Chenard replaced Andrew's vacated position with another of her White associates, Heidi B, though she too lacked qualifications required by the Black coworkers in the Risk and Compliance Department.

66.     Ms. Chenard did not like being questioned and she responded aggressively whenever Mr. Singleton would not be intimidated to break store policies:

67.     Ms. Chenard gave an internal document to a disgruntled customer who requested it, against advisement from both Black security coworkers, as internal security documents were not supposed to be given out. She later acknowledged they were correct and she shouldn't have given the document to the customer.

68.     When Mr. Singleton would not agree to violate the policy and allow a forklift in the warehouse full of customers, Ms. Chenard disregarded Mr. Singleton when he told her it was against store policy and she should check with the store manager.

69.     Following her aggressive outburst, Ms. Chenard later apologized and acknowledged he was right, as the store manager had informed her of the same.

### C. Complaint Count Timeline

70.     Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs of this Complaint as though fully recounted herein. This is not an exhaustive list. It includes, but is not limited to the following:

71.     Ms. Chenard took multiple actions against Mr. Singleton during furlough in 2020, including refusing his keys, preventing him from receiving his paychecks, and taking one of his paychecks home with her.

72.     Ms. Chenard purposefully recalled the Black coworkers in the Risk and Compliance Department, including Mr. Singleton, back from furlough after all of the other coworkers in the department, even though Mr. Singleton had seniority.

73.     Both Black coworkers were the only coworkers in the department placed on deferment, based on pretext, when being recalled from furlough.

74.     Following the targeting of Mr. Singleton's physical address in 2020 by Ms. Chenard, the HRSC advised Mr. Singleton to update his physical address to a C/O with a PO box. His checks arrived to the store with Ms. Goodman's PO box for the following year.

75.     Ashley Wilson (Ashley W), another White associate of Ms. Chenard, was reported for making a discriminatory comment to and against Mr. Singleton:

76.     Cash office team lead, Ashley W, who was close friends with Ms. Chenard and the fiancée of Andrew H, made provocative comments to Mr. Singleton throughout the course of the day, culminating with a racist comment when she told Mr. Singleton that she was sick of the Black Lives Matter shit.

77.     Mr. Singleton reported the incident to his manager, Les Hendricks, while Ashley reported

the incident to Ms. Chenard, instead of using the usual reporting matrix.

78.    Ms. Chenard called Les and tried to stop him from reporting the incident, but Les had already reported it to Ashley W's manager, Madeline Roberts (Madeline R).

79.    Madeline R then reported the incident to the store manager, Heather Spatz, and she had an outside HR representative, Sierra, investigate the incident.

80.    Ms. Chenard attempted to intercept the reporting matrix to prevent an investigation, but following the investigation in which Ashley W admitted to saying the racist comment, she was given the chance to resign in place of termination.

81.    Another White associate of Ms. Chenard's, Ronda Knight (Ms. Knight), was hired into the Risk and Compliance department in 2020.

82.    Ms. Knight reported a Black customer at the cash lanes for suspicious behavior on her first day as a Risk and Compliance Agent. When Mr. Singleton responded to the scene, the customer was a Black male teen waiting for his father, who was actively purchasing their items at the cash lanes.

83.    In 2021, though the least experienced and newest coworker in the department, Ms. Knight was promoted to Risk and Compliance Manager.

84.    As the Manager, Ms. Knight constantly sent Risk and Compliance Agents to watch or follow Black customers. Ms. Knight only sent agents after Black customers and she did not have customers of other races followed.

85.    Multiple Black customers complained to management for being racially profiled. Management acknowledged the customer complaints, but there was never any follow up or corrective actions for Ms. Knight.

86.    Ms. Knight began furthering Ms. Chenard's interest in targeting Mr. Singleton's performance, availability, schedule, and hours.

87.    Ms. Knight went as far as trying to point out that Mr. Singleton hadn't done his work properly, but when the matter was looked into, Mr. Singleton had performed perfectly, while Ms. Knight was the one in error and had not completed the work. Ms. Knight apologized for her not doing her job and attempting to blame it on Mr. Singleton.

88.    Ms. Knight faced no repercussions for her attempt to fabricate a disciplinary write up for Mr. Singleton.

89.    Caleb Kelley (Caleb K), a White associate of Ms. Knight and Heidi B, was hired into the Risk and Compliance Department in 2021.

90.    Caleb K was given preferential treatment and Ms. Knight broke store policies constantly to cover for him.

91.    Caleb K stopped working for IKEA during the summer of 2021, but Ms. Knight and management kept him on the books, until after he received the bonus in November 2021. He was removed from the books and systems the week after the bonuses were distributed.

92.    When Mr. Singleton was called a nigger by an abusive customer and Mr. Singleton handled the situation gracefully and professionally, Les H, his manager, wanted to add it to Mr. Singleton's yearly Performance Evaluation. Ms. Chenard attempted to block the action, because she didn't want Mr. Singleton acknowledged as the victim in the situation.

93.    Numerous Black coworkers and managers confided in Mr. Singleton their individual experiences of a disparate nature and actions taken against them.

94.    Edmund B, a Black team lead, sought Mr. Singleton's assistance in or about 2021, when

Ms. Chenard sent him an email alleging that he scared her and acted aggressively in a meeting, though he was professional in the meeting when addressing a mistake she made with a spreadsheet.

95.    In an attempt to affect Mr. Singleton's work performance in 2021, Ms. Chenard, Ms. Knight, and Ms. Ely decided to change the entire Risk and Compliance Audit program to make it more detailed and a more intensive workload, and they gave Mr. Singleton the most difficult in-depth audits.

96.    The Risk Managers at Corporate and Les H, decided that the new audit system was too convoluted and could not be instated just to affect Mr. Singleton. The new process was reverted back to the original audit system.

97.    In or about March 2021, Ms. Ely and Ms. Chenard hosted security training for the Risk and Compliance Department. Management attempted to redefine the Relationship Policy, which would allow them to target the Black coworkers in the Risk and Compliance Department, if and when needed, in direct opposition to the "IKEA US Policy on personal relationships in employment" (referred to as "Relationship Policy" for the remainder of the complaint) on multiple points. (Attachment 1)

98.    In the training, Ms. Ely specified the Risk and Compliance Manager could not have a personal relationship with any direct reports in the Risk and Compliance Department, which is addressed by the Relationship Policy, which specifies direct reports, matrix reporting coworkers, or in setting compensation.

99.    She provided no further examples regarding the training to include coworker to coworker relationships as posing a possible conflict of interest, because that would not be supported by the

Relationship Policy.

100.    Following the training, management did not address any of the relationships in the Risk and Compliance Department, nor any of the individual coworkers regarding any relationships. Management neither investigated nor mitigated any of the relationships posing conflicts of interest in Operations under Ms. Chenard or associates of Ms. Chenard.

101.    From Spring to Fall 2021, management continued to hire and promote White coworkers both into and out of the Risk and Compliance Department, with direct-report personal relationships, which is specifically addressed by the Relationship Policy and would pose conflicts of interest as stated within it.

102.    In or about August 2021, Jonathan Scott (Mr. Scott), IKEA HRBP, negligently emailed a personnel spreadsheet containing every coworker's personal information, including pay, to multiple departments.

103.    Two minority Customer Service team leads confided to Mr. Singleton about the upset in the Cash Office over the pay disparities presented by the leaked spreadsheet, specifically the pay of Lisa Padro (Lisa P) a Customer Service Team Lead and associate of Ms. Chenard compared to the minority Team Leads.

104.    At the end of August, Mr. Singleton took vacation following the report he made regarding his discriminatory pay to Ms. Ely, which he learned of from the spreadsheet emailed by Mr. Scott earlier in the month.

105.    In early September 2021, after returning from vacation, Mr. Singleton had an email from the HRSC stating that his case was closed. He was surprised by the email, because he did not open a case at anytime to initiate any request to remove Ms. Goodman from his check, as he had

updated his address to include Ms. Goodman as his C/O over a year prior.

106.    The email said that Mr. Singleton's manager called because Mr. Singleton noticed that his paycheck was also made out to Danielle Goodman and provided her coworker ID for the case.

107.    Mr. Singleton and Ms. Goodman reported the privacy breach to Ms. Knight, the Risk and Compliance Manager, reporting someone impersonated him to open an HR case at the HRSC in order to access and change his personal information.

108.    At first Ms. Knight pretended she didn't know about the situation, and Mr. Singleton told her the email said his manager is the one who called.

109.    After Mr. Singleton produced the email from the HRSC, documenting the interaction, Ms. Knight said she didn't know there would be an email, and she would tell him what happened.

110.    Ms. Knight admitted Alex Rodriguez, a Site Admin Coordinator, Jonathan Scott, the HRBP, and herself worked together to attempt to change Mr. Singleton's personal information, by removing Ms. Goodman's name, while Mr. Singleton was on vacation.

111.    Ms. Knight said Mr. Scott was the one who called the HRSC and impersonated Mr. Singleton, and he was the one who looked up Mr. Singleton's information and Ms. Goodman's coworker ID number.

112.    In September 2021, Mr. Singleton reported to Raquel Ely, during one of their usual meetings, that he was making unfair lower pay compared to the others in his department, on account of experience, responsibility, seniority, and longevity; Mr. Singleton reported the history of the racial discrimination regarding his pay, as he was told by his direct managers, Mark, Elliot, DK, and Les.

