**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| **RICKY SINGLETON,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 1:24-cv-00025-PTG-LRV** |
| **IKEA US RETAIL LLC, *et al*.,** | |
| **Defendants.** | |

<u>**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**</u>

Defendants IKEA US RETAIL LLC (IKEA) and Raquel Ely (Ms. Ely) (collectively referred to as "Defendants") pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rules 7(F) and 56, submit this Memorandum in Support of their Motion for Summary Judgment and show as follows:

## I.     INTRODUCTION AND SUMMARY OF THE ARGUMENT

Plaintiff Ricky Singleton (Plaintiff or Mr. Singleton) was employed in the Risk & Compliance Department at the IKEA store located in Woodbridge, Virginia. Mr. Singleton engaged in an intimate relationship with Risk & Compliance Department co-worker,[1] Danielle Goodman, beginning in 2015 and continuing past the end of his employment with IKEA. Through its Personal Relationships Policy and related guidance, IKEA required co-workers to disclose any relationship established during employment and any relationship between a Risk & Compliance co-worker and another co-worker within the store so that such relationships could be risk assessed,

---

[1] IKEA refers to all of its employees as "co-workers."

mitigated, and documented with approval. Mr. Singleton failed to disclose his relationship in violation of the policy. Therefore, in accordance with its policies, IKEA had no choice but to terminate his employment for violating the Personal Relationships Policy, Code of Conduct, and Behavior Standards Policy.

Mr. Singleton brought this suit alleging IKEA terminated him in violation of Title VII, 42 U.S.C. § 1981, and the Virginia Human Rights Act because of his race and in retaliation for allegedly assisting with an EEOC charge brought by Ms. Goodman in November 2021. He also alleges that he was subjected to harassment in violation of 42 U.S.C. § 1981. Lastly, he alleges he was defamed during his termination. His claims lack merit.

Defendants are entitled to summary judgment because Mr. Singleton's claims are premised entirely on his own uncorroborated version of events. Mr. Singleton's claims fail because he has no evidence that he was treated differently than similarly-situated co-workers. Similarly, he has no evidence of harassment based on race that was sufficiently severe or pervasive so as to alter the conditions of his employment. He likewise has no evidence that any statements included in his termination documents or said during his termination were made with malice such that they overcome intracorporate immunity qualified privilege.

Specifically, Mr. Singleton claims that he was discriminated against based on his race because he alleged (1) was not promoted to team lead; (2) was not given his preferred schedule; (3) was paid less than his co-workers due to his race; (4) was discriminated against in the furlough return process; and (5) he was terminated for not disclosing his relationship with Ms. Goodman. Am. Compl. ¶¶ 44, 72, 86, 185-7, 195, ECF No. 52. However, the undisputed facts show that Mr. Singleton never applied for a team lead position. In addition, Mr. Singleton was given available hours based on his indicated availability and in line with IKEA policy, not based on his race.

Moreover, Mr. Singleton was the second highest paid of the five Risk & Compliance Co-workers at IKEA Woodbridge and was paid more than others who were outside his protected class. Co-workers at IKEA Woodbridge were called back from furlough based on position and seniority; it was Mr. Singleton who failed to answer calls from IKEA. And, finally, Mr. Singleton was not terminated because of his race or in retaliation for any protected conduct but, again, because of his non-compliance with clear IKEA policy.

Mr. Singleton also claims he experienced harassment. However, he improperly bases his claims on the same alleged discrete acts which underlie his claims of discrimination. Moreover, the alleged harassment is not sufficiently severe or pervasive such that it altered the conditions of Mr. Singleton's employment and created an abusive working environment.

Defendants are likewise entitled to summary judgment on Mr. Singleton's defamation *per se* claim because he has not presented evidence that the statements were false and he presents no evidence of malice to overcome intracorporate immunity.

Accordingly, his Title VII, § 1981, VHRA, and defamation *per se* claims fail as a matter of law. As there is no genuine dispute of material fact, summary judgment should be entered in Defendants' favor.

## II.  STATEMENT OF UNDISPUTED MATERIAL FACTS[2]

No genuine issue of material fact exists in this case. Although Plaintiff's deposition testimony revealed that he personally believes he was treated differently because of his race, his subjective beliefs, without more, are insufficient to support his allegations against Defendants. *See Bryant v. Bell Atl. Maryland, Inc.*, 288 F.3d 124, 134-35 (4th Cir. 2002) ("subjective beliefs . . .

---

[2] For the purposes of this Motion only, Defendants take these facts as true, in the light most favorable to Plaintiff.

3

without more, [are] insufficient to create a genuine issue of material fact as to any discriminatory conduct"). Here, Mr. Singleton's subjective beliefs represent the sum of his proof, and those beliefs are at odds with the actual record evidence. The uncontroverted material facts which establish that Defendants are entitled to summary judgment on Plaintiff's claims are as follows:

### A.    IKEA Is an Equal Opportunity Employer

1.    IKEA is an equal opportunity employer that prohibits discrimination and harassment based on any protected category, including race, as well as retaliation. **Exhibit 1**, October 13, 2025 Deposition of Ricky Singleton (Singleton Dep.), 156:8-21, Ex. 5 at IKEA 0000007-10.[3]

2.    In accordance with its Harassment, Discrimination and Retaliation Prevention Policy (EEO Policy), IKEA encourages any co-worker who believes someone has violated the EEO policy, becomes aware of a third-party complaint, or becomes aware of circumstances that may give rise to a third-party complaint, to notify any member of management or HR with whom they feel comfortable making a report. Singleton Dep. Ex. 5 at IKEA 0000007-8. Managers who learn of any concern about a violation of the EEO Policy are required to report it to their Location Manager, their Unit's HR Manager, or their HR Generalist. *Id.* at IKEA 0000010. A co-worker who has not heard back on a complaint made under the EEO Policy can contact the U.S. HR Manager at IKEA or make a report online or by phone via the iSpeak hotline. *Id.* at IKEA 0000010.

3.    IKEA investigates all reports of EEO Policy violations and if a violation is found, takes corrective action, up to and including termination. *Id.*

---

[3] Exhibits from Plaintiff's October 13, 2025 deposition transcript are enclosed as part of Exhibit 1 and referred to as "Singleton Dep. Ex."

**B.      The Behavior Standards Policy and Code of Conduct**

4.      The IKEA Behavior Standards Policy sets forth "certain specific rules of conduct[.]" Singleton Dep. Ex. 38 at IKEA 0001105-108. More specifically, the Behavior Standards Policy sets forth a non-exhaustive list of "examples of behavior or of conduct that is not allowed at IKEA." *Id.* at IKEA 0001105.

5.      In relevant part, the Behavior Standards Policy prohibits co-workers from "[a]ny act of dishonesty as it relates to performance of work duties or investigations regarding possible violations of Company policies and/or applicable laws[,]" and "[i]nsubordination to a lawful management directive . . . without proper justification." *Id.* at IKEA 0001105-106.

6.      Any violations of the Behavior Standards Policy may result in disciplinary action, up to and including termination of employment. *Id.* at IKEA 0001105.

7.      IKEA also maintains a Code of Conduct. Singleton Dep. Ex. 39 at IKEA 000109-120. In relevant part, the Code of Conduct discusses the company's policy of avoiding conflicts of interest. See *Id.* If a co-worker is in doubt about a possible conflict of interest, they are required to speak with their manager, HR, or central Risk Management and Compliance for guidance. *Id.* at IKEA 000115-116.