113.     Mr. Singleton expressed the mental stress and anxiety caused by the continual harassment he faced on a daily basis from his management team, and how it affected him everyday when he had to come into work worrying about the next thing they were going to be plotting against him.

114.     Mr. Singleton reported to Ms. Ely that Mr. Scott accessed both his and Ms. Goodman's personal information, violating the IKEA North America Co-worker Privacy Notice (Attachment 2), and he used the information to impersonate Mr. Singleton to the HRSC, in order to have access to altering his personal information.

115.     There was no investigation into the incident and no follow up with Mr. Singleton.

116.     Management released Cost of Living raises in September 2021 for coworkers in good standing, in response to unrest following Mr. Scott's leaked personnel spreadsheet, and Mr. Singleton received one because he was in good standing.

117.     In October 2021, Mr. Singleton received an excellent yearly Performance Evaluation and qualified for a performance raise, which would go into effect January 1, 2022.

118.     In October 2021, Mr. Singleton assisted another Black coworker, his child's mother, in filing an EEOC Charge of Racial Discrimination regarding the unfair pay addressed in Mr. Scott's spreadsheet, which Mr. Singleton had already addressed with Ms. Ely.

119.     In early November 2021, Mr. Singleton received a bonus, as all coworkers in good standing received, due to the store exceeding the sales goals for the previous fiscal year.

120.     In November 2021, in the course of his regular duties, Mr. Singleton reported a manager and team lead for a security breach of the cash office, which exposed their relationship as posing a conflict of interest according to the Relationship Policy. As the manager used her position to coerce another Team Lead into giving the manager's roommate access to the Cash Office, which

was directly against IKEA policies and guidelines:

121.    Jada Goodsen (Jada G), the opening Cash Office Team Lead was unable to access the Cash Office one morning, and when another team lead would not provide Jada her own personal code to access the Cash Office, Jada G called Heidi B, about needing access. Heidi B then contacted the other team lead and coerced her into giving Jada her code, so she could enter the cash office.

122.    As Heidi had previously been a team lead in the Risk and Compliance Department, she would have known the multiple policies being violated and the serious security breach.

123.    Following the security breach, Mr. Singleton reported manager attempts, by Heidi B, Ms. Knight, and Ms. Ely, to prevent him from filing the security breach report officially and to cover up the security breach itself.

124.    Les H, the Risk and Compliance Team Lead told Mr. Singleton Ms. Ely asked him to prevent Mr. Singleton from officially filing the security breach report.

125.    There were no repercussions for the managers and leaders involved in the security breach or attempted cover up.

126.    In December 2021, the EEOC Charge with Mr. Singleton's name on it and mentioning his child, was dismissed, and there were immediate adverse actions and retaliation following the dismissal.

127.    Ms. Knight told Mr. Singleton he needed to fill out a new availability sheet. She also said they would be returning him to an older shift starting at 6am.

128.    Ms. Knight informed Mr. Singleton that not everyone in the department would be able to take holiday vacations that year, but after she found out he already had his vacation in the

system, she reversed what she said.

129.    Ms. Ely called Mr. Singleton to meet with her under the guise of a friendly chat in December 2021, as they usually had their previous one on one conversations, chats, and meetings:

130.    Ms. Ely established and encouraged a confidential and personal relationship with Mr. Singleton when she first moved to the Woodbridge store.

131.    Throughout her time there, she regularly sought out and met with Mr. Singleton to have private conversations where she expressed her support of him and his position in the store.

132.    As when Ms. Ely met with Mr. Singleton in September 2021 and he told her about the unfair pay he learned about from the HR spreadsheet that was leaked by Mr. Scott. He also told her about Ms. Knight's and Mr. Scott's attempt to alter his personal information with the HRSC for having Ms. Goodman on his address. During the meeting, Mr. Singleton confided to Ms. Ely the detrimental impact of the stress he experienced from the discrimination, harassment, and hostile working environment he regularly experienced from his managers, specifically Ms. Knight and Ms. Chenard.

133.    Ms. Ely appeared understanding and supportive as she promised she would do what she could to help him and alleviate the problems.

134.    While Ms. Ely had called Mr. Singleton for a friendly chat as usual in December 2021, he realized this was not one of their usual one on one conversations, because Jonathan Scott was in the room when he arrived.

135.    Ms. Ely and Mr. Scott had called both Mr. Singleton and Ms. Goodman in for "friendly chats", which were concerning the protected activity from the November 2021 EEOC charge.

136.    Ms. Ely and Mr. Scott interrogated Mr. Singleton regarding his participation in protected activity, and they stated he was now in a conflict of interest.

137.    Mr. Scott became very hostile during the meeting, after Mr. Singleton would not be coerced into admitting wrongdoing for participating in protected activity.

138.    Mr. Scott and Ms. Ely feigned ignorance of Mr. Singleton's relationship with Ms. Goodman as the mother of his child prior to their "new-found" knowledge. They cited their "secret source" from November 2021 for divulging the relationship and his child, and they demanded Mr. Singleton admit he knew his relationship broke the Relationship Policy, and that he was willfully hiding it, in the knowledge that it would harm the company.

139.    They maintained he was already guilty and demanded he admit wrongdoing of any form.

140.    Mr. Singleton denied wrongdoing and reiterated his right to engage in protected activity. He knew the reason they would need him to agree to wrongdoing, is because they wanted to harm him in retaliation in the first place.

141.    Mr. Singleton reported the attempted cover up of the security breach and conflict of interest of managers and team leads in November 2021, including their knowledge and participation, and pointed out that to label him as having a conflict of interest now was both discriminatory and retaliatory.

142.    Mr. Singleton maintained that he had personal relationships with coworkers throughout the store due to his lengthy tenure, and he agreed to any investigations which would be required.

143.    Due to the leading questioning and hostile interrogation, Mr. Singleton requested his personnel file and a copy of all of his signed policies. He specifically asked for the signed policies, as he had not signed any of the policies for years following being targeted by managers

earlier in his career.

144.    His managers understood his reasoning for not signing the policies and supported his decision to refrain from doing so, as he always had top remarks for his yearly performance reviews and was exceptional according to their merit system, abiding by all policies regardless of the lack of his signature on them.

145.    Mr. Scott remained hostile throughout the meeting even after being addressed by Ms. Ely multiple times for his behavior and conduct against the two coworkers/MR. S & MS. G.

146.    Due to Mr. Scott's continual hostility, verbal attacks, clear disdain, and bias, Mr. Singleton requested he be respectfully excused from the hostile meeting, as neither coworker deserved such abusive treatment and conduct from an upper manager in a business environment.

147.    Ms. Ely consented to the request, and the two coworkers excused themselves.

148.    Mr. Singleton sent a follow-up email after the misrepresented meeting, and Ms. Ely met with him on her own, as previously, to address the discrimination he was reporting, including multiple incidents and concerns involving Mr. Scott, and the detrimental effect it was having on Mr. Singleton's mental state.

149.    Ms. Ely acknowledged Mr. Singleton's concerns and request, and she promised Mr. Singleton he would never have to be in a meeting with Mr. Scott ever again.

150.    In late December 2021, Michelle Chenard, who has a personal relationship to the manager reported for the security breach in November 2021, attempted to fabricate a situation to write Mr. Singleton up for a fictitious security breach, which was another retaliatory adverse action.

151.    At the same time, Mr. Singleton was told by Les H, that management wanted to start a

paper trail on him, which has repercussions of having a corrective action on your file, and leaves a coworker susceptible to further negative administrative actions.

152.    Once he had a corrective action, they could selectively bar him from actions for coworkers in good standing, such as receiving raises or bonuses that arise, like the bonuses in November 2021 and the raises he received in September 2021 and January 2022.

153.    The write up meeting was timed to be given to Mr. Singleton on the day before his holiday vacation started, right before he left for the day, even though the events allegedly took place at the beginning of December 2021. Les H was called to come in early, just to give Mr. Singleton the write up, as he was leaving for vacation.

154.    During the write up Les H acknowledged prior knowledge of the situation, as he and Mr. Singleton had already discussed it. Les H said Ms. Chenard was pushing for him to give the fabricated write up to Mr. Singleton even though he didn't agree with it.

155.    Ms. Chenard added a date to the write up from years prior saying that the same thing happened previously, though there was no history or documentation of it ever happening.

156.    Though already on vacation herself, Ms. Chenard came in to bring holiday treats and presents to the department at that exact time, so she was in his office when he got out of the write up meeting to go home.

157.    While Mr. Singleton was gathering his personal belongings to leave, Ms. Chenard continually baited Mr. Singleton into direct communication with her, knowing that she had just had him written up on the fabricated allegations, which he had just received.

158.    Mr. Singleton returned upstairs and reported the entire incident and timing to Ms. Ely before he left for vacation, as well as recounting the history of the continual discrimination he

experienced.

159.    Ms. Ely told him not to worry about anything and she would handle it.

160.    Mr. Singleton was told, on good authority from a member of his direct management team, Ms. Chenard had plotted with other members of management, to create situations which would incite an agitated response from Mr. Singleton, which they would then be able to label him as an angry, aggressive, scary Black man.

161.    After a general discussion in January 2022, Mr. Singleton asked, and Ms. Ely agreed, to meet for another friendly chat in the administration meeting room on or about January 13, supposedly as usual, to discuss the disturbing discriminatory information he received and how she officially handled the write up from December 2021.

162.    Mr. Singleton arrived to meet her expecting a one on one as usual, like they planned. On entering, Mr. Scott was positioned in the meeting room, so Mr. Singleton did not actually ascertain his surprise presence, until he had already fully entered the room.