**C.      The Personal Relationship Policy**

8.      IKEA maintains a Policy on personal relationships in employment (Personal Relationships Policy). Singleton Dep. Ex. 7 at IKEA 0000025-30. The Personal Relationships Policy applies to all IKEA co-workers. *Id*. at IKEA 0000025.

9.      The Personal Relationships Policy defines "personal relationship" to include, in relevant part, "[r]elationships of a private, romantic or intimate nature . . .." *Id*. at IKEA 0000025, Singleton Dep. 190:5-191:13.

10.     The Personal Relationships Policy requires co-workers who develop a personal relationship during the course of their employment at IKEA to "disclose it to their line managers, Risk & Compliance manager and HR representative. In case of a doubt, co-workers must seek guidance from their managers and/or the corresponding HR manager." Singleton Dep. Ex. 7 at IKEA 0000027.

11.     All IKEA co-workers are expected to cooperate "with the corresponding manager, Risk Management & Compliance and HR function towards a resolution of the issue or mitigation of the risk created by the situation." *Id*. at IKEA 0000026.

12.     In 2021, IKEA provided updated guidance and training on the Personal Relationships Policy. Singleton Dep. Ex. 9 at IKEA 0000735-44.

13.     In relevant part, the training on the Personal Relationships Policy made clear that all personal relationships "should be risk assessed to identify possible conflict." *Id*. at IKEA 0000738.

14.     The Personal Relationships Policy specifically prohibited a personal relationship between co-workers in the same store if one of the co-workers was a Risk & Compliance Manager or Risk & Compliance Leader. *Id*. at IKEA 0000739. Further, any relationship between a Risk & Compliance co-worker and another co-workers within the store was required to "be risk assessed and documented." *Id*. at IKEA 0000740.

15.     Following this training, a number of relationships at IKEA Woodbridge were disclosed and subsequently assessed for mitigation. **Exhibit 2**, Declaration of Michelle Chenard (Chenard Decl.) ¶¶ 9-10,  Ex. 5 at IKEA 0000005.

**D.    The Employment Status Policy**

16.    IKEA co-workers may work in seasonal or regular positions and may be exempt or non-exempt under the Fair Labor Standards Act and may be paid on a salary or hourly basis. Singleton Dep. Ex. 21 at IKEA 0000012-14.

17.    Hours Level (HL) status determines the number of hours a co-worker is typically scheduled. *Id*. at IKEA 0000012. There are four HLs for non-exempt, hourly co-workers: HL1 (12-20 hours per week); HL2 (20-34 hours per week); HL3 (34-40 hours per week); and HL4 (retail leaders and specialists, 38-40 hours per week). *Id*. at IKEA 0000013.

18.    A co-worker's hours per week may be temporarily increased based on business needs but will generally not be lower than the minimum of their designated HL without a formal change in status. *Id.* Overtime hours are generally offered and worked on a voluntary basis. *Id*.

**E.    Mr. Singleton's Employment at IKEA**

19.    Mr. Singleton began working at IKEA in December of 1997. Singleton Dep. 124:18-125:2, 256:10-17. Throughout his tenure at IKEA, Mr. Singleton held several positions, ultimately becoming a Risk & Compliance Co-Worker. *Id.* at 123:17, 256:10-260:17.

20.    Mr. Singleton was aware of the Personal Relationship Policy at IKEA and that it set forth parameters surrounding personal relationships in the store and conflicts of interest. Singleton Dep. 184:9-186:19, 210:11-212:9, Ex. 30.

21.    In mid-March 2020, many co-workers at IKEA Woodbridge were placed on furlough due to the COVID-19 pandemic. Mr. Singleton was later recalled back to work. Singleton Dep. 170:10-183:13.

22.    Co-workers in Mr. Singleton's department were called back from furlough based on position and seniority with IKEA. *Id*. at 172:13-173:8.

23.     When Risk & Compliance Co-Workers were called back, Mr. Singleton was the first co-worker called based on his seniority. Ms. Chenard called the number Mr. Singleton had on file numerous times and left voicemails. Chenard Decl. ¶ 8. She later learned that his number was incorrect in the system. *Id.* Co-workers are responsible for keeping their numbers on file accurate and up to date. *Id*.

24.     In February 2021, Mr. Singleton attended a meeting that included a presentation by Ms. Chenard and Ms. Ely on new guidelines for the IKEA Personal Relationship Policy. Singleton Dep. 200:10-203:13; Am. Compl. ¶ 97.

25.     In July 2021, Jonathan Scott, People and Culture Manager, mistakenly emailed an Excel spreadsheet with individual co-workers' salary information to the store's site admin distribution list. **Exhibit 3**, July 1, 2021 Email, IKEA 0000003; **Exhibit 4,** Spreadsheet Showing Wages IKEA 0000006.

26.     The spreadsheet showed Mr. Singleton was the second highest paid of the five Risk & Compliance co-workers at IKEA Woodbridge. *Id*.

27.     The following Risk & Compliance co-workers were paid less than Mr. Singleton: Vance Saucedo (who identifies as Hispanic/Latino), Jair Ascarza-Santillana (who identifies as Hispanic/Latino and Caleb Kelly (who identifies as White). Chenard Decl. ¶¶ 11-15.

28.     A single Risk & Compliance co-worker was paid more than Mr. Singleton, Sone Khampheng. *Id*. at ¶ 12. Mr. Khampheng self-identifies as Asian. *Id*.

29.     IKEA issued Company-wide cost of living increases to wages in September 2021, which were not specific to IKEA Woodbridge or Mr. Singleton's department. *Id*. at ¶ 16.

30.     IKEA posts internal positions and requires that employees interested in such positions apply for the open roles. *Id*. at ¶ 5.

31.     During his employment, Mr. Singleton did not apply for a promotion to Risk and Compliance Team Lead. Singleton Dep. 328:7-330:21.

**F.     Mr. Singleton's Relationship with Danielle Goodman**

32.     Mr. Singleton and Ms. Goodman began having an intimate relationship in 2015, while both worked at IKEA. Singleton Dep. 214:7-220:16; *see also* **Exhibit 5**, September 19th, 2025, Deposition of Ricky Singleton (Initial Singleton Dep.) 21:13-26:5.

33.     Ms. Goodman's position at IKEA was Site Admin Coordinator. Chenard Decl. ¶ 17. She and Mr. Singleton worked in the same department at IKEA. *Id*.

34.     Ms. Goodman is the mother of Mr. Singleton's two children. Initial Singleton Dep. 15:17-16:13.

35.     In 2018, Mr. Singleton took parental leave following the birth of his first child with Ms. Goodman. Am. Compl. ¶ 54.

36.     Paperwork regarding any form of leave, including paternity/maternity leave, is not submitted to or reviewed by IKEA but is submitted and reviewed by the third-party administrator for IKEA. Chenard Decl. ¶ 6.

37.     Mr. Singleton was "aware and knowledgeable of the [IKEA] policies and guidelines surrounding his position" and "the policies and guidelines that governed the other departments . . . including general store and management policies." Am. Compl. ¶ 18.