163.    Ms. Ely told Mr. Singleton the write up was a misunderstanding, offered apology for the misunderstanding, and stated it was rescinded from his file.

164.    Ms. Ely had previously promised Mr. Singleton to not be in a meeting with Mr. Scott ever again due to Mr. Scott's previous misconduct against Mr. Singleton and Ms. Goodman.

165.    In the past, if there was a conflict of interest with an HR representative, another HR representative could be present instead.

166.    Had Ms. Ely wanted an HR representative in the meeting for an official reason, she could have requested another representative from another location, usually from College Park, as they were the closest store to the Woodbridge location. Such as when Ashley Wilson made a racial

slur against Mr. Singleton, and the store manager, Heather Spatz, brought in an external HR Representative from College Park, Sierra, to conduct an unbiased investigation.

167.    The fact that Ms. Ely concealed Mr. Scott's presence, after reports of the distress his presence had already caused Mr. Singleton, shows intent to affect Mr. Singleton's response to his surprise presence, which directly coincides with the plot Mr. Singleton was reporting at the same meeting.

168.    Mr. Singleton reminded Ms. Ely of the original reasons they agreed to meet, and he reported finding out about the management plot to label him according to a Black male stereotype, and he was also aware of both Ms. Ely's and Mr. Scott's involvement with the plot as well.

169.    Neither Ms. Ely nor Mr. Scott were surprised or denied the plot. They wanted to know who told Mr. Singleton about it. Mr. Singleton said he would write a formal statement to make sure the situation was officially documented.

170.    Due to the stress and anxiety caused by the environment of the meeting, Mr. Singleton also requested a copy of his personnel file, including all performance evaluations and signed policies, because he wanted to verify the write up rescinded and document the policies he signed.

171.    On reflection, following the meeting, Mr. Singleton sent a follow up email withdrawing his decision to write a formal statement, as he no longer felt he could trust Ms. Ely or management to protect his safety or well being.

172.    With no follow up or investigation into the discrimination or the plot that was reported, Mr. Singleton was unlawfully terminated on January 21, 2022 in a discriminatory way, meant to humiliate him and tarnish his reputation and memory with the rest of the coworkers, especially

for the coworkers who followed his lead and addressed the discrimination they experienced and witnessed during the course of their work.

## IV. Causes of Action

### COUNT I
### Continuing Race Discrimination and Disparate Treatment in Violation of Title VII
### (Defendant: IKEA)

173.    Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs of this Complaint as though fully recounted herein.

174.    Mr. Singleton exhausted his administrative remedies, as he filed a charge with the EEOC on August 22, 2022. The EEOC provided Mr. Singleton a Right to Sue Notice, which he received on November 16, 2023.

175.    Title VII prohibits discrimination and disparate treatment on the basis of race.

176.    The Defendants have violated Title VII by engaging in the actions described in the preceding and following paragraphs of this complaint. The following is not an exhaustive list, it includes but is not limited to the following Race Discrimination and Disparate Treatment violations:

### A. Promotions

177.    From 2019-2021, Mr. Singleton was denied promotions for team lead and manager positions. Mr. Singleton was not considered for any of the positions, and both positions were filled by less qualified and less experienced White employees, with personal relationships with Ms. Chenard.

178.    When this information about the promotion denials was acknowledged on the EEOC charge in November 2021, management ignored the allegations and retaliated against both Black

coworkers involved with the charge.

### B. Availability and Religious Accommodation

179.    Mr. Singleton was discriminated against regarding his availability and schedule

throughout his career. Multiple managers used it as a source of targeting him, while White

coworkers in the department were given preferred schedules and availabilities, without the same

constraints as those imposed on Mr. Singleton.

180.    The Black coworkers, Mr. Singleton and Ms. Goodman, were the only Risk and

Compliance coworkers whose availability and scheduling was constantly limited and scrutinized.

181.    A White coworker in the department had a set schedule, never worked weekends, and

was able to choose her days and times to work.

182.    In June 2020, Sierra, an external HR Representative from College Park, was brought to

the store for the discrimination investigation regarding Ashley W making a discriminatory

comment against Mr. Singleton:

183.    While Sierra was there, she settled the scheduling disparities against the Black

coworkers in the department.

184.    Sierra entered Mr. Singleton into a program to protect coworker's religious

accommodation to have Sundays off and established that he had to be treated equally to the

other coworkers in the department.

185.    When Ms. Ely became the Store Manager in 2021, she allowed Ms. Chenard and Ms.

Knight to reinstate some of the same schedule and availability disparities which existed before

Sierra's visit in 2020, such as limiting Mr. Singleton's hours even though he was the only agent

who didn't get overtime in the first place.

186.    Ms. Ely also supported Ms. Chenard and Ms. Knight in their decision to hold Mr.

Singleton alone to their "No Overtime" decision. They increased it to mean that he had to clock

out at exactly 8 hours, without going a minute over, which meant he had to clock out five

minutes prior to the end of his shift. It caused undue stress, as the 5 minute cushion in the policy

was meant to prevent undue stress about clocking in and out for coworker shifts.

187.    Mr. Singleton was the only coworker who had to live with this added stipulation, as it

was a topic of conversation that the other non-Black agents regularly got overtime and were not

held to the same time constraints or hours limiting as Mr. Singleton.

### C. Vacations and Leave

188.    The Defendant Ms. Knight told the Risk and Compliance Department that due to Summer

2021, being the busy time of year, vacations would be limited, and not everyone would be

allowed to take vacations that summer.

189.    Ms. Knight approved all of the vacation requests made by the non-Black coworkers

throughout the summer, including multiple vacations for the same coworkers.

190.    These actions directly contradicted the mandate she made prior to summer, and as the

Black coworkers were the only ones to not put in PTO during the busy time, they were the ones

targeted by the original mandate.

191.    Ms. Knight attempted to impose the same restrictions on December vacations in 2021,

but when she found out Mr. Singleton had his vacation in prior to December, she reversed it.

192.    It was generally discussed in the department the Ronda still worked at the store while she

was on FMLA even though working while on FMLA isn't allowed.

193.    Ronda went on FMLA to care for her mother, in contrast to three Black coworkers who

were denied leave to care for their mothers, and faced performance repercussions, when they took time to take care of them.

### D. Pay Disparity

194.    Mr. Singleton has been receiving lower pay in his department on the basis of his race throughout his career.

195.    Multiple direct managers of Mr. Singleton have told him that he was being paid less than other coworkers, specifically White coworkers, based on no other reason except for his race.

196.    Multiple direct managers attempted to get Mr. Singleton compensated fairly, but were met with resistance and denials from upper management, while White coworkers were receiving raises without being asked.

197.    When Mr. Scott leaked the spreadsheet in August 2021, Mr. Singleton saw for himself, as the only Black agent, that he was being paid less comparatively to the other agents in the department in relation to experience, performance, education, seniority, and longevity, which was supposedly addressed by O4G in 2017.

### E. Privacy

198.    Ms. Knight and Mr. Scott mishandled Mr. Singleton's paycheck in September 2021, misused his personal information, and attempted to alter his mailing address without his consent or knowledge.

199.    Another White manager, Bruce H, had a C/O on his mailing address, just like Mr. Singleton did. Neither Ms. Knight nor Mr. Scott questioned, mishandled, or impersonated him in order to remove his C/O from his mailing address.

200.    Neither manager was concerned with the White manager's address, and only contacted

the HRSC to try to make Mr. Singleton appear guilty of wrongdoing.

201.    At the same time, there was history of managers mailing Mr. Singleton's checks to the wrong address, so he wouldn't be able to get his checks and would have to go through a difficult HR process to get his checks, like he experienced in 2020.

202.    Privacy accommodations were made to protect Mr. Singleton, and after Ms. Chenard withdrew them, Mr. Singleton suffered from workplace stalking, mishandling of his personal information, fraud, car vandalism, and undue stress from the extra constant vigilance he had to maintain for his own personal safety.

### F. Security Breaches

203.    In November 2021, there was a security breach of the Cash Office. The security breach was orchestrated by a White manager, Heidi B, in the Customer Service Department.

204.    On learning of the security breach, multiple managers attempted to cover up the breach, prevent the investigation,  and prevent Mr. Singleton from filing the official security report. Managers involved included, but were not limited to the original manager involved, Heidi B, Ronda Knight, and Raquel Ely.

205.    The coworkers involved in the breach were protected and did not receive any repercussions for their involvement or their conflicts of interest.

206.    In December 2021, Michelle Chenard had Mr. Singleton written up for a fabricated security breach, instigated and carried out by Ms. Chenard and Ms. Knight.

207.    While the write up was eventually rescinded, he was still given the write up at first, which would be in his permanent file, leave him susceptible to further administrative discipline, and bar him from benefits reserved for coworkers in good standing.

208.    The susceptibility to further administrative discipline bears all the more in the case of Mr. Singleton, as his future termination showed the extent to which management was willing to selectively push administrative actions against him with the intent to cause lasting harm to him.

209.    Another security breach comparison is when Mr. Singleton reported numerous instances of the closing agent leaving the store unlocked and unsecured at night, which posed serious security policy violations and risk for the store which came with it's own disciplinary actions.

210.    Not only were there no repercussions for the breaches for the Hispanic agent, the manager informed Mr. Singleton that management was fully aware of the doors not being locked at night, and Ms. Ely did not want to pay the expense of having the doors fixed and properly secured.