38.     Mr. Singleton was "well-versed on the policies" and understood that the Personal Relationship Policy prohibited co-workers in certain roles, including Risk & Compliance roles, from having personal relationships if they worked in the same store and that he was required to disclose any personal relationship with a co-worker. Singleton Dep. 198:6-199:1, 210:11-212:5, Ex. 7 at IKEA 0000025-30.

### G.   IKEA Learns of Mr. Singleton's Relationship with Ms. Goodman

39.     On or around November 16, 2021, Ms. Goodman filed a charge with the EEOC. Chenard Decl. ¶18. In her charge, Ms. Goodman indicated she was engaged in a personal relationship with Rick Singleton. *Id*.

40.     Mr. Singleton understood IKEA first learned that he was in a personal relationship with Ms. Goodman after receiving Ms. Goodman's November 2021 EEOC charge. Singleton Dep. 439:3-441:9.

41.     On December 10, 2021, Raquel Ely, Market Manager, and Jonathan Scott, People and Culture Generalist, called for a meeting with Mr. Singleton to address his relationship with Ms. Goodman. Singleton Dep. 221:5-231:21.

42.     During the December 10, 2021 meeting, Mr. Singleton did not admit to the relationship. *Id*.

43.     On January 13, 2022, Ms. Ely and Mr. Scott met with Mr. Singleton again regarding his relationship with Ms. Goodman. Singleton Dep. Ex. 26 at IKEA 0000060-61; *see* Singleton Dep. 477:3-5. Again, Mr. Singleton did not admit to the relationship. *Id*.

44.     Mr. Singleton did not think he needed to tell management he was in a relationship with Ms. Goodman because (1) he and Ms. Goodman had both requested parental leave for the same child in 2018, (2) Ms. Goodman's EEOC charge indicated they were in a relationship. Am. Compl. ¶¶ 54, 138; Singleton Dep. 227:5-231:21, 236:12-237:3, 439:3-441:10.

### H.   IKEA Terminates Mr. Singleton's Employment

45.     On January 21, 2022, IKEA terminated Mr. Singleton's employment because he repeatedly refused to disclose his personal relationship with Ms. Goodman. Singleton Dep. 474:3-479:21, Ex. 26 at IKEA 0000060-61. As such, Mr. Singleton was in violation of the Personal Relationship Policy, the Code of Conduct, and the Behavior Standards Policy of IKEA. *Id.*

## I.    Mr. Singleton's Charge of Discrimination & Lawsuit

46.    Mr. Singleton filed a charge with the EEOC and Prince William Human Rights Commission on August 22, 2022, alleging IKEA discriminated against him on the basis of race and retaliated against him for engaging in protected activities. Am. Compl. ¶¶ 174, 267, 286, 361, Ex. 1.

47.    Mr. Singleton filed his original Complaint in this matter on January 5, 2024. *See* ECF No. 1.

48.    Mr. Singleton filed his Amended Complaint (Am. Compl.), the operative complaint in this matter, on March 3, 2025. *See* ECF No. 52.

## III.    ARGUMENT

### A.    Standard of Review

The summary judgment standard under FED. R. CIV. P. 56 is well-established. Once the moving party has shown that no genuine issue of material fact exists, the non-moving party must go beyond the pleadings and come forth with sufficient proof to establish the elements of their claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Any disputed facts must be material, meaning they must be facts that might affect the outcome of the claim under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he non-moving party must present sufficient evidence such that 'reasonable jurors could find by a preponderance of the evidence' for the non-movant." *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 818 (4th Cir. 1995) (quoting *Anderson*, 477 U.S. at 252). A plaintiff must do more than demonstrate there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *Anderson*, 477 U.S. at 247-48. Further, a plaintiff's speculative testimony about the motive for an employer's action cannot create a triable issue of material fact.

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (finding, conclusory allegations insufficient to defeat summary judgment).

In deciding a motion for summary judgment, a court must construe the facts in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. However, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." *Anderson*, 477 U.S. at 252; *see also, Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008). "And when, like here, the plaintiff maintains the ultimate burden of persuasion at trial, the defendant can meet the burden on its motion by simply identifying the absence of evidence supporting the plaintiff's case." *Blair v. Colonnas Shipyard, Inc.*, 52 F. Supp. 2d 687, 692 (E.D. Va. 1999) (citing *Celotex*, 477 U.S. at 325), *aff'd*, 203 F.3d 819 (4th Cir. 2000)).

Federal Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The moving party "need not produce evidence, but simply can argue that there is an absence of evidence by which the nonmovant can prove his case." *Cray Commc'ns, Inc. v. Novatel Comput. Sys., Inc.*, 33 F.3d 390, 393-94 (4th Cir. 1994).

The Fourth Circuit has expressly recognized that trial judges have an "affirmative obligation . . . to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citation omitted); *see also*, *Celotex*, at 323-24 ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."). Accordingly, to deny a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case,

and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict." *Thompson Everett, Inc. v. Nat'l Cable Adver.*, *LP*, 57 F.3d 1317, 1323 (4th Cir. 1995). "[W]here a summary judgment motion is made and adequately supported, the nonmovant may not merely rest on allegations in the pleadings." *Gordon v. Gutierrez*, No. 1:06cv861, 2007 WL 30324, at *5 (E.D. Va. Jan. 4, 2007) *aff'd*, 250 F. App'x 561 (4th Cir. 2007); *see also, Felty*, 818 F.2d at 1128 (emphasizing that a plaintiff's "[u]nsupported speculation is not sufficient to defeat a summary judgment motion").

Here, summary judgment is appropriate as there is no genuine dispute on any material facts, making trial on the issues raised in Mr. Singleton's Amended Complaint unwarranted and unnecessary. The material facts show that Defendants are entitled to judgment as a matter of law.

### B. Mr. Singleton Failed to Administratively Exhaust Several of His Title VII Discrimination Claims

A plaintiff who alleges a violation of Title VII in Virginia must file a charge of discrimination with the EEOC within 300 days of the alleged discriminatory act. *White v. BFI Waste Services, LLC*, 375 F3d 288 (4th Cir. 2004); 42 U.S.C. § 2000e-5(e)(1). Failure to file a charge of discrimination within the requisite time period bars a subsequent civil lawsuit. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002); *Saffell v. State Farm Mut. Auto. Ins. Co.*, 202 F. Supp. 2d 475, 477 (E.D. Va. 2002); *Lewis v. Norfolk S. Corp.*, 271 F. Supp. 2d 807, 811 (E.D. Va. 2003). A court lacks subject matter jurisdiction over claims where a plaintiff failed to exhaust his administrative remedies. *Lucas v. Henrico County Sch. Bd.*, 822 F. Supp. 2d 589, 598-602 (E.D. Va. 2011). Generally, a plaintiff may not bring claims of Title VII discrimination in a lawsuit if they were not included in his EEOC charge. *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132-33 (4th Cir. 2002) (holding plaintiff could not bring new allegations of discrimination based on sex and color where the EEOC Charge only identified discrimination based on race);

*Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962-63 (4th Cir. 1996) (holding allegations contained in an EEOC charge "generally operate to limit the scope of any subsequent judicial complaint.") (citation omitted). Accordingly, "[o]nly those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint" may be brought in a subsequent lawsuit. *Id.* at 963; *see also Dennis v. Cty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995) (claims that exceed the scope of the EEOC charge and the EEOC's investigation are procedurally barred).