211.    Security breaches were tolerated, excused, and protected on a daily basis, by non-Black coworkers and managers, while Mr. Singleton, the only Black Risk and Compliance Agent, received a write up for a fabricated security breach he did not even commit.

### G. Conflicts of Interest

212.    In December 2021 Ms. Ely and Mr. Scott told Mr. Singleton his relationship was now a conflict of interest. Management based their decision on the definition of a "Personal Relationship" in the Relationship Policy. At the same time, management refused to acknowledge the definition of a "Conflict of Interest" in the same Relationship Policy.

213.    Management would not acknowledge the information included in the Relationship Policy and could not state that Mr. Singleton violated any section of the Relationship Policy.

214.    The Relationship Policy states coworkers with personal relationships should not be involved with setting salaries, in order to prevent pay disparities as presented in the Cash Office

with Lisa P, a close associate of Ms. Chenard, in contrast to the lower pay of the minority Team Leads in the department.

215.    Management refused to acknowledge any other sections of the Relationship Policy, except for the definition of a Personal Relationship.

216.    Management alleged his relationship broke the information addressed in the security training in March 2021.

217.    Management did not address any relationships of any of the other agents or managers in the Risk and Compliance Department or Operations matrix, either before, simultaneously, or after addressing Mr. Singleton's relationship.

218.    Management could not provide the training presented at the March 2021 training to the EEOC or the PWC Human Rights Commission.

219.    Management did not address the relationship of the White coworkers whose relationships broke the same alleged information addressed in the March 2021 training or in the false March 2021 training provided to the EEOC.

220.    Mr. Singleton, the only Black Risk and Compliance Agent, was in a relationship with another Black coworker.

221.    The two Black coworkers were the only coworkers addressed about their relationship following the training, and without investigation, labeled as a conflict of interest, which is against the Relationship Policy.

222.    Being labeled as a conflict of interest following the protected activity, in order to take negative action against the parties, is an adverse action.

223.    Management used the pretext of Mr. Singleton's relationship as a conflict of interest for

the basis of his termination the following month.

224.    In November 2021, when a White manager's relationship caused a security breach and posed an actual conflict of interest, the relationship was not investigated, labeled, or mitigated.

225.    Ms. Ely, while being one of the managers labeling Mr. Singleton's relationship, was one of the mangers who excused and protected both the security breach and the conflict of interest for the White manager.

### H. Terminations

226.    Mr. Singleton was never given a chance to resign instead of being terminated, while White Team Lead, Ashley W was:

227.    In 2020 Mr. Singleton reported Ashley W's racist comments and misconduct to Madeline R, Ashley's manager, who then reported the incident to the store manager, Heather Spatz, and she had an outside HR representative, Sierra, investigate the incident.

228.    Ms. Chenard attempted to intercept the reporting matrix to prevent an investigation, but following the investigation in which Ashley admitted to saying the racist comment, she was given the chance to resign in place of termination.

229.    Management was less protective of Black coworker's privacy during terminations, and managers drew more attention to Black terminations than terminations of White coworkers and coworkers of other races.

230.    Mr. Singleton's termination was distinct, and unlike any other termination, in the history of the store, and no guidelines or policies were followed in its' execution.

231.    Terminations are supposed to be kept as private and confidential as possible. Coworkers are intercepted in the coworker entrance before starting work, taken to a meeting room for the

termination, and then quietly leave the building.

232.    Managers can request an agent to be available if they are concerned about a negative response, but it is rare, and there are usually other factors involved.

233.    Mr. Singleton worked half of his shift on the day of his termination.

234.    Halfway through his shift, Ms. Chenard came to the office and told him that Ms. Ely wanted to speak with him upstairs. Ms. Chenard took over the security desk at the coworker entrance, so he could go meet Ms. Ely.

235.    External security agents were on the landing where Mr. Singleton met Ms. Ely. She asked Mr. Singleton in to one of the meeting rooms, where a White male manager was waiting as witness, and the security agents were posted just outside the door.

236.    Following the termination, Mr. Singleton was escorted by the external security agent through heavily populated areas so he could collect his personal items.

237.    Management knew that visitors usually arose interest and questions amongst the coworkers, and having external agents would provide the attention and gossip necessary to make sure word of the termination spread and increased his stress and humiliation.

238.    As acknowledged in the meeting on January 13, 2022, management seemed determined to cast Mr. Singleton as an angry, aggressive, scary Black man.

239.    Management brought in outside security, which had never happened before, in order to oversee the termination and escort Mr. Singleton as he was paraded through the admin area at the busiest time of the morning and past the regularly scheduled, morning manager meeting.

240.    Terminations in the past, even for criminal matters, were conducted as to protect the individual's privacy and their rights.

241.    Mr. Singleton was disrespected, vilified, and humiliated, because he was not willing to abide the continual race discrimination propagated against Black coworkers, and assisted other coworkers in protected activity.

242.    Mr. Singleton's termination was made a public display in order to send a message to the other Black coworkers, that reporting racial discrimination would not be tolerated.

### I. Lies and Misunderstandings

243.    Mr. Singleton's termination paper alleges that he lied about being in a relationship.

244.    Management continues that the single alleged lie about his relationship, also breaks the Code of Conduct and the Behavior Standards Policies at the same time.

245.    Management then states that the single alleged lie, counts as 3 infractions, which is how they can terminate him.

246.    Mr. Singleton never lied about being in a relationship, and he agreed to any investigation and required mitigation following any investigation into any of his relationships in the store.

247.    Even if Mr. Singleton hadn't told the truth at anytime, even labeling him as a liar for it, would be Disparate Treatment in and of itself.

248.    In December 2021, Mr. Singleton reported Ms. Chenard to Ms. Ely for the fabricated security breach write up.

249.    Ms. Ely conducted an investigation and rescinded the write up from Mr. Singleton's file.

250.    The write up was rescinded, because Mr. Singleton was innocent of the fabricated allegations.

251.    Acknowledging that the incident was a fabrication, means the basis for the write up was a lie. The lie was created, a whole situation was planned around it, other managers were involved

in its' execution, and the whole plan was concocted in order to harm a coworker, Mr. Singleton.

252.    After Ms. Ely's investigation, she did not call the incident a lie nor the White conspirators liars. Ms. Ely stated the incident was simply a misunderstanding, and that was also not a singular occurrence.

253.    Whenever a White manager or coworker is caught in a direct lie or fabrication, which is often in the case of Ms. Chenard, the lie is always called a misunderstanding, and there are never any repercussions.

254.    As soon as management alleged a Black coworker lied, they called it a lie, they labeled him a liar, and they terminated his employment.

### J. Mental Health

255.    Even with the known negative stigma of mental health in the Black community, Mr. Singleton confided his mental distress due to Mr. Scott's targeting, hostility, and abuse to Ms. Ely in December 2021, due to the trustful relationship she had fostered with him over the previous year.

256.    Though Ms. Ely said she understood and promised Mr. Singleton she would make sure he never had to be in a meeting with Mr. Scott ever again, she surprised Mr. Singleton with Mr. Scott's presence during a supposed one on one meeting with her in January 2022.

257.    Not only did Ms. Ely break her word, but she ignored the mental distress Mr. Singleton confided to her, and tricked him into another situation she knew would have a negative impact on Mr. Singleton.

258.    There was no accommodation made for Mr. Singleton's mental health, and he was purposefully put back into the same situation which was known to have a detrimental effect on

his mental health.

259.    On two separate occasions, White coworkers had violent outbursts in the Admin area and verbally attacked other coworkers and frightened others in the Admin area, and the incidents resulted in EMS being called to the store.

260.    Ms. Ely was involved in both situations, and another agent confided to Mr. Singleton that she requested to cover up the incidents and not have them reported officially. She specifically didn't want Mr. Singleton to find out about them.

261.    Both White coworkers were given generous accommodations for mental health and returned to their roles.

262.    Mr. Singleton reported his mental stress, but even without public display or outburst, Mr. Singleton was denied accommodation or support, and was in fact terminated instead.

263.    As a direct and proximate result of the unlawful discriminatory conduct committed by the Defendant in violation of Title VII, Mr. Singleton has suffered, and will continue to suffer, monetary and other economic harm for which he is entitled to an award of monetary damages and other relief.

264.    As a direct and proximate result of the unlawful conduct committed by the Defendant in violation of Title VII, Mr. Singleton has suffered, and continues to suffer, physical illness, ailments, and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, loss of life's pleasures, and other emotional pain and suffering, for which he is entitled to an award of compensatory damages and other relief.

265.    Defendant's unlawful and discriminatory actions were done with willful malice and a

conscious disregard of Mr. Singleton's protected rights under Title VII, for which Mr. Singleton

is entitled to an award of punitive damages.

## COUNT II
### Unlawful Harassment and Hostile Work Environment in Violation of Title VII
### (Defendant: IKEA)

266.    Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs of this

Complaint as though fully recounted herein.

267.    Mr. Singleton exhausted his administrative remedies, as he filed a charge of

discrimination and retaliation with the EEOC on August 22, 2022.

268.    The EEOC inaccurately presented Mr. Singleton's charge, and Mr. Singleton asked for

his Charge to be amended by the EEOC and the PWCHRC.

269.    The EEOC provided Mr. Singleton a Right to Sue Notice, which he received on

November 16, 2023.

270.    The Defendants continually violated Title VII in their endless pursuit to affect and harm

Mr. Singleton by surrounding him in a hostile work environment for all of the reasons recounted

throughout Count I.