Plaintiff limited his charge to discrimination/retaliation under Title VII based on his January 2021 termination as follows: "On January 21, 2022, I was discharged. I believe I have been discriminated against because of my race (African American) and in retaliation for engaging in protected activities, with respect to discharge . . . ." *See* Compl. Ex. 1, ECF No. 1-1. Plaintiff now raises numerous allegations that are beyond the scope of the Charge. Indeed, Plaintiff alleges (1) he was not promoted to team lead; (2) he was not given his preferred schedule; (3) he was paid less than his co-workers; (4) he was discriminated against in the furlough return process; and (5) he was terminated. Am. Compl. ¶¶ 44, 72, 86, 185-7, 195. Other than his termination, none of these allegations were included in his charge nor are they reasonably related to those in his charge. A plaintiff fails to exhaust his administrative remedies where "his administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit." *Chacko v. Patuxent Institution*, 429 F.3d 505, 506 (4th Cir. 2005). Because Mr. Singleton failed to exhaust his administrative remedies, summary judgment as to his non-termination-related Title VII claims is warranted.

**C.     Mr. Singleton Cannot Establish a *prima facie* Claim of Retaliation Under Title VII, § 1981, or the VHRA (Counts Three, Six and Ten)**

Under Counts Three, Six and Ten, Mr. Singleton alleges that IKEA retaliated against him for engaging in protected activity. *See* Am. Compl. ¶¶ 288, 323-327. However, Plaintiff's retaliation claims under Title VII, § 1981, and the VHRA are without merit and fail as a matter of law. *See Sanders v. Tikras Tech. Sols. Corp.*, 725 F. App'x 228, 229 (4th Cir. 2018) (noting Title VII and § 1981 retaliation claims are evaluated similarly*)*; *Abreu v. N. Am. Partners in Anesthesia, LLP*, 2023 WL 5959430, at *10 n.8 (E.D. Va. Sept. 12, 2023) (analyzing Title VII and VHRA claims together because the claims rested on the same facts and the plaintiff "provide[d] no alternative framework by which to analyze his VHRA claims"); *Washington v. Offender Aid & Restoration of Charlottesville-Albemarle, Inc.*, 677 F. Supp. 3d 383, 394 n.4 (W.D. Va. June 15, 2023) (analyzing Title VII and VHRA claims together because the statutes use "substantially identical language").

Title VII prohibits retaliation against an employee who complains about alleged prior discrimination. *Foster v. Univ. of Md. – Eastern Shore*, 787 F.3d 243, 249 (4th Cir. 2015) (citing 42 U.S.C. §§ 2000e-2(a)(1), 2000e(3)(a)). Absent direct evidence of retaliation, a plaintiff can establish a *prima facie* case of retaliation by showing he engaged in protected activity, the employer took adverse action against him, and a causal relationship existed between the protected activity and the adverse employment action. *Roberts v. Glenn Inds. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021) (citing *Foster* at 250); *Gusseous v. Fairview Prop. Inv'rs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (same standard under § 1981); *Washington*, 677 F. Supp. 3d at 398 (same standard under VHRA). If a plaintiff can make a *prima facie* case, the burden shifts to the employer to show that the adverse action was taken for legitimate, non-retaliatory reasons. *Roberts* at 122 (citing *Foster* at 250). If the employer can make this showing, the burden shifts back to the plaintiff to

show that the employer's purported non-retaliatory reasons are pretextual. *Id.* (citing *Foster* at 250).

In the instant case, Mr. Singleton cannot establish a causal relationship between any alleged protected activity and the termination of his employment at IKEA. Mr. Singleton alleges that IKEA terminated him in January 2022 in retaliation for assisting or acting as a witness for a November 2021 EEOC charge. *See* Am. Compl. ¶ 289; Singleton Dep. 241:13-247:13. Mr. Singleton alleges he assisted with the November 2021 EEOC charge filed by Ms. Goodman, and was interviewed by an employee of the agency about the charge. *Id*. First, there is no evidence that IKEA had knowledge that he assisted with this charge or that he was interviewed by the EEOC about this charge. "In order to demonstrate a causal link between the protected activity and the decision maker's decision to take adverse employment action, Plaintiff must make a threshold showing that the decision maker had knowledge of the engagement in the protected activity." *Ramos v. Molina Healthcare, Inc.*, 963 F. Supp. 2d 511, 528 (E.D. Va. 2013), *aff'd*, 603 F. App'x 173 (4th Cir. 2015). But-for causation requires that a plaintiff demonstrate that the decisionmaker imposing the adverse action have actual knowledge of the protected activity. "A decisionmaker obviously cannot be motivated by something that the decisionmaker did not know." *Carr v. United States*, 674 F. Supp. 3d 234, 244 (E.D.N.C. 2023), *aff'd*, No. 23-1725, 2024 WL 2558637 (4th Cir. May 24, 2024). As IKEA had no knowledge of this alleged protected activity, it could not retaliate against him because of it.

While assisting with an EEOC charge is protected activity, (*see Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir.1998) ("Activities that constitute participation are . . . (1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII.")), Mr. Singleton makes no

showing beyond his own self-serving allegations that he did so, nor does he allege or produce evidence that Defendants were aware that he had assisted with the charge. *See* Am. Compl. ¶ 118, 126. His retaliation claims fail for this reason.

Moreover, Mr. Singleton was in violation of the IKEA Personal Relationships Policy beginning in 2015 through his termination because he was in an intimate relationship with Ms. Goodman, a Risk & Compliance colleague, and he failed to report this relationship to IKEA. SUMF ¶¶ 32, 41-44. "An employer is forbidden to discriminate against an employee who participates in an investigation of employment discrimination. But participation doesn't insulate an employee from being discharged for conduct that, if it occurred outside an investigation, would warrant termination." *Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 745 (7th Cir. 2010).

Mr. Singleton contends that IKEA knew of his and Ms. Goodman's relationship in 2018 when both took parental leave following the birth of their first child. SUMF ¶¶ 35,44. As a threshold matter, Mr. Singleton cannot present any evidence that IKEA personnel were comparing parental leave requests from two co-workers to see if they happened to be requesting parental leave for the same child. Mr. Singleton cannot produce a single piece of evidence other than his own self-serving testimony, that IKEA personnel would have done so, let alone IKEA personnel who worked at IKEA Woodbridge or had any role in his termination some three years later in January 2022. "[A] party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658-59 (4th Cir. 2020) (quoting *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004). *See also Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012) (noting that "[a]lthough we do not make credibility determinations at the summary judgment phase, we should also not find a genuine dispute of material fact based solely on [a party's] self-serving testimony"); *Felty*, 818 F.2d at 1128

("Unsupported speculation is not sufficient to defeat a summary judgment motion."). Further, all requests for leave, including paternity leave, at IKEA are reviewed and addressed by a third-party administrator, not any IKEA co-worker. SUMF ¶ 36. Therefore, no one at IKEA would have reviewed either Mr. Singleton or Ms. Goodman's parental leave request documents, let alone compared the two to each other.

Even if IKEA personnel knew or suspected that Mr. Singleton and Ms. Goodman were in an intimate relationship in 2018, Mr. Singleton cannot present any fact to indicate anyone knew or suspected they were still in an intimate relationship three years later, in 2021 into January 2022.