271.    Defendants IKEA, Ms. Ely, Ms. Chenard, and Ms. Knight continually targeted Mr.

Singleton's reports and redefined the audit program in order to make him responsible for the

most difficult audits, while adding to the audits themselves with new specific lengthy

expectations, in order to  affect his productivity, so they would have something negative to say

on his performance evaluation, which could then be used as a reason to deny him positive

employment actions and promotions.

272.    While Mr. Singleton excelled, even with the new daunting audit process, the new system was abandoned by the Risk and Compliance team as a whole, as it was not conducive to the company to add all of the extra work with hidden pitfalls for no reason, and the team reverted to the previous IKEA developed program.

273.    Defendants IKEA, Ms. Ely, Ms. Chenard, Mr. Scott, and Ms. Knight, created a hostile environment when they created new guidelines for the Relationship Policy (Attachment 2), while the policy itself states local policies should only be enacted in countries where they are required for legal compliance (Relationship Policy: Section 5).

274.    The Defendants created the guidelines to allow them to target the Black coworkers in the Risk and Compliance Department, at their convenience. They decided to employ this tactic after the Black coworkers filed an EEOC Race Discrimination Charge. The Defendants then used the alleged new guidelines as a basis for Mr. Singleton's termination.

275.    Defendants IKEA, Ms. Knight, and Mr. Scott, created a hostile work environment when they mishandled Mr. Singleton's paycheck, personal information, and privacy to alter his personal information to induce an image of wrongdoing and prevent him from receiving his official mail and paychecks.

276.    Ms. Knight informed Mr. Singleton that not all coworkers in the department would be allowed to take their holiday vacations in 2021, and it would be on a first come first served basis.

277.    Had Mr. Singleton not taken his PTO by the end of the year, he would have lost all of the PTO accrued over 40 hours.

278.    Mr. Singleton had already put in his holiday PTO request months earlier, so Ms. Knight recanted what she said, and all of the coworkers were able to take their vacations.

279.    Emboldened by the dismissal of the EEOC Charge of Race Discrimination in December 2021, the Defendants IKEA, Ms. Ely, Ms. Chenard, Mr. Scott, and Ms. Knight willfully fostered a hostile work environment following Mr. Singleton's participation in the protected activity in November 2021. Including but not limited to targeting, open hostility and aggression, altering his availability and schedule, fabricating a performance issue, abusing power over subordinates, retaliation, and termination.

280.    Defendants did not learn of Mr. Singleton's child from the EEOC Charge, so to build an aggressive interrogation around a lie, shows willful intent to create a hostile environment for Mr. Singleton.

281.    Mr. Scott subjected Mr. Singleton to undue stress when he verbally attacked the coworkers during the meeting, abused his authority, and was determined to coerce the coworkers into falsely admitting wrongdoing, so he would be able to affect their employment status.

282.    As a direct and proximate result of the unlawful harassment and discriminatory conduct committed by the Defendant in violation of Title VII, Mr. Singleton has suffered, and will continue to suffer, monetary and other economic harm for which he is entitled to an award of monetary damages and other relief.

283.    As a direct and proximate result of the unlawful conduct committed by the Defendant in violation of Title VII, Mr. Singleton has suffered, and continues to suffer, physical illness, ailments, and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, loss of life's pleasures, and other emotional pain and suffering, for which he is entitled to an award of compensatory damages and other relief.

284.    Defendant's unlawful and discriminatory actions were done with willful malice and a conscious disregard of Mr. Singleton's protected rights under Title VII, for which Mr. Singleton is entitled to an award of punitive damages.

## COUNT III
### Retaliation and Unlawful Termination in Violation of Title VII
### (Defendant: IKEA)

285.    Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs of this Complaint as though fully recounted herein.

286.    Mr. Singleton exhausted his administrative remedies, as he filed a charge with the EEOC on August 22, 2022. The EEOC provided Mr. Singleton a Right to Sue Notice, which he received on November 16, 2023.

287.    Mr. Singleton filed internal reports of race discrimination throughout his career, and while he had faced retaliatory actions, they never escalated to termination.

288.    By the actions described above, for all of the reasons recounted in Count I and throughout this complaint, Defendant retaliated against Mr. Singleton on the basis of his complaints of racial discrimination by terminating his employment, and among other things, which would not have occurred but for Plaintiff's legally protected activity.

289.    In November 2021 Mr. Singleton participated in multiple protected activities, including assisting an external report to the EEOC of Race Discrimination within IKEA Woodbridge.

290.    Immediately following the charge dismissal in December 2021, Mr. Singleton experienced continual adverse actions escalating to termination in January 2022.

291.    Defendants did not "just learn" of Mr. Singleton's child from the EEOC Charge, and at no time did he conceal or deny his relationship and child.

292.    Management alleged they only just learned of Mr. Singleton's relationship from their "secret source" in November 2021. Besides the fact that management later contradicted that statement, management did not address Mr. Singleton after they received the information from their "secret source". Management only addressed Mr. singleton about his relationship after the EEOC dismissed the charge. The fact that they waited until after the dismissal, exposes their retaliatory motivation.

293.    The Defendants acknowledged they used the information from the EEOC charge, and the fact that they called the charge their "secret source" shows they knew they were breaking the law when the did so.

294.    The Defendants only acknowledged the information from the charge that they could manipulate to harm the Black coworkers.

295.    Management was solely focused on the Black coworkers who reported the discrimination to the EEOC. The Defendants ignored the rest of the information on the charge and refused to discuss or acknowledge anything else contained therein.

296.    As a direct and proximate result of the unlawful discriminatory conduct committed by the Defendant in violation of Title VII, Mr. Singleton has suffered, and will continue to suffer, monetary and other economic harm for which he is entitled to an award of monetary damages and other relief.

297.    As a direct and proximate result of the unlawful conduct committed by the Defendant in violation of Title VII, Mr. Singleton has suffered, and continues to suffer, physical illness, ailments, and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, loss of

life's pleasures, and other emotional pain and suffering, for which he is entitled to an award of

compensatory damages and other relief.

298.     Defendant's unlawful and discriminatory actions were done with willful malice and a

conscious disregard of Mr. Singleton's protected rights under Title VII, for which Mr. Singleton

is entitled to an award of punitive damages.

## COUNT IV
### Continuing Race Discrimination and Disparate Treatment in Violation of 42 U.S.C. § 1981
### (Defendants: IKEA, Ms. Ely, Ms. Chenard, Mr. Scott, and Ms. Knight)

299.     Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs of

this Complaint as though fully recounted herein.

300.     42 U.S.C. § 1981 prohibits discrimination and disparate treatment on the basis of race.

301.     The Defendants have violated 42 U.S.C. § 1981 by engaging in the actions described in

the preceding paragraphs of this complaint and for all of the reasons recounted in Count I. The

following is not an exhaustive list, it includes but is not limited to the following Race

Discrimination and Disparate Treatment violations which are detailed in the following

subsections of Count I above:  A. Promotions, B. Availability and Religious Accommodation, C.

Vacations, D. Pay Disparity, E. Privacy, F. Security Breach, G. Conflicts of Interest, H.

Terminations, I. Lies and Misunderstandings, and J. Mental Health.

302.     Defendants IKEA, Ms. Ely, Ms. Chenard, Mr. Scott, and Ms. Knight, decided to label Mr.

Singleton as an angry, aggressive, scary Black man, so they could affect his employment status,

and they tried to put him in situations to elicit that response.

303.     As a direct and proximate result of the unlawful discriminatory conduct committed by the

Defendants in violation of 42 U.S.C. § 1981, Mr. Singleton has suffered, and will continue to

suffer, monetary and other economic harm for which he is entitled to an award of monetary damages and other relief.

304.    As a direct and proximate result of the unlawful conduct committed by the Defendants in violation of 42 U.S.C. § 1981, Mr. Singleton has suffered, and continues to suffer, physical illness, ailments, and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, loss of life's pleasures, and other emotional pain and suffering, for which he is entitled to an award of compensatory damages and other relief.

305.    Defendant's unlawful and discriminatory actions were done with willful malice and a conscious disregard of Mr. Singleton's protected rights under 42 U.S.C. § 1981, for which Mr. Singleton is entitled to an award of punitive damages.

## <u>COUNT V</u>
### Unlawful Harassment and Hostile Work Environment in Violation of 42 U.S.C § 1981 (Defendants: IKEA, Ms. Ely, Ms. Chenard, Mr. Scott, and Ms. Knight)

306.    Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs of this Complaint as though fully recounted herein.

307.    The Defendants continually violated 42 U.S.C § 1981 in their endless pursuit to affect and harm Mr. Singleton by surrounding him in a hostile work environment for all of the reasons recounted throughout Count I and this complaint.

308.    Ms. Chenard promoted a harassing, hostile environment against Mr. Singleton, when she continually attempted to end and negate the safety precautions put in place for Mr. Singleton's physical safety by a previous store manager, following the termination of Ms. Chenard's associate.

309.    There were numerous safety measures enacted including but not limited to, limiting access to Mr. Singleton's physical address and phone number, having his business mail and pay checks mailed directly to the store, keeping the security schedules secured in the security office, and having him park in safe areas near security cameras, away from designated coworker parking.

310.    Defendants IKEA and Ms. Chenard fostered a hostile work environment in and around June 2020 concerning furlough return. Ms. Chenard took numerous direct actions against Mr. Singleton regarding his personal information to prevent him from receiving his paychecks, prevent him from returning from furlough, and attempting to hold him responsible for missing store keys.