Further, in February 2021, IKEA issued new guidelines on the Personal Relationship Policy, on which Mr. Singleton received training. *Id*. ¶ 23. In relevant part, the updated guidelines made clear that *all* personal relationships between IKEA co-workers needed to be disclosed, with a particular emphasis on personal relationships which involved any IKEA co-worker working in Risk & Compliance. *Id*. ¶¶ 12-14. Despite confirming he was "aware and knowledgeable of the policies and guidelines surrounding his position . . . including general store and management policies," (*Id*. ¶ 37), Mr. Singleton still did not disclose his relationship with Ms. Goodman even after IKEA issued the new guidelines. *Id*. ¶¶ 40-44. Indeed, despite understanding these employment requirements, Mr. Singleton apparently decided *he* did not have to disclose his and Ms. Goodman's relationship with IKEA because he did not want to. *See id*. ¶¶ 8-15, 41-44.

The undisputed facts show that Mr. Singleton was not terminated in retaliation for assisting with a 2021 EEOC charge, but, rather, because he repeatedly refused to disclose his personal relationship with Ms. Goodman in violation of the IKEA Personal Relationship Policy, Code of Conduct, and Behavior Standards Policy. *Id*. ¶ 45; *see Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008) ("Workers are shielded from retaliation on account of their assertion of rights protected

under Title VII. But a complaining worker is not thereby insulated from the consequences of insubordination[.]"); *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (finding, "mere knowledge on the part of an employer that an employee has filed a [complaint] is not sufficient evidence of retaliation" where the adverse action taken was based on, among other things, plaintiff's violation of company policies). Specifically, Mr. Singleton was dishonest and evasive when Ms. Ely and Mr. Scott repeatedly tried to talk to him about his relationship with Ms. Goodman. SUMF ¶¶ 41-44. Mr. Singleton's blatant refusal to comply with IKEA policies left the Company with no choice but to separate his employment. Federal courts "do[] not sit as a kind of super-personnel department weighing the prudence of employment decisions made by [employers] charged with employment discrimination." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998). Accordingly, Mr. Singleton's Title VII, § 1981, and VHRA retaliation claims should be dismissed.

**D. Mr. Singleton's Title VII, § 1981, and VHRA Race Discrimination Claims (Counts One, Four and Ten) Fail as a Matter of Law**

Under Counts One, Four, and Ten, Mr. Singleton alleges IKEA discriminated against him based on his race, in violation of Title VII, § 1981, and the VHRA. In the absence of direct evidence of race discrimination motivating the adverse employment action, a plaintiff may establish a violation under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *See Williams v. Giant Food, Inc.*, 370 F.3d 323, 434 (4th Cir. 2004) (citing *Causey v. Balog*, 162 F.3d 795, 804 (4th Cir. 1998) (noting that the elements of a *prima facie* case are the same under Title VII and § 1981)). *See also Guessous v. Fairview Property Investments, LLC*, 828 F.3d 208, 216 (4th Cir. 2016) ("This framework was initially developed for Title VII discrimination cases but has since been held to apply in discrimination cases arising under § 1981 . . . .")(internal citations omitted); *Ayers v. Wal-Mart Assocs., Inc.,* No. 7:23-CV-00419, 2024 WL 4182706, at *5 (W.D. Va. Sept. 13, 2024) (applying *McDonnell Douglas* framework to

claims under the VHRA). The elements of a *prima facie* case of discrimination are: (1) the plaintiff's membership in a protected class; (2) an adverse employment action taken against the plaintiff; (3) that at the time of the adverse employment action, the plaintiff was meeting his employer's legitimate expectations; and (4) that the adverse employment action "occurred under circumstances giving rise to an inference of unlawful discrimination." *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 Fed. App'x 745, 747-48 (4th Cir. 2017) (quoting *Adams v. Tr. of Univ. of N.C. – Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011)). *See also Sanders*, 725 F. App'x at 229-230 (same).

If Mr. Singleton can demonstrate the initial *prima facie* case of his race discrimination claims, the burden shifts to Defendants to show a legitimate, non-discriminatory reason for the adverse employment action. *Sanders* at 229. Once Defendants meet this burden, it shifts back to Mr. Singleton to prove that the company's stated reason for the adverse employment action is pretext and that the true reason is discriminatory. *Id.*

> **1.** **Mr. Singleton Cannot Establish a *prima facie* Case of Race Discrimination and IKEA Has Articulated a Legitimate, Non-Discriminatory Reason for its Actions**

In the instant case, Mr. Singleton cannot establish that he was meeting the legitimate expectations of IKEA or that there is a causal relationship between his race and any adverse employment action and therefore his race discrimination claim fails as a matter of law. Even if he can do so, Defendants have proffered legitimate, non-discriminatory reasons for their actions.[4]

First, Mr. Singleton alleges he was not promoted to team lead; however, and critical to his claim, he never applied for any internal promotions. SUMF ¶ 31. Indeed, Mr. Singleton testified

---

[4] The Court previously ruled any alleged acts occurring on or before May 23, 2020 are not actionable under § 1981 because they are untimely. ECF No. 62. Therefore, IKEA has not addressed alleged acts prior to January 5, 2020. This includes any allegations stemming from alleged interactions with Dee Sellman, who by Mr. Singleton's own testimony has not worked at IKEA Woodbridge since prior to 2011. Singleton Dep. 335:22-336:18.

that he did not "have to apply" and could not recall having applied for internal promotions. *Id*. His failure to apply for a position is fatal to his claim. *See Justus v. Junction Ctr. for Indep. Living Inc.*, No. 1:11CV00039, 2012 WL 844340, at *4 (W.D. Va. Mar. 12, 2012) (citing *Williams*, 370 F.3d at 431) (holding that a general interest in a promotion without submitting an application is not enough to establish a *prima facie* case of discrimination when the defendant-employer has publicized an open position).

Mr. Singleton alleges he was persistently not given his preferred schedule or overtime like other co-workers in the Risk & Compliance Department. Am. Compl. ¶¶ 185-187. Yet, he cannot present any evidence to support his claim that he was not scheduled for 40+ hours of work per week when such work was actually available. And, even if he was not scheduled overtime hours, Mr. Singleton cannot present any evidence that this was because of his race. IKEA policy is clear that the HL3 level merely meant he would generally be scheduled for 34 to 40 hours per week. SUMF ¶¶ 17-18. This did not guarantee him opportunities for overtime but, rather, *generally* a work schedule of between 34 and 40 hours per week. *Id*. The specific number of hours a co-worker is scheduled to work per week will vary based on the co-worker's availability and store needs. *Id*.

Mr. Singleton claims that he and another Black Risk & Compliance co-worker were the last to be returned to work following furlough due to the COVID-19 pandemic. Am. Compl. ¶ 73. Mr. Singleton alleges that despite his seniority, he was not called back. In fact, Mr. Singleton was among the first people to be called back but could not be reached because he had an inaccurate phone number on file. SUMF ¶ 23. In his deposition, Mr. Singleton admitted that to his knowledge, Ms. Chenard attempted to reach him at the number he had on file with IKEA. Singleton Dep. 180:1-20. However, he asserts this constitutes discrimination as she should have otherwise had access to his then current number from having allegedly called him on it some two years earlier

while he was on parental leave in 2018. *Id*. Yet, he cannot present any evidence to support this claim other than his own, self-serving testimony. *See CTB, Inc.*, 954 F.3d at 658-59 (quoting *Williams*, 370 F.3d at 433). *See also Harris*, 499 F. App'x at 294; *Felty*, 818 F.2d at 1128. This is insufficient to establish a *prima facie* case of discrimination.