311.    While coworkers were on furlough and not allowed to work or return to the store due to Covid-19 shutdown, Ms. Chenard requested Mr. Singleton return his store keys.

312.    Mr. Singleton shipped them to the store as requested, but the package was denied by management on purpose, even though Ms. Chenard's name was on it, because he was the sender.

313.    When Mr. Singleton returned from furlough, Ms. Chenard told him he would receive a write up for losing the keys, and he would be responsible for the cost of replacing them, which was known to be thousands of dollars.

314.    When Mr. Singleton returned from furlough, the physical checks, for coworkers who still received physical checks, were still located in the security office as usual, but none of Mr. Singleton's checks were there.

315.    While on furlough, management mailed out Mr. Singleton's checks to an address they knew to be wrong, though they did not mail out the other coworker's checks. HR is required to

have a written request from the coworker granting consent and the address where to mail the check, before a check can be mailed out. Neither prerequisite for mailing was met.

316.    Mr. Singleton ended up having to go the the store manager, Heather Spatz, in order to get IKEA to provide Mr. Singleton with his 7 missing paychecks.

317.    Following the checks being reissued, managers Ms. Chenard and Ms. Abilmona left the checks and the check detail pages, with all of Mr. Singleton's personal information, on the unsecured admin printer for in or over 2 weeks, until another manager turned them into the security office.

318.    Defendants IKEA, Ms. Ely, Ms. Chenard, Mr. Scott, and Ms. Knight, willfully fostered a hostile work environment for the same actions detailed in the preceding paragraphs and in Count III above.

319.    As a direct and proximate result of the unlawful harassment and discriminatory conduct committed by the Defendant in violation of 42 U.S.C. § 1981, Mr. Singleton has suffered, and will continue to suffer, monetary and other economic harm for which he is entitled to an award of monetary damages and other relief.

320.    As a direct and proximate result of the unlawful conduct committed by the Defendant in violation of 42 U.S.C. § 1981, Mr. Singleton has suffered, and continues to suffer, physical illness, ailments, and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, loss of life's pleasures, and other emotional pain and suffering, for which he is entitled to an award of compensatory damages and other relief.

321.    Defendant's unlawful and discriminatory actions were done with willful malice and a

conscious disregard of Mr. Singleton's protected rights under 42 U.S.C. § 1981, for which Mr.

Singleton is entitled to an award of punitive damages.

## COUNT VI
### Retaliation and Unlawful Termination in Violation of 42 U.S.C. 1981
### (Defendants: IKEA, Ms. Ely, Ms. Chenard, Mr. Scott, and Ms. Knight)

322.    Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs of this

Complaint as though fully recounted herein.

323.    Defendants violated 42 U.S. Code § 1981 when they retaliated against Mr. Singleton

following his protected activity and for their retaliatory conduct recounted in Count I.

324.    By the actions described above, among others, the Defendants retaliated against Mr.

Singleton on the basis of his complaints of racial discrimination by, among other things,

terminating his employment, which would not have occurred but for Plaintiff's legally protected

activity and following all policies and laws.

325.    Defendants IKEA, Ms. Ely, Ms. Chenard, Mr. Scott, and Ms. Knight willfully retaliated

against Mr. Singleton for his participation in protected activity for the same actions detailed in

the preceding paragraphs and in Count V above.

326.    IKEA and the PWC Human Rights Commission investigator acknowledge the

information they use came from the protected activity, they acknowledge that the information

was then used to harm Mr. Singleton, so they in turn admit retaliation and the causal link.

327.    Since the information used to terminate Mr. Singleton came from his protected activity,

then had he not participated in the protected activity, he would not have been terminated.

328.    Mr. Singleton's termination was then made as a public spectacle to dissuade other Black

coworkers from continuing to report race discrimination at IKEA.

329.     As a direct and proximate result of the unlawful discriminatory conduct committed by the Defendants in violation of 42 U.S.C. § 1981, Mr. Singleton has suffered, and will continue to suffer, monetary and other economic harm for which he is entitled to an award of monetary damages and other relief.

330.     As a direct and proximate result of the unlawful conduct committed by the Defendants in violation of 42 U.S.C. § 1981, Mr. Singleton has suffered, and continues to suffer, physical illness, ailments, and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, loss of life's pleasures, and other emotional pain and suffering, for which he is entitled to an award of compensatory damages and other relief.

331.     Defendant's unlawful and discriminatory actions were done with willful malice and a conscious disregard of Mr. Singleton's protected rights under 42 U.S.C. § 1981, for which Mr. Singleton is entitled to an award of punitive damages.

## COUNT VII
### Defamation per se
### (Defendants: IKEA, Ms. Ely, and Mr. Scott)

332.     Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs of this Complaint as though fully recounted herein.

333.     Defendants violated Virginia state law when they defamed Mr. Singleton as expressed in the preceding paragraphs and in Count I.

334.     Ms. Ely and Mr. Scott wrote on Mr. Singleton's termination paper that he had lied about his relationship, had concealed his relationship, and was uncooperative when asked about it, all

of which were untrue.

335.    IKEA acknowledged prior and general knowledge of the relationship after the

termination, which means they were fully aware they were not telling the truth when they stated

he lied about and continually concealed his relationship.

336.    Both managers were present when Mr. Singleton agreed to any investigation or

mitigation required, so they were aware of the lies while they were writing Mr. Singleton's

termination.

337.    Ms. Ely restated these untrue allegations in front of the witness during the termination.

338.    The public display of the termination, based on the defamatory statements, also drew

extra attention to humiliate Mr. Singleton and drive interest, gossip, and ridicule to impugn his

honor, destroy his reputation, and inflict emotional distress.

339.    Mr. Singleton was contacted by individuals unrelated to his termination at the store,

which were aware of his termination due to the public display.

340.    As a direct and proximate result of the defamatory conduct committed by the Defendants

Mr. Singleton has suffered, and will continue to suffer, monetary and other economic harm for

which he is entitled to an award of monetary damages and other relief.

341.    As a direct and proximate result of the defamatory conduct committed by the Defendant,

Mr. Singleton has suffered, and continues to suffer, physical illness, ailments, and conditions, as

well as mental anguish and emotional distress, including, but not limited to, depression,

humiliation, embarrassment, stress and anxiety, loss of self-esteem, loss of life's pleasures, and

other emotional pain and suffering, for which he is entitled to an award of compensatory

damages and other relief.

342.    Defendant's unlawful and discriminatory actions were done with willful malice and a conscious disregard of Mr. Singleton's protected rights, for which Mr. Singleton is entitled to an award of punitive damages.

## COUNT VIII
### Violation of 42 U.S. Code § 1985 Conspiracy to Interfere with Civil Rights
### (Defendants: IKEA, Ms. Ely, Ms. Chenard, Mr. Scott, and Ms. Knight)

343.    Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs of this Complaint as though fully recounted herein.

344.    The Defendants violated 42 U.S. Code § 1985 (3) every time they conspired to commit actions and inflict harm on Mr. Singleton with violations of Title VII and 42 U.S. Code § 1981 as recounted in Count I.

345.    Defendants Ms. Ely, Ms. Chenard, Mr. Scott, and Ms. Knight violated 42 U.S. Code § 1985 (3) when they conspired to elicit an aggravated emotional response from Mr. Singleton, with the goal of labeling him as an angry, aggressive, scary Black man and taking adverse employment action against him in order to harm his performance, reputation, and employment status.

346.    Mr. Singleton was informed of the conspiracy by Les H, who was present during a meeting when Ms. Chenard, Ms. Knight, Ms. Ely, and Mr. Scott were discussing and planning the plot against Mr. Singleton.

347.    Defendants conspired against Mr. Singleton in full knowledge of his delicate and affected mental state due to the constant stress and anxiety he suffered from their management fostering the hostile environment against him.

348.    Defendants did not offer Mr. Singleton a chance to resign as they wanted to continue to

harm him in his future opportunities by having him terminated, knowing it would harm his

reputation and chances of future employment.

349.    Defendants fabricated his termination to accuse him of wrongdoing to mar his reputation

and prevent him from receiving unemployment.

350.    As a direct and proximate result of the unlawful discriminatory conduct committed by the

Defendants in violation of 42 U.S.C. § 1985, Mr. Singleton has suffered, and will continue to

suffer, monetary and other economic harm for which he is entitled to an award of monetary

damages and other relief.

351.    As a direct and proximate result of the unlawful conduct committed by the Defendants in

violation of 42 U.S.C. § 1985, Mr. Singleton has suffered, and continues to suffer, physical

illness, ailments, and conditions, as well as mental anguish and emotional distress, including, but

not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem,

loss of life's pleasures, and other emotional pain and suffering, for which he is entitled to an

award of compensatory damages and other relief.

352.    Defendant's unlawful and discriminatory actions were done with willful malice and a

conscious disregard of Mr. Singleton's protected rights under 42 U.S.C. § 1985, for which Mr.

Singleton is entitled to an award of punitive damages.

## COUNT IX
### Violation of 42 U.S. Code § 1986 Action for Neglect to Prevent
### (Defendants: IKEA, Ms. Ely, Ms. Chenard, Mr. Scott, and Ms. Knight)

353.    Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs of this

Complaint as though fully recounted herein.

354.    The Defendants violated 42 U.S. Code § 1986 for all of the actions mentioned in the

previous paragraphs and counts, when the Defendants had knowledge of the discriminatory actions being taken against Mr. Singleton, and allowed them to happen, knowing that his rights were being violated due to his race, and subjecting Mr. Singleton to their continual discrimination, harassment, and hostile environment.