Mr. Singleton also claims that he was underpaid compared to the other Risk & Compliance co-workers due to his race. Am. Compl. ¶ 194. However, again, he was the second highest paid Risk & Compliance co-worker. SUMF ¶¶ 26-28. There were Risk & Compliance co-workers outside of his race, who earned less than him. Therefore, Mr. Singleton cannot establish a *prima facie* case of race discrimination based on his pay.

As for his termination, Mr. Singleton freely admits behavior that was not in compliance with the IKEA Personal Relationships Policy. *Id*. ¶¶ 32, 44. Concurrently, Mr. Singleton was aware of the IKEA Personal Relationships Policy and that it set forth "parameters surrounding personal relationships in the store." *Id*. ¶ 20. He understood the Personal Relationships Policy defined "personal relationship" to include relationships of a romantic or intimate nature. *Id*. ¶¶ 9-10, 20. He was also aware that co-workers needed to disclose if they were engaged in a personal relationship. *Id*. ¶¶ 9, 14, 20. He was also aware that IKEA issued new guidance on the Personal Relationships Policy on which he received information in February 2021. *Id*. ¶¶ 12, 20, 24.

Even assuming IKEA already knew about Mr. Singleton and Ms. Goodman's relationship, Mr. Singleton's refusal to essentially reconfirm that which he already believed IKEA to know is illogical, at best. In repeatedly refusing to do so, Mr. Singleton was not in compliance with multiple IKEA policies, (*id*. ¶ 45), and therefore not meeting legitimate job expectations. "In assessing whether plaintiff complied with [his employers workplace behavior standards], the Fourth Circuit has made clear that 'it is the perception of the decision maker which is relevant, not the self-

assessment of the plaintiff.'" *Sadeghi v. Inova Health Sys.*, 251 F. Supp. 3d 978, 992 (E.D. Va. 2017)(quoting *DeJarnette* at 299), *aff'd*, 711 F. App'x 174 (4th Cir. 2018). Given Mr. Singleton's admitted awareness and knowledge of the Company's workplace policies generally, including the Personal Relationships Policy, Behavioral Standards Policy, and Code of Conduct, he has no basis to argue he did not understand what he needed to do. SUMF ¶¶ 37-38. *See Sadeghi* at 993 (finding, defendant satisfied its burden as "[i]nsubordination is a legitimate, nondiscriminatory reason for discharge because Title VII does not insulate workers from the consequences of insubordination") (internal quotations and citations omitted).

Even if Mr. Singleton was meeting his employer's legitimate job expectations, he cannot establish a causal relationship between his race and his termination. Mr. Singleton claims IKEA terminated him for violating the Personal Relationships Policy while white co-workers in the Risk & Compliance Department were not terminated for the same purported violation. Specifically, he claims Caleb Kelly was hired into Risk & Compliance despite being related to then Team Lead Heidi Becker. Am. Compl. ¶ 89. He also testified that Heidi Becker and Jada Goodson were roommates. Singleton Dep. 250:14-255:18. However, he has not proffered any evidence that Mr. Kelly, Ms. Becker, or Ms. Goodson failed to disclose these hypothetical relationships, that the relationships were of a comparable nature, or that they repeatedly denied their alleged personal relationship when asked about it by store management and directed that they needed to disclose it. *See Cook v. Prince George Cnty. Sh. Bd.*, Civil Action No. 3:22-cv-129-HEH, 2023 U.S. Dist. LEXIS 33021, at *23-24 (E.D. Va. Feb. 27, 2023) (holding plaintiff and comparator not similarly-situated because plaintiff engaged in "additional unprofessional and insubordinate actions" that the comparator did not). Accordingly, Mr. Singleton cannot establish a *prima facie* case of race discrimination as to his termination.

## 2.    Mr. Singleton Cannot Show Pretext

Mr. Singleton cannot show that the reasons proffered by IKEA are pretextual. *See McNaught v. Virginia Cmty. Coll. Sys.*, 933 F. Supp. 2d 804, 816 (E.D. Va. 2013) (" . . . the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.") (internal citations and quotations omitted). In the final stage of the *McDonnell Douglas* framework, Plaintiff's ultimate burden towards establishing pretext is evaluated under a two-part approach. *See Ramos v. Molina Healthcare, Inc.*, 963 F. Supp. 2d 511, 524-25 (E.D. Va. 2013). First, Plaintiff must establish his employer's proffered reasons are false. *Id.* Second, he must establish that the alleged race discrimination was the real reason. *Id.*

In the instant case, Mr. Singleton cannot show that Defendants' reasons for his scheduled hours are false. He cannot rebut the legitimate, no discriminatory reasons regarding his schedule because he does not present any evidence to rebut Defendants' position that HL3 level employees are not guaranteed overtime hours. He has no evidence to even suggest, let alone prove, these reasons are false beyond his own, self-serving testimony. *See CTB, Inc.*, 954 F.3d at 658-59 (quoting *Williams*, 370 F.3d at 433). *See also Harris*, 499 F. App'x at 294; *Felty*, 818 F.2d at 1128.

The same is true regarding Mr. Singleton's pay. Mr. Singleton was the second highest-paid Risk & Compliance Co-Worker. SUMF ¶¶ 26-28. Others in his role and outside of his protected class were paid less than him. Therefore, Mr. Singleton cannot show his pay was discriminatory.

Finally, Mr. Singleton cannot show that his violation of multiple IKEA policies was pretext for race discrimination. Mr. Singleton has not pointed to a single comparator who engaged in the same conduct as he – failing to disclose a personal relationship – who were not separated. Accordingly, this claim also fails as a matter of law. Since Mr. Singleton cannot establish a *prima facie* case, or successfully rebut Defendants' legitimate, non-discriminatory reasons for the actions

taken by IKEA, his race discrimination claims under Title VII, § 1981 and the VHRA fail as a matter of law.

E.     **Defendants Are Entitled to Summary Judgment on Plaintiff's Harassment/Hostile Work Environment Claim under § 1981 (Count Five)**

At the outset, Plaintiff's race-based harassment/hostile work environment claims rely on the same allegations he makes with respect to his discrimination claims under a disparate treatment theory. *See* Am. Compl. ¶¶ 306, 307. Plaintiff's allegations of discrete acts of discrimination, nonetheless, "cannot be transformed, without more, into a hostile work environment claim." *Moss v. Pasquotank Cnty.*, 2:10-cv-56-BR, 2012 WL 2325846, at *10 (E.D.N.C. June 19, 2012); *see also Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 108 (D.D.C. 2005) (granting employer summary judgment and noting, the bulk of the "hostile" events on which plaintiff relied were the very employment actions he claimed were discriminatory or retaliatory and concluding, a plaintiff "cannot so easily bootstrap discriminatory claims into a hostile work environment claim"), *aff'd*, 222 F. App'x 5 (D.C. Cir. 2007). For this reason alone, Plaintiff's race-based harassment/hostile work environment claim is subject to summary judgment. Moreover, looking at the allegations, plaintiff fails to make a *prima facie* case of a hostile work environment.