355.   Defendants were in managerial positions with the ability to stop the discrimination, harassment, and hostile environment against Mr. Singleton, but all of the individual Defendants not only participated in, but also excused and exacerbated, the discriminatory and hostile environment against Mr. Singleton.

356.   Previous store managers and HR including Frederick Rabe, Arda A., Heather Spatz, and Sierra, stopped the discrimination and hostile environment against Mr. Singleton when they were in their positions, showing that the current Defendants also had the choice to do so, and failed to protect Mr. Singleton as the previous store managers and HR had.

357.   As a direct and proximate result of the unlawful discriminatory conduct committed by the Defendants in violation of 42 U.S.C. § 1986, Mr. Singleton has suffered, and will continue to suffer, monetary and other economic harm for which he is entitled to an award of monetary damages and other relief.

358.   As a direct and proximate result of the unlawful conduct committed by the Defendants in violation of 42 U.S.C. § 1986, Mr. Singleton has suffered, and continues to suffer, physical illness, ailments, and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, loss of life's pleasures, and other emotional pain and suffering, for which he is entitled to an award of compensatory damages and other relief.

359.    Defendant's unlawful and discriminatory actions were committed with at least reckless and callous indifference, if not with full willful malice, and with a conscious disregard of Mr. Singleton's protected rights under 42 U.S.C. § 1986, for which Mr. Singleton is entitled to an award of punitive damages.

**COUNT X**
**Violation of Virginia Human Rights Act § 2.2-3900**
**(Defendant: IKEA)**

360.    Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs of this Complaint as though fully recounted herein.

361.    Mr. Singleton exhausted his administrative remedies for reporting discrimination and retaliation to the EEOC, which was transferred to the PWC Human Rights Commission, and according to the Prince William County, VA Code of Ordinances Sec. 10.1-5, "The human rights commission created by this chapter shall have jurisdiction to enforce this chapter and all state and federal laws and regulations governing discrimination on the basis of race..."

362.    All Defendants failed to safeguard Mr. Singleton, as a member of the Commonwealth, from unlawful discrimination on the basis of his race, preserve his public safety, health, and general welfare, and further his interests, rights, and privileges as an individual within the Commonwealth, either through directly participating in the discrimination, failing to prevent or stop the discrimination, or by denying Mr. Singleton, either directly or indirectly, of a fair and unbiased investigation.

363.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the VHRA, Mr. Singleton has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation

and benefits, for which he is entitled to an award of monetary damages and other relief.

364.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the VHRA, Mr. Singleton has suffered, and continues to suffer, physical illness and ailments, as well as mental anguish and emotional distress for which he is entitled to an award of monetary damages and other relief.

365.    Defendants' unlawful discriminatory conduct was intentional, done with malice and showed a deliberate, willful, wanton and reckless indifference to Mr. Singleton's rights under the VHRA, for which Mr. Singleton is entitled to an award of punitive damages.

366.    Defendants' unlawful discriminatory and retaliatory actions constitute malicious, willful and wanton violations of the VHRA, for which Mr. Singleton is entitled to an award of punitive damages.

### COUNT XI
### Violation of Business Conspiracy VA Code § 18.2-499
### (Defendants Ms. Ely, Ms. Chenard, Mr. Scott, and Ms. Knight)

367.    Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs of this Complaint as though fully recounted herein.

368.    Defendants Ms. Ely, Ms. Chenard, Mr. Scott, and Ms. Knight violated the Business Conspiracy statute when they conspired to elicit an aggravated emotional response from Mr. Singleton, with the goal of labeling him as an angry, aggressive, scary Black man and taking adverse employment action against him in order to harm his performance, reputation, and employment status.

369.    The Defendants introduced Mr. Singleton to multiple environments and situations as to induce their desired emotional response, so they could fulfill their plot against him.

370.    Ms. Ely and Mr. Scott concealed Mr. Scott's presence in a private meeting after Ms. Ely

promised Mr. Singleton she would not let it happen again.

371.    Ms. Chenard attempted to have Mr. Singleton written up for a fabricated incident, and

then planned to provoke him physically if the write up alone wasn't enough to engender an

emotional response.

372.    Ms. Chenard's involvement when Ashley W tried to provoke Mr. Singleton with

discriminatory and pointed remarks to and about him and Black Lives Matter in 2020, shows Ms.

Chenard had been plotting this for an extended time herself.

373.    Ms. Chenard also attempted to label another Black Team Lead, Edmund B, as being

angry and aggressive towards her, when he was respectfully pointing out her mistake, showing a

history of her labeling Black males to suit her agenda and cover her own misconduct.

374.    Ms. Chenard, Ms. Knight, Mr. Scott, and Ms. Ely all had personal stakes in harming Mr.

Singleton with their conspiracy, as Mr. Singleton's position in Risk and Compliance gave him

access to information and systems which held all four of them accountable for their misconduct

and required him to report their misconduct, which could lead to their own infractions, corrective

actions, and termination, as they broke policies and laws at will for personal gain.

375.    Following him reporting of finding out about the plot and the participants, the involved

managers, Ms. Chenard, Ms. Ely, Ms. Knight, and Mr. Scott, created a fabricated narrative to

terminate him, and orchestrated a discriminatory termination spectacle to cause lasting harm to

Mr. Singleton and his reputation as punishment for him abiding by the Defendant's own policies

and laws.

376.    As a direct and proximate result of the unlawful discriminatory conduct committed by the

Defendants in violation of VA Code § 18.2-499, Mr. Singleton has suffered, and will continue to suffer, monetary and other economic harm for which he is entitled to an award of compensatory and treble damages and other relief.

377.   As a direct and proximate result of the unlawful conduct committed by the Defendant in violation of VA Code § 18.2-499, Mr. Singleton has suffered, and continues to suffer, physical illness, ailments, and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, loss of life's pleasures, and other emotional pain and suffering, for which he is entitled to an award of compensatory and treble damages and other relief.

378.   Defendant's unlawful and discriminatory actions were committed with at least reckless and callous indifference, if not with full willful malice, and with a conscious disregard of Mr. Singleton's protected rights under VA Code § 18.2-499, for which Mr. Singleton is entitled to an award of punitive damages.

## COUNT XII
### Civil Conspiracy in Violation of Virginia Common Law
### (Defendants: IKEA, Ms. Ely, Ms. Chenard, Mr. Scott, Ms. Knight)

379.   Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs of this Complaint as though fully recounted herein.

380.   As stated in Count VII and Count XI, Defendants Ms. Ely, Ms. Chenard, Mr. Scott, and Ms. Knight conspired to put Mr. Singleton in different stressful situations in order to elicit an aggravated emotional response, so they could then label him as an angry, aggressive, scary Black man to justify an adverse employment action.

381.   Ms. Chenard, Ms. Knight, Mr. Scott, and Ms. Ely all had personal stakes in harming Mr.

Singleton with their conspiracy, as Mr. Singleton's position in Risk and Compliance gave him access to information and systems which held all four of them accountable for their misconduct and required him to report their misconduct, which could lead to their own infractions, corrective actions, and termination, as they broke policies and laws at will for personal gain

382.    As a direct and proximate result of the unlawful discriminatory conduct committed by the Defendants in violation of Virginia Common Law, Mr. Singleton has suffered, and will continue to suffer, monetary and other economic harm for which he is entitled to an award of monetary damages and other relief.

383.    As a direct and proximate result of the unlawful conduct committed by the Defendant in violation of Virginia Common Law, Mr. Singleton has suffered, and continues to suffer, physical illness, ailments, and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, loss of life's pleasures, and other emotional pain and suffering, for which he is entitled to an award of compensatory damages and other relief.

384.    Defendant's unlawful and discriminatory actions were committed with full willful malice, and with a conscious disregard of Mr. Singleton's protected rights under Virginia Common Law, for which Mr. Singleton is entitled to an award of punitive damages.

## <u>COUNT XIII</u>
### Intentional Infliction of Emotional Distress
### (Defendants: IKEA, Ms. Ely, Ms. Chenard, Mr. Scott, and Ms. Knight)

385.    Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs of this Complaint as though fully recounted herein.

386.    The Defendants willfully inflicted emotional distress against Mr. Singleton throughout is career including the reasons recounted throughout Counts I-XII, and specifically following his assistance in filing a Race Discrimination charge with the EEOC and reporting Ms. Chenard's close friends for security breaches and conflicts of interest in November 2021, and when he told management that he had learned of their discriminatory plot to label him with a racial stereotype and harm his employment status and benefits in 2022.

387.    The defendants put Mr. Singleton in numerous situations meant to inflict emotional distress in order to elicit an emotional response, as that formed the basis for their plot.

388.    Even after Mr. Singleton addressed the emotional turmoil following different situations, management continued to create the situations to elicit their desired emotional distress.

389.    Mr. Singleton suffered emotional distress from the willful, wonton, and vindictive actions taken by the Defendant against Mr. Singleton with their continual discrimination, hostile working environment, harassment, retaliation, and discriminatory, defamatory, and unlawful termination.

390.    The Defendant was aware of Mr. Singleton's affected mental state at the time of the termination, as he reported his mental distress to Ms. Ely specifically on multiple occasions during their private meetings before he was terminated.

391.    The Defendant was aware of the mental distress their actions were causing, and continued their discriminatory behavior in full knowledge of the damage they were causing Mr. Singleton with a callous disregard for his well being.