1.     **There Is No Genuine Dispute of Material Facts to Support Plaintiff's Harassment/Hostile Work Environment Claim**

A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Parks v. Louisiana-Pacific Corp.*, 400 F. Supp. 3d 393, 404 (W.D.N.C. 2019) (noting, hostile work environment claims are evaluated similarly under Title VII and § 1981). To state a race-based harassment or hostile work environment claim, Plaintiff must demonstrate: (1) he experienced unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was sufficiently severe or pervasive to alter

the conditions of his employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on Defendants. *Id.* at 405; *see also Holleman v. Colonial Heights Sch. Bd.,* 854 F. Supp. 2d 344, 353 (E.D. Va. 2012) (noting, plaintiffs "must clear a high bar in order to satisfy the severe or pervasive test") (quotation omitted). In the Fourth Circuit, courts "look at the totality of circumstances to determine whether an environment is hostile or abusive, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Skipper v. Giant Food*, 68 Fed. Appx. 393, 398 (4th Cir. 2003) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Plaintiff's harassment/hostile work environment claim boils down to the following allegations: (1) he was given the most difficult audits; (2) the relationship policy guidelines were applied to him leading to his termination; (3) he was told he would be unable to take PTO he was ultimately permitted to take; (4) attempts were made to end and negate safety precautions put in place by his former manager; and (5) he was "targeted" in the furlough return process. Am. Compl. ¶¶ 271-280. None of the foregoing allegations amount to a harassment claim based on race to avoid summary judgment in favor of Defendants under Fourth Circuit law. As demonstrated in detail below, there are no material facts in dispute and the record contains no evidence that the alleged harassment was based on Plaintiff's protected class or was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive atmosphere.

### a.     No Reasonable Finder of Fact Could Conclude that the Alleged Conduct was Based on Plaintiff's Race

First, no reasonable fact finder could conclude that any of the conduct alleged was based on Plaintiff's race. Here, Plaintiff cannot show, and the record does not contain any evidence that but-for his race, he would not have experienced the same alleged "harassment." *See Parks*, 400 F.

Supp. 3d at 406; *see also McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 409 (4th Cir. 2022) ("We may infer that harassment is based on race when the plaintiff suffered harassment more often than others of different races or suffered harassment of a kind likely to be motivated by race."). Indeed, there is nothing in the record to demonstrate that any of his superiors, harbored any sort of animus towards black people, or that they treated individuals outside of Plaintiff's protected classes more favorably. *See* Am. Compl. ¶ 270, 307; *see also Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998) (explaining, a plaintiff's conclusory statements regarding dissimilar treatment, without specific evidentiary support, cannot support an actionable claim for harassment); *McIver*, 42 F.4th at 409 (" . . . a plaintiff cannot rely on her own 'conjecture' to impute a racial character to what appears to be neutral . . ."). Indeed, Mr. Singleton was the second highest paid Risk & Compliance co-worker, he was reached out to first, and ultimately did return from furlough, and the IKEA Personal Relationship policy was applied to him without regard to race. SUMF ¶¶ 13-15, 22-23, 26-28, 45. As such, Plaintiff fails to establish and the record does not contain any evidence that but-for his race, he would not have been subject to the alleged conduct at IKEA.

> **b.** **No Reasonable Finder of Fact Could Conclude that the Alleged Conduct Was Sufficiently Severe or Pervasive to Alter the Conditions of Plaintiff's Employment and Create an Abusive Atmosphere**

Plaintiff cannot show that he was subjected to a level of severe or pervasive harassment that occurred frequently enough to interfere with his job performance. Whether a work environment is actionably hostile or abusive is a function of: (1) the frequency and severity of the conduct at issue; (2) whether the conduct is threatening or humiliating as opposed to being offensive; and (3) whether the conduct unreasonably interferes with the employee's job performance. *Harris*, 510 U.S. at 23. The isolated incidents of alleged harassment fail to establish that Plaintiff was subjected to severe or pervasive harassment. *E.E.O.C. v. Sunbelt Rentals, Inc.*,

521 F.3d 306, 318 (4th Cir. 2018) (finding no employer can lightly be held liable for "scattered incidents"). Here, Mr. Singleton worked at IKEA for 26 years, and his allegations are a handful of circumstances which are neither severe, nor pervasive enough to have changed his employment. For example, per his own allegation, he was permitted to take PTO. Am. Compl. ¶¶ 277-278. Similarly, he was returned from furlough and received payment for the checks he alleged were missing. *Id*. ¶¶ 315-316. Moreover, he was assigned tasks in line with department wide practices and commensurate with his experience. Singleton Dep. 368:20-372:1. In sum, Mr. Singleton fails to allege conduct that arises to the level of altering his work. *See Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996) (holding that a supervisor's alleged harassment of former employee was not sufficiently severe or pervasive to create an objectively hostile work environment because "[a] handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage" (quoting *Baskerville v. Culligan Internat'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995)); *McIver*, 42 F.4th at 407 (finding no "severe or pervasive" harassment based on discrete instances because "a hostile-work-environment claim's 'very nature involves repeated conduct'" (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002))).; *Pridgen v. Goodyear Tire & Rubber Co.*, No. 5:05-CV-830-FL, 2008 WL 11429694, at *5 (E.D.N.C. Mar. 31, 2008) (finding that "sporadic and inappropriate behavior may have been unpleasant, but plaintiff is unable to show that the relatively infrequent episodes actually

'alter[ed] the conditions' of her employment to such an extent as to establish an actionable hostile work environment claim" where there were twenty plus incidents over the course of two years.).[5]

### F.     Mr. Singleton Cannot Establish a *prima facie* Case of Defamation *per se*

Under Virginia law, a plaintiff seeking to recover for defamation *per se* must allege (1) the publication of false information concerning the plaintiff that tends to defame the plaintiff's reputation. *See Hatfill v. New York Times Co.*, 416 F.3d 320, 330 (4th Cir. 2005) (citing *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993)). At common law, defamatory words that "prejudice [a] person in his or her profession or trade" are actionable as defamation *per se*. *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 82 S.E. 2d 588, 591 (1954). However, mere allegations of unsatisfactory job performance do not generally rise to the level of defamation *per se*. *McBride v. City of Roanoke Redevelopment & Housing*, 871 F. Supp. 885, 892 (W.D. Va. 1994); *Echtenkamp v. Loudon County Pub. Schs.*, 263 F. Supp. 2d 1043, 1063 (E.D. Va. 2003). Defendants are entitled to summary judgment as to defamation, first because Mr. Singleton has not shown the communications in his termination documents and conveyed during his termination meeting were false. In addition, the termination communications are privileged internal corporate communication, made without malice, for the legitimate business purpose of effectuating Mr. Singleton's termination, and as such Plaintiff fails to show publication.

---

[5] In a separate case involving identical claims by the co-worker with whom Mr. Singleton had a relationship, this Court dismissed those claims and granted summary judgment.  See *Danielle Goodman v. IKEA US Retail, LLC*, No. 1:24-cv-868, 2024 WL 4554773 (E.D . Va. Oct. 23, 2024).