392.    The Pattern and Practice continual Race Discrimination, retaliation, hostile working environment, harassment, defamation, hair discrimination, and unlawful termination Mr. Singleton was subjected to, was not a regular experience in a normal, everyday work place.

393.    While Mr. Singleton was employed by the Defendant, Mr. Singleton's health was a generally discussed topic throughout the store. Mr. Singleton was the epitome of health; he rarely got sick, nearly never had to call out of work due to illness, and lost sick time yearly as it was use or lose leave.

394.    Many coworkers asked Mr. Singleton for guidance and support with healthy diet and exercise, and they liked to confide in him with their challenges and hopes of improving their health and qualities of life.

395.    Prior to his termination, Mr. Singleton led an all-natural healthy lifestyle, including never taking any medication or pills. He now has to take numerous medications throughout the day, some of which cause and exacerbate unpleasant side effects which he has never experienced in his life.

396.    Following his termination, Mr. Singleton suffered from anxiety, panic attacks, and depression while trying to deal with the fact of being terminated in such a manner after his honorable and tenured career, through no wrongdoing of his own.

397.    The emotional distress was so severe it impacted his ability to function on a daily basis.

398.    Mr. Singleton is suffering ongoing physical and mental fall out from his unlawful termination and has detailed his impacted health as his medical case has progressed.

399.    Due to the stress and mental anguish caused by the Defendant, Mr. Singleton's mental and physical health deteriorated over the following months in 2022 after his unlawful termination, and his symptoms were misdiagnosed in 2023 due to his seemingly healthy appearance, and his mental anguish was determined to be extreme anxiety causing physical stress and symptoms.

400.    With no reprieve from his stress and mental anguish, Mr. Singleton suffered acute illness

in the Summer of 2023. With a sudden onset of constant and relentless migraines, face, chest,

and shoulder pain, and hallucinations, Mr. Singleton sought medical attention. Mr. Singleton saw

four different doctors, who all assured him of his apparent health, and his eventual diagnosis was

extreme anxiety and stress causing migraines, rapid heart rate, and hallucinations. After a few

months, the acute symptoms mostly resided, but they flared up again in the Summer of 2024.

401.    Mr. Singleton's symptoms continued to decline, and in addition to the same symptoms

from 2023, he began to suffer seizures as well in Summer 2024. Mr. Singleton was rushed to the

hospital by ambulance after suffering a grand mal seizure for over five minutes. Doctors did not

expect him to make it through the night, and he was hospitalized due to emergency treatment for

a stroke, grand mal seizures, and heart failure. Mr. Singleton remained in the hospital for over

two weeks under constant medical care, baffling his team of doctors due to his apparent health,

in contrast to his stress and anxiety damaged brain and body.

402.    Mr. Singleton underwent extensive medical testing to find the cause for his symptoms,

and while doctors have ruled out a number of possibilities, they have yet to find a final diagnosis,

and they are focused on autoimmune diseases as his array of symptoms are still baffling.

Throughout his hospitalization and testing, doctors became aware of and treated him for his

original symptoms and also became aware of encephalitis, diabetes 1.5, and kidney stones. He is

currently being treated for stroke, seizure, and heart attack prevention, diabetes 1.5, and stress,

anxiety, and depression.

403.    Mr. Singleton suffered objective physical injury from the stress of the emotional distress,

he sought medical care, was hospitalized for an extended period of time, currently remains

under constant medical evaluation and treatment, and can prove the tort with clear and convincing evidence.

404.    Mr. Singleton now has a severely diminished quality of life, as he now lives with daily radiating pain, chest, head, and shoulder pain, numbness, tingling, and nerve damage in his face, arms, and legs, night sweats, an extensive list of medications required throughout the day, constant blood pressure and glucose monitoring, anxiety and depression, panic attacks, and the constant fear of relapsing into the worst symptoms of his disease, including the fear of having a stroke with no symptoms and seizures with no warning, as he did in Summer 2024.

405.    Mr. Singleton will continue to suffer from his physical maladies for the rest of his life, and he will have to see multiple specialists for the wide array of his symptoms.

406.    Mr. Singleton lost his medical benefits after his termination, contributing to his anxiety, and he will now have extensive medical costs for the rest of his life due to the intensive medical care his conditions require.

407.    As a direct and proximate result of the unlawful discriminatory conduct committed by the Defendant in violation of Virginia Law, Mr. Singleton has suffered, and will continue to suffer, monetary and other economic harm for which he is entitled to an award of monetary damages and other relief.

408.    As a direct and proximate result of the unlawful conduct committed by the Defendant in violation of Virginia Law, Mr. Singleton has suffered, and continues to suffer, physical illness, ailments, and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, loss of life's pleasures, and other emotional pain and suffering, for which he is entitled to an award of

compensatory damages and other relief.

409.    Defendant's unlawful and discriminatory actions were committed with at least reckless

and callous indifference, if not with full willful malice, and with a conscious disregard of Mr.

Singleton's protected rights under Virginia Law, for which Mr. Singleton is entitled to an award

of punitive damages.

## V. <u>Prayer for Relief</u>

WHEREFORE, Mr. Singleton prays that the Court enter judgment in his favor and against

Defendants, through the following relief:

A.    A declaratory judgment that the actions of Defendants complained of herein

violate the laws of the United States and the State of Virginia;

B.    An injunction and order permanently restraining Defendants from engaging in

such unlawful conduct;

C.    An award of compensatory damages in an amount to be determined at trial, plus

prejudgment interest, to make Mr. Singleton whole for all monetary and economic damages,

including but not limited to past and future lost earnings, benefits, and earnings capacity which

he has suffered and will continue to suffer as a result of Defendant's unlawful and discriminatory

conduct;

D.    An award of damages in an amount to be determined at trial, plus prejudgment

interest, to compensate Mr. Singleton for harm to his professional and personal reputations and

loss of career fulfillment which he has suffered and will continue to suffer as a result of the

Defendant's unlawful and discriminatory conduct;

E.      An award of compensatory damages in an amount to be determined at trial, plus prejudgment interest, to compensate Mr.Singleton and make him whole for all non-monetary damages , including but not limited to, mental anguish, past and future pain and suffering, emotional distress, embarrassment, humiliation, loss of self-esteem, and loss of life's pleasures Mr. Singleton has suffered and will continue to suffer as a result of Defendant's unlawful and discriminatory conduct;

F. An award of punitive damages in an amount to be determined at trial;

G. An award of liquidated damages in an amount to be determined at trial;

H. An injunction to provide Mr. Singleton with his full retirement, including the money in his TACK retirement fund and any other amounts accrued during his employment that would have been paid upon retirement, amounts that would have continued to accrue in his retirement accounts had he not been unlawfully terminated, and all of the lasting benefits IKEA provides all of their other retired coworkers;

I. An injunction to provide Mr. Singleton payments for all bonuses and extraneous payments and benefits he would have been entitled to had he not been wrongfully terminated;

J. An injunction to cover all of Mr. Singleton's past and future medical costs relating to his deteriorated health including but not limited to specialist fees, travel, room and board for testing, studies, exploratory procedures, and treatment, unforeseen loss of health care or coverage, and any medications or treatment to prolong his life and/or improve his quality of life;

K. An award of such other damages, including but not limited to treble damages, as appropriate under the legal claims herein to be determined at trial;

L. An award of attorneys' fees and costs that Plaintiff has incurred in this action to the

fullest extent permitted by law; and

M. Such other and further relief, including injunctive or equitable relief, as the Court may

deem just and proper.

Plaintiff respectfully requests a trial by jury.

All Plaintiff Correspondence may be sent to:

Ricky Singleton
15240 Mimosa Trail
Dumfries, Virginia 22025

## VI. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of Signing: __3 | 3 | 2025__

Signature of Plaintiff: __Ricky Singleton__

Printed name of Plaintiff: __Ricky Singleton__

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing First Amended Complaint, was served this 4th Day of March 2025, to Yvette V. Gatling, counsel for the Defendants, by electronic notification of the court's filing system and addressed as:

Yvette V Gatling, Esq., Littler Mandelson, P.C.
1800 Tysons Blvd Suite 500, Tysons Corner, VA 22102

Date of Signing: ___3 | 3 | 2025___

Ricky Singleton
15240 Mimosa Pl
Dumfries, VA 22025

Signature of Plaintiff: _____

Printed name of Plaintiff: _____

*pro se*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRIGINIA**
Alexandria **DIVISION**

RICKY SINGLETON
_____
Plaintiff(s),

v.

IKEA US RETAIL, LLC et al.
_____          Civil Action Number: 1:24-cv-00025-PTG-LRV
Defendant(s).

# LOCAL RULE 83.1(M) CERTIFICATION

**I declare under penalty of perjury that:**

**No attorney has prepared, or assisted in the preparation of** Amended complaint .
                                                                                    **(Title of Document)**

Ricky Singleton
_____
Name of *Pro Se* Party (Print or Type)

Ricky Singleton
_____
Signature of *Pro Se* Party

Executed on: 3/3/2025 (Date)

                                                        **OR**

**The following attorney(s) prepared or assisted me in preparation of** _____.
                                                                                        **(Title of Document)**

_____
(Name of Attorney)

_____
(Address of Attorney)

_____
(Telephone Number of Attorney)
**Prepared, or assisted in the preparation of, this document**

_____
(Name of *Pro Se* Party (Print or Type)

_____
Signature of *Pro Se* Party

Executed on: _____ (Date)