1. **The Court Should Grant Summary Judgment in Favor of Defendants Because Plaintiff Has Not Demonstrated that the Alleged Defamatory Statements are False**

An actionable statement is one that is both false and defamatory. *See Chapin*, 993 F.2d at 1092. The termination communications in question were neither. Truth is an absolute defense in a defamation action and the plaintiff has the burden of proving falsity. *See Goddard v. Protective Life Corp.*, 82 F. Supp. 2d 545, 560 (E.D. Va. 2000) (granting motion for summary judgment in part because the statement at issue was true); *McBride*, 871 F. Supp. at 892 (granting summary judgment where the plaintiff failed to show falsity). Under Virginia law, plaintiff has the burden "to produce sufficient evidence to show that the allegedly defamatory statement was false." *Union of Needletrades v. Jones*, 268 Va. 512, 603 S.E. 2d 920, 924-25 (2004). "If the plaintiff does not establish the falsity of the statement by a preponderance of the evidence in his case-in-chief, he has not met this threshold burden, and the trial court should strike the evidence and grant summary judgment to the defendant." *Id.*; *Jordan v. Kollman*, 269 Va. 569, 612 S.E. 2d 203, 207 (2005) (plaintiff "has the burden of proving that the statement is false"). Here, Mr. Singleton has not done so. While Plaintiff summarily asserts that he did not need to admit his relationship because IKEA was already aware of it, he does not state that he affirmed his relationship with Ms. Goodman such that IKEA could mitigate consistently with its relationship policies. SUMF ¶¶ 39-44. Plaintiff does not meet his burden that the alleged statements made during the course of his termination – that he failed to disclose his relationship in violation of IKEA policies – were false. Accordingly, summary judgment is warranted in favor of Defendants, and the Court does not even need to assess whether the qualified privilege applies.

2. **The Alleged Defamatory Statements are Subject to Qualified Privilege**

Under Virginia law a communication between persons within a corporate entity who have a duty and interest in the subject matter triggers a qualified privilege unless a plaintiff shows by

"clear and convincing evidence" that the communication was made with malice. *Larimore v. Blaylock*, 259 Va. 568, 528 S.E.2d 119, 121-23 (2000). "[E]mployment matters are occasions of privilege in which the absence of malice is presumed." *Id.* at 122. To overcome this privilege, "the plaintiff must establish both that the statement was false[6] and that the defendant acted with actual malice." *Union of Needletrades*, 603 S.E.2d at 924.

### a. Defendants Properly Communicated the Statements to Only Those Who Had a Duty and Interest in the Subject Matter

In Virginia, communications relating to matters of mutual interest and employee investigations into misconduct or discipline are presumptively privileged. *Dwyer v. Smith*, 867 F.3d 184, 195 (4th Cir. 1989). "The Virginia Supreme Court has advised that, in the context of an employment relationship, an allegedly defamatory statement is afforded a qualified privilege when the statement is made between persons on a subject in which they have an interest or duty." *Ortiz v. Panera Bread Co.*, Civil Action No. 1:10CV1424, 2011 U.S. Dist. LEXIS 85463, at *10 (E.D. Va. Aug. 2, 2011) (quoting *Jones*, 603 S.E.2d at 924). As such, statements included in termination documents or made in the context of a termination discussion cannot form the basis of a defamation claim.

The Supreme Court of Virginia has also "applied the doctrine of qualified privilege in a number of cases involving defamatory statements made between co-employees and employers in the course of employee disciplinary or discharge matters." *Larimore* 528 S.E.2d at 121. This privilege extends "to communications by employers to employees explaining a co-worker's termination and to communications by employers discussing former employees with their

---

[6] As explained above, summary judgment should be granted in favor of Defendants because Plaintiff cannot demonstrate the statement is false.

prospective employers." *Ortiz*, 2011 U.S. Dist. LEXIS 85463, at *11 (citing *Wynn v. Wachovia Bank*, No. 3:09CV136, 2009 U.S. Dist. LEXIS 38250, at *9-10 (E.D. Va. May 6, 2009)); *Hargrave v. Tignor*, 24 Va. Cir. 353, 358 (Va. Cir. Ct. 1991); *Se. Tidewater Opportunity Project, Inc. v. Bade*, 246 Va. 273, 435 S.E.2d 131, 132 (1993) (termination letter written in the context of an employment relationship constitutes a qualified privilege communication); *Nigro v. Va. Commonwealth Univ. Med. College of Va.*, No. 9-cv-00064, 2010 U.S. Dist. LEXIS 123939, at *49 (W.D. Va. Nov. 23, 2010) (statements made to the human resources department are protected by the qualified privilege). Here, Mr. Singleton alleges that the defamatory conduct occurred in the context of his termination, in his termination paper and in communications made during the termination. Am. Compl. ¶¶ 243, 334-335, 337. As such, the alleged defamatory statements fall squarely within the intracorporate immunity qualified privilege.

### b. Mr. Singleton Cannot Establish Malice by Clear and Convincing Evidence

To defeat the qualified privilege, Mr. Singleton must make a showing of malice by clear and convincing evidence. Indeed,

> In order to avoid the privilege it is necessary for the plaintiff to show that the words were spoken with malice in fact, actual malice, existing at the time the words were spoken; that is, that the communication was actuated by some sinister or corrupt motive such as hatred, revenge, personal spite, ill will, or desire to injure the plaintiff; or what, as a matter of law, is equivalent to malice, that the communication was made with such gross indifference and recklessness as to amount to a wanton or [willful] disregard of the rights of the plaintiff....

*Se. Tidewater Opportunity Project, Inc.*, 435 S.E. 2d at 132-133.

Here, there is no evidence of malice other than Plaintiff's own self-serving speculative belief, which is woefully insufficient to prove malice. Indeed, it has long been held that "[e]vidence which does no more than raise a suspicion that he might have been actuated by malice or only a doubt as to the good faith of the defendant is, as a matter of law, not sufficient to . . . establish the

existence of malice. The evidence must affirmatively prove malice." *Hargrave*, 24 Va Cir. at 360 (quoting *Chesapeake Ferry Co. v. Hudgins*, 155 Va. 874, 907, 156 S.E. 429, 441 (1931)); *see Mann v. Heckler & Koch Def., Inc.*, 639 F. Supp. 2d 619, 636-37 (E.D. Va. 2009), *aff'd*, 630 F.3d 338 (4th Cir. 2010) (granting summary judgment where the plaintiff provided evidence showing that the individual making the allegedly defamatory statement "seemed angry" but failed to show evidence as to the intent in sending the specific e-mail that was the subject of plaintiff's claim.). !

In sum, Plaintiff has presented <u>no</u> evidence of malice, let alone clear and convincing evidence. As a matter of law, the Court should grant summary judgment in favor of Defendants.

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant Defendants' Motion for Summary Judgment, enter judgment in Defendants' favor, and award Defendants such other relief as the Court deems just and proper.

Dated: December 1, 2025

*/s/ Yvette V. Gatling*
Yvette V. Gatling (VSB No. 92824)
ygatling@littler.com
Lauren M. Bridenbaugh (VSB No. 90586)
lbridenbaugh@littler.com
A. Remi Omidiji (VSB No. 99889)
romidiji@littler.com

LITTLER MENDELSON, P.C.
1800 Tysons Boulevard, Suite 500
Tysons Corner, VA. 22102
Telephone: 703.286.3143
Facsimile: 703.842.8211

*Counsel for IKEA. US Retail, LLC and Raquel Ely*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 1st day of December 2025 a true copy of the foregoing was served through the Court's CM/ECF system on all parties of record, addressed as follows:

Ricky Singleton
15240 Mimosa Trail
Dumfries, VA. 22195
liams.sig@gmail.com

*/s/ Yvette V. Gatling*
Yvette V. Gatling