# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## Alexandria Division

|  |  |
|---|---|
| ) | Case No.: 1:24-cv-00025-PTG-LRV |
| **RICKY SINGLETON,** ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Jury Trial Requested: YES |
| ) | |
| ) | |
| **IKEA US RETAIL, LLC,** *et al* ) | |
| **Defendant.** ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT AND IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

Plaintiff Ricky Singleton respectfully submits this Memorandum in Opposition to the Defendants Motion for Summary Judgement and in Support of his Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rules 7(F) and 56, and shows as follows:

### I. INTRODUCTION AND SUMMARY OF THE ARGUMENT

Plaintiff Ricky Singleton (Plaintiff or Mr. Singleton) was employed in the Risk & Compliance Department at the IKEA store located in Woodbridge, Virginia at the time of his unlawful termination on January 21, 2021. Mr. Singleton formed a fast friendship with his fellow co-worker, Danielle Goodman, beginning in 2015 when she was hired into the Security Department. Mr. Singleton trained Ms. Goodman, as he had trained every new coworker, team lead, and manager brought into the department for years. While their friendship was solidified through daily camaraderie and trust was developed through stressful security incidents, Mr. Singleton found

a like-minded partner to identify with on a personal level as well as a professional level, and over the years their partnership flourished and formed a true and lasting bond. After supporting each other through personal tragedies and loss, the two coworkers partnership naturally evolved to include a traditionally-considered romantic aspect. As the Defendants discriminatorily refused to promote Mr. Singleton at any time during his 26 year employment, they can establish no possible conflict of interest between Mr. Singleton and Ms. Goodman. Mr. Singleton was not in violation of the official "IKEA US Policy on personal relationships in employment" ( Relationship Policy) at any time during his employment.

The Defendants then attempt to defend their unlawful actions by saying the mere allegation of being in violation of the Relationship Policy, breaks the Code of Conduct and Behavior Standards Policy as well. This stance is illogical in and of itself; according to that logic, every infraction against any policy would be immediately actionable and terminable. As such, terminating Mr. Singleton for a single infraction is already discriminatory, as no coworker had ever been terminated for a single infraction except for acts of violence, which are one of the few exceptions that provide for immediate termination according to company policy.

The Defendants can not present a non-discriminatory or non-retaliatory reason for Mr. Singleton's unlawful termination. The Defendants allege Mr. Singleton is in violation of the policy for failing to disclose his relationship, but the policy does not require co-workers to disclose their relationship, and at the same time, the policy also allows for any coworker to report any relationship which may pose a possible conflict of interest according to the policy. At no time did any of Mr. Singleton's managers or coworkers report his relationship as posing a possible conflict of interest. His relationship was not addressed as posing a conflict of interest when Ms. Goodman applied for three management positions in the Summer of 2021, though she was interviewed by all four managers conspiring in Mr. Singleton's termination in January 2022, because she did not receive any of the positions, therefore did not pose any possible conflict of interest according to the policy.

As the Defendants maintain in their Motion for Summary Judgement that, *"Therefore, in accordance with its policies, IKEA had no choice but to terminate his employment for violating the*

*Personal Relationships Policy, Code of Conduct, and Behavior Standards Policy,*" they make it clear that the decision to terminate Mr. Singleton was a personal decision of the conspiring managers, as the company always provides a choice in how to handle employee corrective actions, and termination is only one possibility of the Behavior Standards Policy. The Defendants can not provide any specific part of the Code of Conduct that Mr. Singleton allegedly violated and merely repeats that breaking the Relationship Policy, broke the Code of Conduct as well. The Relationship Policy is not a terminable policy in the first place, and it is only signed by managers and team leads in the company. Coworkers are provided the policy to read, so they are aware of it, but they do not sign or acknowledge the contents within it, as it is a management policy and only affects coworkers who find themselves in relationships with managers or team leads.

The Defendants acknowledge they knew about Mr. Singleton's relationship prior to November 2021 in their 2022 position statement to the EEOC, which means they lied in December 2021 when they stated they had just learned of his relationship in November 2021 from Ms. Goodman's dismissed EEOC Charge, and subsequently, when they lied about just learning about his relationship in November 2021, in writing, on his discriminatory termination paper imbued with personal animosity, undue malice and animus, and then again verbally during his unlawful termination where the lie riddled narrative was read verbatim. Mr. Singleton filed suit against the Defendants because after persevering for the company with loyalty and dedication through years of direct discrimination, continuous harassment, recurring retaliation, open hostility, personal danger and personal attacks, Mr. Singleton was terminated unlawfully by his managers, who were coworkers with a personal stake and interest in his unwarranted demise, as a means to protect their own interests in concealing their unlawful actions and misdeeds and to also cast aspersions and discredit Mr. Singleton to lessen the impact of the truths Mr. Singleton knew and reported.

Mr. Singleton is entitled to Summary Judgment because his claims are substantiated by both his evidence and the evidence provided to him by the Defendants during Discovery. The Defendants base their Motion for Summary Judgement on numerous lies and manipulations of the truth, including but not limited to, their outrageous claim that Mr. Singleton never applied for a Team Lead position, was given his hours based on his availability and in line with IKEA policy,

was paid fairly comparatively in his department, was recalled from furlough appropriately, and was terminated for failing to disclose his relationship with another coworker which simultaneously broke three policies, the harassment he experienced wasn't sufficiently severe or pervasive enough to constitute a violation of law or create a hostile working environment, and finally, the absurd notion of him being terminated due to his non-compliance with company policy, while all documentation, history, and policies are in direct opposition to that position.

Mr. Singleton was discriminated against based on his race, because he was never promoted to team lead or manager, though he was the acting manager in the absence of a manager without fair compensation, was made to train every team lead and manager who was hired instead of him receiving the promotion, and that he was held to higher standards for the promotion than those for the White candidates who received the positions, and who then needed to be trained for their position by Mr. Singleton. Mr. Singleton's availability, schedule, and weekly hours were constantly targeted while White coworkers in the department regularly received their chosen schedules and were not required or held to the same standards as the Black coworkers in the department, and when Mr. Singleton reported the discriminatory targeting of his schedule directly to Ms. Ely, she supported the discriminatory stance taken against Mr. Singleton, though it was not introduced or enforced against any other coworker in the organization, and was not in line with any company policy, as coworkers are guaranteed their work schedule as displayed, but Mr. Singleton was the sole coworker required to clock out from his shift five minutes early everyday. Not only does the spreadsheet with coworker pay show that Mr. Singleton was being paid unfairly, as he had hired and trained every person in his department, and as such should have been the highest paid coworker by a wide margin, but he also has direct evidence from a witness, that he was specifically denied promotions and raises because he is Black and has Black characteristics, and certain raises were provided to less qualified and less tenured White coworkers.

The two Black coworkers in the department, one of which was Mr. Singleton, were the only two coworkers in the department put on deferment when being recalled from furlough, and it was through no fault of their own, as according to the Defendants, coworkers were recalled in order of longevity, which means that Mr. Singleton should have been the first coworker called to return, but

other coworkers in the department were already recalled and back to work before Mr. Singleton received even his first call back.

At no time has Mr. Singleton claimed he was terminated for not disclosing his relationship with Ms. Goodman; he has made it clear that the Defendants claim that is their lawful reason for his termination, and Mr. Singleton has pointed out that their reasoning of using his relationship at all is pretext and only used to cover and deny the truth of his discriminatory and retaliatory termination. The undisputed facts show that Mr. Singleton not only can provide evidence for all of these claims, but also that the Defendants fail to provide a legal or logical reason for his termination, and they provide evidence that supports Mr. Singleton's claims and contradicts their own position, as well as providing evidence which evinces the conspiratorial efforts of the managers involved in the retaliatory actions against Mr. Singleton, which resulted in his unlawful termination.

Mr. Singleton is entitled to summary judgement on his defamation *per se* claim because the Defendants' retaliatory statements and actions following Mr. Singleton's protected activity, provide the malice required by Virginia to defeat an intracorporate immunity qualified privilege.

As Mr. Singleton's Title VII, § 1981, VHRA, and defamation *per se* claims are all substantiated and corroborated by evidence and witnesses, the Defendants' motion fails as a matter of law, and as there is no genuine dispute of material fact, summary judgment should be granted in Mr. Singleton's favor for all of his remaining claims.

## II. Defendants' STATEMENT OF UNDISPUTED MATERIAL FACTS are actively disputed by Mr. Singleton and provide his STATEMENT OF GENUINE ISSUES IN DISPUTE

This case contains numerous genuine issues of material fact. While the Defendants wish to maintain that the, *"Plaintiff's deposition testimony revealed that he personally believes he was treated differently because of his race, his subjective beliefs, without more, are insufficient to support his allegations against Defendants. See Bryant v. Bell Atl. Maryland, Inc., 288 F.3d 124, 134-35 (4th Cir. 2002)"* Mr. Singleton's case does not rely on his subjective beliefs, as he has provided extensive evidence and witnesses to support all of his claims, and his allegations are supported by extensive documentation and detailed records of events.

The material facts in dispute, which the Defendants attempt to establish their entitlement to

summary judgment on Plaintiff's claims are disputed and addressed as follows:

**A. IKEA Is an Equal Opportunity Employer**

1. The Defendants maintain that IKEA is an equal opportunity employer that prohibits discrimination and harassment based on any protected category, including race, as well as retaliation. They provide in defense of this notion their, *"Exhibit 1, October 13, 2025 Deposition of Ricky Singleton (Singleton Dep.),"* though in the final Pretrial Conference the Defendants stated they were not using either of Mr. Singleton's depositions at trial and did not add them to their list of exhibits to be used at trial.

2. Simply because the Defendants say, *"IKEA is an equal opportunity employer..."* does not make it so, and Mr. Singleton has provided numerous documents which prove that not only has Mr. Singleton been discriminated and retaliated against on numerous occasions and under multiple managers, none of the managers have ever faced any consequences or corrective actions for their unlawful behavior, and the Defendants make the outrageous claim that Mr. Singleton never reported any discrimination or retaliation though he has direct communications with the Defendants containing reports of discrimination, retaliation, and manager misconduct. **Exhibit** 4 & 22

3. The Defendants refused to acknowledge or address the allegations in Ms. Goodman's November 2021 EEOC Charge of Race Discrimination, and the only action they took after the charge's dismissal, was calling in both coworkers to tell them their relationship was now being considered a conflict of interest, requested the coworkers admit to wrong doing, lying, and harming the company, and maintaining that neither Ms. Ely nor Mr. Scott were interested in discussing the reported discrimination. The confidential HR spreadsheet Mr. Scott dispersed was the basis of Ms. Goodman's EEOC charge as it proved that her pay had been docked unfairly since she first reported her discriminatory pay-cut in 2017. **Exhibit** 1

**B. The Behavior Standards Policy and Code of Conduct**

4. The Defendants allege Mr. Singleton broke both the Behavior Standards Policy and the Code of Conduct, but they can not specify any specific action of Mr. Singleton's that would warrant termination, absent selective and discriminatory application of either document against Mr. Singleton, in the presence of tolerated misconduct by numerous coworkers without any corrective

actions at all, let alone the drastic act of termination, against a coworker in Mr. Singleton's standing and his long tenure with nothing but the highest performance evaluations. **Exhibit** 18

5. Prior to filing his EEOC Charge following his unlawful termination in 2022, Mr. Singleton was not accused of insubordination or described as insubordinate at any time. The Defendants have changed their position as this case has progressed, in an attempt to provide any semblance of a possible justification for their unlawful actions against Mr. Singleton.

6. As stated within it, any violations of the Behavior Standards Policy may result in disciplinary action, up to and including termination of employment. When Ms. Chenard fabricated a security breach and had Mr. Singleton written up for it in December 2021, Ms. Ely had it rescinded, which acknowledged Ms. Chenard's dishonesty, and presented another discriminatory and retaliatory action against Mr. Singleton. Ms. Chenard received no corrective action at all for this egregious behavior, but Mr. Singleton was terminated for alleged, but neither factual, verifiable, nor documented, dishonesty. Ignoring the actual dishonesty of a White coworker, while terminating a Black coworker for alleged dishonesty, is discrimination in and of itself. **Exhibit** 7

7. The Defendants can not identify any infraction of the Code of Conduct, and while they state it as one of the infractions Mr. Singleton's termination is based on, they do not state at anytime how it was violated by Mr. Singleton. And while the Defendants also address a section of the Code of Conduct which states coworkers should avoid conflicts of interest, they can not say Mr. Singleton didn't avoid any conflicts of interest, was implicated in a conflict of interest, or ever appeared to be in a potential conflict of interest, and it is evident that no coworker in the organization was in doubt of any possibility of any conflict of interest between Mr. Singleton and Ms. Goodman, as no coworker in the organization, including all of Mr. Singleton's team leads and managers, ever reported even a potential or possible conflict of interest between these two coworkers. **Exhibit** 12

8. Mr. Scott violated the Code of Conduct multiple times as he disseminated a confidential HR spreadsheet with pay and personal information for all coworkers at the Woodbridge location, abused his access to coworker personal information to target Mr. Singleton and Ms. Goodman in September 2021, and he violated multiple company policies, including the Code of Conduct and Behavior Standards Policy, when he retaliated against both coworkers in December 2021, along

with Ms. Ely, when they selectively targeted Mr. Singleton and selectively enforced and misapplied the Code to erroneously label Mr. Singleton's relationship as posing a conflict of interest.

**Exhibit 12 Code of Conduct p. 35 and 43**

9. While multiple relationships relative to Ms. Chenard were reported as both possible and actual conflicts of interest according to the Relationship Policy and the Code of Conduct, none of the relationships were ever mitigated, addressed as conflicts of interest, or acknowledged as a problem, and none of the coworkers involved received corrective actions or were terminated for their misconduct. **Exhibit 4**

**C. The Personal Relationship Policy**

10. IKEA maintains a Policy on personal relationships in employment, and it specifically states that it supersedes any guidelines instituted at the local level, unless required by law. **Exhibit 10:
IKEA US Policy on personal relationships in employment** (Relationship Policy)

11. The Relationship Policy defines a "personal relationship" and a "conflict of interest" and yet, while the Defendants belabor the obvious existence of Mr. Singleton's relationship to draw focus away from what the policy is actually about, the Defendants fail to address the fact that there is no conflict of interest for either Mr. Singleton or Ms. Goodman according to the policy, and the Defendants acknowledge in their 2022 response to the EEOC that a relationship does not create a conflict of interest on its own, unless specific other instances are present as well as stated in the Relationship Policy. **Exhibit 25 IKEA POSITION STATEMENT**

12. As IKEA co-workers are expected to cooperate, and even in the absence of a conflict of interest or even a potential for one, both Mr. Singleton and Ms. Goodman not only agreed to cooperate with management but also acquiesced to any and all investigation or mitigation required by the Defendants as requested or deemed necessary following the new retaliatory actions the managers took against the two coworkers for their joint protected activities, evinced by the fact that they were not terminated immediately according to the Defendants retaliatory plan. **Exhibit 6 & 20**

13. In 2021, Ms. Ely and Ms. Chenard provided local updated guidance and training for the Risk and Compliance Department on the Personal Relationships Policy, which was not in line with the policy as there were no local laws requiring any new guidelines to be implemented. The Defendants

provided both the blank digital presentation they filled in with their self-serving narrative and alleged guidelines **Exhibit 13** and an email showing their knowledge of Mr. Singleton's relationship, and their conspiring to target his relationship with the new local guidelines they were instituting. **Exhibit 13**

14. The Personal Relationships Policy **Exhibit 10**, specifically prohibited a personal relationship between co-workers in the same store if one of the co-workers was a Risk & Compliance Manager or Risk & Compliance Leader, and as neither Mr. Singleton nor Ms. Goodman were ever a team lead or manager in their department, the policy did not identify their relationship as a problem.

15. The Defendants now contend that their local guidelines stipulated that any relationship between a Risk & Compliance co-worker and another co-worker within the store, was required to "be risk assessed and documented." None of the Risk coworker's relationships were risk assessed or documented following this training, and in fact none of them were addressed until after all of the Black coworkers were removed from the department in January 2022. **Exhibit 2 (+19**

16. Not only were none of the familial or close personal friendships which resulted in preferential treatment for some of the coworkers in the department addressed or mitigated, while Heidi was still maintained as a Team Lead in the Risk Department, even after her role became redundant, her brother was hired into the department as an agent. **Exhibit 21**

17. The mere fact that Ms. Chenard was one of the managers instituting the new alleged guidelines, while she was also the Risk and Compliance manager who signed off on both coworker's parental leave papers, and she also investigated Ms. Goodman's sexual harassment complaint against Ms. Chenard's close personal friend, while the HR Manager was out on medical leave, for lewd and explicit comments made to another coworker about Ms. Goodman's relationship with Mr. Singleton, and that the policy and Code of Conduct state any coworker can report a possible conflict of interest, all shows that Mr. Singleton's relationship wasn't considered a risk at the time the alleged guidelines were implemented, or at anytime after that, until after Ms. Goodman filed her charge with the EEOC in November 2021, and it was subsequently dismissed in early December 2021. **Exhibit 14+12**

18. Following this alleged training introducing their new local guidelines for Risk and Compliance, none of the relationships of any of the coworkers in the Risk and Compliance Department were addressed as concerns, required independent or new risk assessment, or required mitigation, until after Mr. Singleton and Ms. Goodman were terminated in January 2022 and filed subsequent EEOC charges following their unlawful terminations. In Section 4.3 of the official Relationship Policy **Exhibit 10**, it states coworkers only need to formally disclose their relationship if a potential conflict of interest arises, and as the Defendants have already made it clear that they never considered Mr. Singleton's relationship as a potential conflict of interest, until after engaging in protected activity with his partner, then the Defendants requiring formal disclosure after the EEOC charge was dismissed, shows the Charge itself was considered the potential conflict of interest. Choosing to consider Mr. Singleton's relationship a conflict of interest after he participated in protected activity, is direct retaliation, discrimination, and harassment, and it created an extremely hostile working environment with continual retaliation for his final remaining month, culminating in his unlawful termination in January 2022. **Exhibit 9**

**D. The Employment Status Policy**

19. Mr. Singleton was an HL3 coworker, but there were numerous times throughout his tenure that his hours were unfairly docked and his schedule was used to target him or give preferential treatment to other coworkers. **Exhibit 19**

20. While overtime hours were not allowed according to Ms. Chenard, Mr. Singleton was the only agent not receiving any overtime, and his timecard shows he was forced to clock out five minutes early from every shift to ensure he never went even a minute into overtime, even though workers are guaranteed their scheduled hours by law. While he was scheduled to 12:30pm everyday, he was told he would receive a corrective action if he didn't clock out at 12:25pm, because it would put him in overtime by the end of the week, while the other HL3s were getting overtime, and none of them were required to clock out early or written up for clocking overtime.

**E. Mr. Singleton's Employment at IKEA**

21. Mr. Singleton began working at IKEA in December of 1997. Throughout his

tenure at IKEA, Mr. Singleton held several positions within the Security Department, and he was a Risk & Compliance Co-Worker at the time of his unlawful termination in January 2022. **Exhibit** 9

22. After most co-workers at IKEA Woodbridge were placed on furlough in mid-March 2020 due to the COVID-19 pandemic, Mr. Singleton was recalled back to work after the rest of the coworkers in his department, as both Black coworkers in the department were put on deferment before being able to return.

23. While the Defendants contend that co-workers in Mr. Singleton's department were supposed to be called back from furlough based on position and seniority, that was not the case, as the other coworkers were already back at work before Mr. Singleton was called, and the Defendants refused to provide any of the missing schedules from the period the two Black coworkers were on deferment while the rest of the department had already been recalled.

24. While Ms. Chenard alleges she did not have the correct phone number to recall Mr. Singleton from furlough, she previously used his correct phone number numerous times to contact him outside of work including to harass him while he was on parental leave and at the beginning of furlough when she was requesting his keys and offering to come to his house to pick them up from him. **Exhibit** 14

25. In February 2021, Mr. Singleton attended a regularly scheduled Risk and Compliance monthly meeting that included a PDF created by Ms. Chenard and Ms. Ely on new guidelines they were implementing locally for Risk and Compliance.

26. The confidential HR spreadsheet leaked by Mr. Scott in the Summer of 2021, showed Mr. Singleton was not the highest paid of the five Risk & Compliance co-workers at IKEA Woodbridge, even though he was the most experienced, most senior, most tenured, hired and/or trained all of the other agents, was the only coworker who had previously been the acting manager of the department, had top performance evaluations, and the highest level of education in the department, and due to all of these factors, according to general and non-discriminatory business practices, should have been the highest paid coworker in the department. **Exhibit** 15,18

27. The Defendants affirm that Mr. Singleton received a raise in September 2021, alleged by management as a cost of living increase, because he was in good standing.

28. Mr. Singleton received excellent performance evaluations every year, including his excellent PE in October 2021, which qualified him for another raise come January 2022 for the following year. **Exhibit** 18

29. While Mr. Scott targeted Mr. Singleton's relationship in September 2021 and attempted to get Ms. Goodman removed from Mr. Singleton's personal information, following Mr. Scott negligently emailing the confidential HR spreadsheet in August 2021, at no time was Mr. Singleton questioned about his relationship or told it was a conflict of interest. **Exhibit** 2+3

30. Mr. Singleton was denied team lead promotions for years, and even at times when he would have been able to transfer to a new location for a team lead position, he was actively prevented from transferring for the promotion as well. The Defendants have stated Mr. Singleton never applied for a Team Lead position, but they provided him the the document Ms. Chenard filled out during his interview for the team lead position he applied for in 2017. **Exhibit** 23

**F. Mr. Singleton's Relationship with Danielle Goodman**

31. Ms. Goodman was hired into Mr. Singleton's department in 2015, and she was trained by Mr. Singleton for two weeks, during which they formed a trusting, supportive, and lasting partnership.

32. In 2018, Ms. Goodman and Mr. Singleton took parental leave following the birth of his first child with Ms. Goodman. The Defendants mislead the Court with their affidavit which claims, *"Paperwork regarding any form of leave, including paternity/maternity leave, is not submitted to or reviewed by IKEA but is submitted and reviewed by the third-party administrator for IKEA. Chenard Decl. ¶ 6.,"* as Ms. Chenard, the direct manager of Risk and Compliance at the time of the two coworker's parental leaves, approved their proof of birth documents and personally singed off on their leave paperwork along with the HR Manager Dianna Abilmona, before the coworkers turned in their leave packets to the IKEA human resources center, which was a central HR department for IKEA US, which means they were not a third-party administrator for IKEA as falsely alleged in Ms. Chenard's affidavit. **Exhibit** 14

**G. IKEA Learns of Mr. Singleton's Relationship with Ms. Goodman**

33. In November 2021, Ms. Goodman filed a charge with the EEOC, which named Mr. Singleton directly. **Exhibit** 5

34. In December 2021 the Defendants falsely alleged they first learned that Mr. Singleton was in a personal relationship with Ms. Goodman after receiving Ms. Goodman's November 2021 EEOC charge.

35. During the alleged meeting about their relationship in December 2021, Mr. Singleton acknowledged his relationship with Ms. Goodman as one of many he formed over his long tenure and he also stated that none of his relationships, inclusive of that with Ms. Goodman, have ever presented a conflict of interest, and he agreed to any investigation or mitigation in relation to his relationship with Ms. Goodman or any other coworker.

36. In the Defendants' 2022 response paper to the EEOC, they admit their prior knowledge of Mr. Singleton's relationship with Ms. Goodman, which expresses both their lie which they based his termination on, and establishes their reasoning is pretextual, which they therefore also acknowledge their adverse actions in attacking his relationship after the EEOC charge was dismissed at the beginning of December 2021, was retaliation. **Exhibit** $2\,5$

**H. IKEA Terminates Mr. Singleton's Employment**

37. The Defendants claim they terminated Mr. Singleton's employment on January 21, 2022 because he refused to admit his personal relationship with Ms. Goodman and was therefore in violation of the Personal Relationship Policy, the Code of Conduct, and the Behavior Standards Policy of IKEA. **Exhibit** $10,\,11,\,12$

38. The Defendants provided no prior corrective actions, warnings, or documentation, before they surprised Mr. Singleton with his immediate termination mere days after he reported direct discrimination, targeting, and harassment to Ms. Ely and Mr. Scott, which according to both law and company policy is protected activity in and of itself, and following sending an email documenting the conversation, he was unlawfully terminated days later. **Exhibit** $6,\,8$

39. During Discovery, the Defendants provided a previously never given write up from the December 10 meeting (friendly chat) which stated that Mr. Singleton was terminated immediately, showing the Defendants had planned to terminate him in retaliation on that day, but as Mr. Singleton was aware of his rights and the law, he did not agree with their false narrative, and instead stood steadfast to the truth, which prevented the Defendants from following through on

their retaliatory plan. **Exhibit** $\underline{26}$

**I. Mr. Singleton's Charge of Discrimination & Lawsuit**

40. Mr. Singleton filed a charge with the EEOC on August 22, 2022, because the Defendants discriminated against him on the basis of race and retaliated against him for engaging in protected activities. **Exhibit** $\underline{16}$, $17$

41. Mr. Singleton filed his original Complaint in this matter on January 5, 2024. *See* ECF No. 1.

42. Mr. Singleton filed his Amended Complaint (Am. Compl.), the operative complaint in this matter, on March 3, 2025. *See* ECF No. 52.

43. Mr. Singleton provided an account of the history of the discrimination, harassment, and retaliation he suffered throughout his career during the EEOC charge and investigation, and therefore, all of the claims he presented in his Lawsuit are admissible as a matter of law. **Exhibit** $\underline{15}$ / $\underline{17}$

**J. Pervasive and severe harassment changing the employment context and resulting in an abusive and a retaliatory hostile working environment**

44. Mr. Singleton was being targeted over five minutes a day, while Ms. Knight was manipulating Caleb's timecards on a daily basis, in direct violation of multiple policies, at least the attendance, relationships, behavior standards policies, and the code of conduct. Preferential treatment for White coworkers and close personal friends and family of Ms. Chenard, while targeting and micro-managing the Black coworkers, including Mr. Singleton, who were always adhering to policy and protecting company assets, as evinced by both coworker's Performance Evaluations, including Ms. Chenard referring to Ms. Goodman as a policy Nazi, shows direct discrimination.

45. Safety measures put in place after Mr. Singleton was threatened directly by a coworker terminated for discrimination, were repealed once Ms. Chenard became his direct manager.

46. Ms. Chenard repealed all safety measures put in place to protect Mr. Singleton and invited the terminated coworker to a company event in 2019, even though he had been trespassed years prior for calling the store to call Mr. Singleton a nigger and make direct threats against Mr. Singleton.

47. While Mr. Singleton identified a few good store managers he had the pleasure of working with, he also identified numerous store managers who were more complicit in the discriminatory actions taken against him and other minority coworkers at the store.

48. While Ms. Ely presented herself as one of the store managers who wanted to follow company policy and support Mr. Singleton, when his position in security caused him to experience discrimination and retaliation from managers for upholding the company's values and policies, and completing his duties as required by the company, without showing preferential treatment to any coworkers regardless of position, title, or ability to either help or hinder Mr. Singleton and his career. Ms. Ely's actions betrayed her kind words, as she was at the center of the conspiracies and plots concocted and carried out against him from the end of 2020 up to his unlawful termination in January 2022.

49. Though Ms. Ely granted generous mental health accommodations for two White coworkers who made violent outbursts, disturbing the admin area, scaring other present coworkers, and ending up in emergency services calls, Ms. Ely attempted to cover up the incidents, to prevent Mr. Singleton specifically for finding out about the company's ability to provide mental health accommodations to employees, while she had ignored his requests for mental health accommodations.

50. Even when she was not directly identified as a key player in actions taken against him, such as when Mr. Scott accessed Mr. Singleton's personal information to impersonate him and attempt to alter his personal information at an official level through the HRSC. While Ms. Ely was not named as being involved, after Mr. Singleton reported the incident to her, she neither investigated the incident, nor followed up with Mr. Singleton about any resolution for the incident. **Exhibit** 2⅓3

51. As the spreadsheet leaked by Mr. Scott was the catalyst for and formed the basis of Ms. Goodman's EEOC Race Discrimination Charge in November 2021, it also explains Mr. Scott's residual and lasting hostility towards Ms. Goodman, which extended to his interactions with both Mr. Singleton and Ms. Goodman in the final months of their employment following the Charge dismissal, and culminating in his vindictive recitation of the corrective action he wrote, ending abruptly in Ms. Goodman's termination, while Ms. Ely read the same to Mr. Singleton in the adjoining room. **Exhibit** 9

## III. ARGUMENT

### A. Standard of Review

The Defendants present numerous case law in their standard of review which all supports Mr. Singleton's case, as he presents extensive evidence to present genuine issues of material facts exist and support his case in requiring the dispute to be argued in court and decided by a jury in his favor based on the extensive evidence he has collected and provided to prove his claims with both hard evidence and also the preponderance of the evidence which would have a reasonable juror find in favor of Mr. Singleton. As Mr. Singleton's claims are heavily substantiated by detailed evidence, all of his claims are protected from summary judgement, and should move forward to be argued at trial. The Defendants have received all of the evidence during Discovery, and merely stating that the evidence does not exist, does not make it so.

In fact, as Mr. Singleton provides a large volume of direct evidence of the Defendants' misconduct and unlawful actions and statements, and as the Defendants provide case law and evidence to support Mr. Singleton's case as well and contradicts their own case, while presenting no evidence that actually supports or defends their case against him, summary judgment should actually be found in favor of Mr. Singleton.

Here, summary judgment in Mr. Singleton's favor is appropriate as there is no genuine dispute on any material facts, as the Defendants have no actual evidence to support their unlawful actions, making trial on the issues raised in Mr. Singleton's Amended Complaint unwarranted and unnecessary. The material facts, presented by Mr. Singleton, show that the Defendants have discriminated, retaliated, harassed, unlawfully terminated, and defamed Mr. Singleton over an extended period of time over his career as he states in his Amended Complaint, creating a pervasive and severe impact on his employment and causing a hostile working environment perpetuated by the Defendants on a continuous basis, with the malicious intent of causing him lasting harm, and continuing the harm throughout multiple changes of management and company reorganization, until he was ultimately retaliated against in retaliation for escalating his reporting to external

sources for legal assistance, establishing his protected activity and clarifying the Defendants direct retaliation for him doing so, and he therefore is entitled to judgment as a matter of law.

**B. Defendants claim Mr. Singleton Failed to Administratively Exhaust Several of His Title VII Discrimination Claims - this claim is Disputed**

Mr. Singleton exhausted his administrative remedies as he reported to, and had his claims investigated by, the EEOC and the Prince William County Human Rights Commission. The Defendants misapply case law to this specific case when they state, *"Generally, a plaintiff may not bring claims of Title VII discrimination in a lawsuit if they were not included in his EEOC charge. Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 132-33 (4th Cir. 2002) (holding plaintiff could not bring new allegations of discrimination based on sex and color where the EEOC Charge only identified discrimination based on race)."* Mr. Singleton did not bring any new claims in his Amended Complaint which were not first, "stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint" and are accordingly within the scope of the EEOC charge and the subsequent investigation. *Id.* at 963; *see also Dennis v. Cty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995)

Mr. Singleton addressed all of his discrimination and retaliation claims with the EEOC, and they were included in their investigation, and as such, all of his allegations were included in his charge and/or are reasonably related to those in his charge. The Defendants claim Mr. Singleton failed to exhaust his administrative remedies due to the wording on the Charge itself, which Mr. Singleton did not agree with in the first place and attempted to have amended multiple times by both the EEOC and the PWCHRC.

As the Defendants base this claim on a procedural misstep or formatting error, and the courts must construe pro se filings liberally and not penalize procedural mistakes, as established in *Haines v. Kerner*, 404 U.S. 519, 520 (1972), then there is no reason for the courts to lend credence to the Defendants notion that Mr. Singleton did not exhaust his administrative remedies for all of his discrimination, retaliation, and harassment claims investigated by the EEOC.

As Mr. Singleton exhausted his administrative remedies, summary judgment on any of his Title VII claims as requested by the Defendants, is unwarranted, and as Mr. Singleton can establish

the Defendants' attempt to provide a legal reason for his termination, is only pretext to cover their clearly identified unlawful retaliation, and as the Defendants are unable to provide evidence in support of their pretextual reasons for his termination, presenting no genuine issue of material fact, the Court should grant Summary Judgement in favor of Mr. Singleton for all of his Title VII claims..

**C. Defendants claim Mr. Singleton Cannot Establish a *prima facie* Claim of Retaliation Under Title VII, § 1981, or the VHRA (Counts Three, Six and Ten) - this is disputed**

Mr. Singleton has direct evidence that IKEA retaliated against him for engaging in protected activity, and beyond that, he can also establish a *prima facie* case for the same. As Mr. Singleton makes his *prima facie* case, the burden shifts to the employer to show that the adverse action was taken for legitimate, non-retaliatory reasons. As the Defendants fail to provide a logical or legitimate, non-retaliatory reason for his termination, the burden wouldn't shift back to Mr. Singleton, but as the Defendant's actions were so ridiculous, Mr. Singleton clearly identified their purported non-retaliatory reasons as pretextual.

Mr. Singleton establishes the causal relationship between his protected activity and his termination, as the EEOC charge within which he was named directly, was sent directly to Ms. Ely, who then had first-hand knowledge of his engaging in protected activity, who questioned him about information from the charge after it was dismissed, and ultimately personally terminated him in January 2022, days after he reported new discrimination and conspiring of his management team to Ms. Ely yet again.

As the Defendants contend that, "*Moreover, Mr. Singleton was in violation of the IKEA Personal Relationships Policy beginning in 2015 through his termination because he was in an intimate relationship with Ms. Goodman, a Risk & Compliance colleague, and he failed to report this relationship to IKEA.* The Defendants did not discharge Mr. Singleton at any time between 2015 and 2021, until after Ms. Goodman filed her EEOC charge in November 2021, and they only terminated him after he participated in protected activity, though they state the reason for his termination existed the entire length of time from 2015 to 2021, and at the same time, they can still not provide any conflict of interest which would actually constitute a violation of the Relationship

Policy, which they use as the basis for stating his actions violated the Code of Conduct and the Behavior Standards Policy. As such, the Defendants can not establish any policy violated by Mr. Singleton at any time, let alone any violations which would warrant immediate termination according to their policies.

The Defendants admit their knowledge of Mr. Singleton's relationship, and Mr. Singleton provides evidence of multiple instances when the Defendants had the opportunity to directly question any issues with Mr. Singleton's relationship, and yet did not raise his relationship as a potential conflict of interest, until after his protected activity in November 2021, specifically in September 2021, when Mr. Scott impersonated Mr. Singleton and attempted to alter Mr. Singleton's personal information to remove Ms. Goodman from his information while both coworkers were out of office on vacation together.

As established in *Burlington Northern & SantaFe Railway Co. v. White*, 548 U.S. 53 (2006), adverse actions including harsher discipline and selective enforcement of company policies led to a finding of pretext. As such, as Mr. Singleton has established he faced harsher discipline including his termination, in contrast to the coworkers in his department, his management team, and the company at large, and the Defendants required misapplication of company policy against Mr. Singleton while selectively enforcing company policies to misapply them against him.

*Prima facie*: Mr. Singleton is a Black coworker, who participated in protected activity in reporting race discrimination to the EEOC and to upper management, specifically Ms. Ely. Following the dismissal in December 2021 of the EEOC charge in which he participated, and was named specifically, he faced instant and continuous adverse actions for the following month, and without prior documentation, or warning, was terminated the following month, providing temporal proximity causation, as well as the fact that the Defendants specifically stated the information provided in the EEOC charge was specifically used to harm his employment and terminate him. The adverse actions he faced are clear retaliation.

As Mr. Singleton provides his *Prima facie* case, and as he can also establish the Defendants alleged non-discriminatory reasons for his termination were pretextual to cover their retaliatory

intent, there is no genuine issue of material fact, and the Court should grant Summary Judgement in favor of Mr. Singleton for his retaliation claims.

**D. Defendants claim Mr. Singleton's Title VII, § 1981, and VHRA Race Discrimination Claims (Counts One, Four and Ten) Fail as a Matter of Law - This is disputed**

      Mr. Singleton presents a sound prima facie case for discrimination, and he has direct evidence to support each requirement.

      Mr. Singleton was a Black coworker, whose race was a protected class, he was terminated after participating in an EEOC race Discrimination Charge addressing discrimination against Black coworkers, while the Defendants knew of his relationship, and he was meeting their legitimate expectations regarding his relationship prior to the race discrimination charge, after the charge was dismissed, Mr. Singleton's previously acceptable relationship was labeled as a conflict of interest, and he was subsequently terminated for his previously acceptable relationship.

      As established in *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133 (2000), a Plaintiff's *prima facie* case, combined with evidence of pretext, can support a reasonable inference of pre textul termination which would need to be decided at trial by a judge or jury.

      The Defendants attempt to provide non-discriminatory reasons for his termination, but ultimately, the Defendants fabricated evidence proves the two Black coworkers in the Risk and Compliance Department, Mr. Singleton and Ms. Goodman, were the only coworkers targeted by their alleged local guidelines, and if the other relationships were addressed at all, it was not until after Mr. Singleton was terminated after almost a full year following their alleged local guidelines being established. The Defendants claim they were unaware of his relationship prior to his protected activity, but besides contradicting their own position by admitting prior knowledge during the EEOC investigations, which exposes their acceptance of his relationship prior to the protected activity, it also shows they only decided his relationship was not acceptable after his protected activity, and that decision was an adverse action, and using that decision to harm Mr. Singleton's employment was another adverse action, both of which were two instances of a long list of adverse

actions which were taken against Mr. Singleton immediately following the dismissal of the Race discrimination charge in December 2021.

The Defendants also can not excuse the immediate temporal proximity of the protected activity to the adverse actions taken against Mr. Singleton, as the timeline speaks for itself:

- The Defendants now claim Mr. Singleton was in violation of the Relationship Policy
- since 2015. (Representing yet another change in their position made as the case has
- progressed.)
- Mr. Singleton's relationship was never addressed as a potential or possible conflict of interest prior to 2021.
- Mr. Singleton attended his monthly meeting where Ms. Chenard introduced the Defendants' alleged new local guidelines, and at no time addressed any of the coworkers in the Risk and Compliance Department about any of their relationships, including Mr. Singleton's relationship for posing either a potential or possible conflict of interest, until after his protected activity in November 2021, and only allegedly addressed the other agent's relationships after terminating both Mr. Singleton and Ms. Goodman.
- The race discrimination charge was dismissed in December 2021.
- Mr. Singleton's relationship was determined to be a conflict of interest in December 2021, though it had not been considered such prior to that month.
- Mr. Singleton continued to report management discrimination and retaliation, including continual adverse actions throughout December 2021 and January 2022.
- Mr. Singleton addressed a specific instance of management conspiring to discriminate and retaliate against Mr. Singleton against his protected class specifically, and he was unlawfully terminated days later, without any prior warning or corrective actions.

As Mr. Singleton provides his *Prima facie* case, and as he can also establish the Defendants alleged non-discriminatory reasons for his termination were pretextual to cover their retaliatory and discriminatory actions and intent, there is no genuine issue of material fact, and the Court should grant Summary Judgement in favor of Mr. Singleton for his discrimination claims.

**1. Defendants claim Mr. Singleton Cannot Establish a *prima facie* Case of Race Discrimination and IKEA Has Articulated a Legitimate, Non- Discriminatory Reason for its Actions - this is Disputed**

Mr. Singleton can establish that he was meeting the legitimate expectations of IKEA by providing his excellent Performance Evaluation in October 2021, which clearly showed the Defendants did not state his relationship as not meeting their legitimate expectations prior to December 2021. His membership in his protected class, which formed the basis for the November 2021 race discrimination charge is the direct causal relationship between his race and any adverse actions taken against him after the charge was dismissed.

While Dee Sellman, has not worked at IKEA Woodbridge since prior to 2011, the Defendants promoted her to Corporate to protect her job after investigating numerous reports of direct discrimination and harassment against Black coworkers, including Mr. Singleton.

Mr. Singleton was told by multiple of his managers that upper management was discriminating against him, and he has witness statements from DK Worthy, specifically addressing discrimination and retaliation against Mr. Singleton. **Exhibit** 1 5

The Defendants misapply case law from *Justus v. Junction Ctr. for Indep. Living Inc.*, No. 1:11CV00039, 2012 WL 844340, at *4 (W.D. Va. Mar. 12, 2012) (citing *Williams*, 370 F.3d at 431) (holding that a general interest in a promotion without submitting an application is not enough to establish a *prima facie* case of discrimination when the defendant-employer has publicized an open position), as the Defendants made their discriminatory intentions clear when they opened the Risk and Compliance Manager position for applications in early 2021, instead of providing the previous Black manager his position back automatically, as they provided the similarly situated White manager under Ms. Chenard his original manager position back automatically when it was available at the same time, without requiring open applications. The Black manager also told Mr. Singleton the management plan to put Ms. Chenard's White family member in place as the Risk and Compliance Manager position to target Mr. Singleton specifically.

The Defendants acknowledge the absurdity of their position when they state, "*Even assuming IKEA already knew about Mr. Singleton and Ms. Goodman's relationship...*" (which they

later confirmed they in fact did know about*), "Mr. Singleton's refusal to essentially reconfirm that which he already believed IKEA to know is illogical, at best."* Mr. Singleton did not deny or fail to disclose his relationship at any time, and so according to their own position, was never not in compliance with the IKEA policies, and therefore still meeting the legitimate job expectations.

The Defendants notion that Mr. Kelly, Ms. Becker, and Ms. Goodson were not similarly situated, is false on its face, as wether Mr. Kelly or Ms. Becker reported their relationship, is not the problem at hand. Had the relationship been reported, hiring Mr. Kelly into the department while his sister was the Team Lead, was in direct violation of both the actual Relationship Policy and the alleged local guidelines imposed by Ms. Chenard, the manager who would have given Mr. Kelly his grandfather interview and agree to his employment offer in the first place. The Relationship Policy was in place to prevent conflicts of interest, such as Ms. Knight altering Mr. Kelly's time card constantly to cover for his inconsistent time management and failure to follow the IKEA Attendance Policy. **Exhibit** 21 + 24

As Mr. Singleton was meeting his employer's legitimate job expectations, and he provides the direct causal relationship between his race and the Defendants' adverse actions including his termination, as the charge they were retaliating against him for was specifically based on his race. Mr. Singleton claims IKEA terminated him for violating the Personal Relationships Policy while no other co-workers in the Risk & Compliance Department even addressed about their relationships, let alone terminated for the same purported alleged violation.

Mr. Singleton was terminated after he reported to Ms. Ely and Mr. Scott that he was informed of their discriminatory plotting with Ms. Chenard and Ms. Knight, to fabricate stressful situations for Mr. Singleton to get him to lash out, so they would then be able to label him as an angry, scary, aggressive Black man, in line with a prejudiced and discriminatory stereotype against his protected class. As he was terminated within days of reporting this information, the causal link is the fact that the protected activity was reporting a racially discriminatory plot, and as the Defendants can not provide any evidence in defense or non-discriminatory reasons beyond the pretext for their adverse actions against him, shows there is no genuine issue of material fact, and he is entitled to Summary Judgement for his Race discrimination claims as a matter of law.

**2. Defendants claim Mr. Singleton Cannot Show Pretext - this is Disputed**

Mr. Singleton has pointed out the Defendants changing position throughout his charge and subsequent lawsuit, as they respond to the facts which Mr. Singleton proves and acknowledges the holes in their defenses. The Defendants are inconsistent with wether Mr. Singleton's relationship was either a conflict or interest or a possible conflict of interest, and the Defendants have quaffed back and forth between the two subtle yet important differences since he filed his EEOC Charge in 2022. The Defendants admit they lied about knowing about Mr. Singleton's relationship prior to receiving the EEOC charge in November 2021 and it being dismissed in December 2021. During the case the Defendants have expanded their position to include and allege Mr. Singleton was insubordinate, but they did not document or even mention insubordination at any time prior to his unlawful termination. The Defendants have held that Mr. Singleton was terminated for performance reasons, as he failed to adhere to three store policies, but they then state later in the case, that he was not terminated for performance reasons, when he points out that there were no previous corrective actions pertaining to any performance problems including any mention of breaching or violating any company policy at any time.

Multiple case laws support the inference of pretextual information in Mr. Singleton's case:

- As established in *Perfetti v. First National Bank of Chicago,* 950 F.2d 449 (7th Cir. 1991), inconsistencies around performance and reasons for termination, combined with the employer's changing explanations supports a reasonable inference of pretextual termination.

- As established in *Jolly v. Northern Telecom Inc.,* 95 F.3d 627, , 634-35 (7th Cir. 1996), the timing of the layoff (and in this case the termination), the employer's changing reasons and selective enforcement of policy supported a reasonable inference of pretext.

- As established in *Emmel v. Coco-Cola Bottling Co. of Chicago,* 95 F. 3d 627, 634-35 (7th Cir. 1996), a late explanation, undocumented performance issues, and more severe discipline supported a reasonable inference of pretextual termination.

Mr. Singleton provides a reasonable inference of pretextual termination, which would require argument at trial to be decided by a jury, as the Defendants have provided inconsistent and

changeable defenses absent of any evidence to support their alleged facts or position, which evolves in response to the valid and logical facts Mr. Singleton presents and provides evidence for, requiring the Defendants to backtrack their statements once they are revealed to be illogical at best and unlawful in their simple false utterance.

In fact, Mr. Singleton provided extensive evidence to support his claims and allegations, while the Defendants are unable to support their claims or provide evidence confirming their allegations of Mr. Singleton's wrongdoing. All coworkers in the Risk and Compliance Department were similarly situated to Mr. Singleton in regards to their being in relationships which would be required to be addressed according to the Defendants' claims, and while Mr. Singleton's relationship was the sole relationship addressed as requiring separate disclosure in the first place, was already an adverse action, and discriminatory as the Defendants were not interested in either discussing or acknowledging any of the other relationships of the other coworkers in the Risk and Compliance Department.

As the Defendants can not provide any evidence in defense or non-discriminatory reasons beyond the pretext for their adverse actions against him, shows there is no genuine issue of material fact, and he is entitled to Summary Judgement for his Race discrimination claims as a matter of law.

**E. Defendants claim they Are Entitled to Summary Judgment on Plaintiff's Harassment/ Hostile Work Environment Claim under § 1981 (Count Five) - this is Disputed**

Plaintiff's race-based harassment/hostile work environment claim is not subject to summary judgment, as he has established the constant targeting and plotting of management against Mr. Singleton, and the constant micromanaging of his and Ms. Goodman's work and physical location, was just a few of the severe and pervasive conduct of the Defendants which fostered an abusive and hostile working environment.

Mr. Singleton not only provides a prima facie case, but he also established that as there is no genuine issue of material fact in regards to the extremely hostile environment perpetuated against him, Mr. Singleton is entitled to Summary Judgement as a matter of law.

**1. Defendants claim There Is No Genuine Dispute of Material Facts to Support Plaintiff's Harassment/Hostile Work Environment Claim - this is Disputed**

Mr. Singleton has extensive emails detailing the continual discrimination and harassment he faced during his employment, and the pervasive existence of the continual targeting and discrimination fostered an abusive work environment severe enough to support his hostile work environment claims, and Mr. Singleton provides both documentation and emails to support and defend his claims.

As established in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-249 (1986) and reaffirmed in Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 33, 148 (2000), emails suggesting discriminatory intent or animus, create a genuine issue of material fact that must be resolved by a jury, as courts have held that such evidence is sufficient to survive summary judgement.

As Mr. Singleton has evidence and emails to represent and express the pervasive existence of race discrimination, targeting, harassment, and retaliation, as well as the toll they took on his mental and physical health, after the prolonged period of him being subjected to such a severe hostile working environment, provides genuine issue of material fact sufficient to survive summary judgement.

**a. No Reasonable Finder of Fact Could Conclude that the Alleged Conduct was Based on Plaintiff's Race - this is Disputed**

As established in *McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 409 (4th Cir. 2022), and acknowledged by the Defendants, the courts hold that harassment based on race can be inferred when the Plaintiff suffered harassment more often than others of different races or suffered harassment of a kind likely to be motivated by race. Mr. Singleton has provided both documentation and witnesses to attest to the harassment Mr. Singleton faced throughout his career, and relate it directly to his race, specifically regarding Ms. Chenard becoming his department manager and taking adverse actions against him throughout the rest of his career, after her close personal friend was terminated for race discrimination after Mr. Singleton reported the coworker's behavior and discriminatory statements.

Ashley Wilson, another White personal relation of Ms. Chenard's was allowed to resign in place of termination after Mr. Singleton reported the direct discrimination of Ms. Wilson against Black people in general, and specifically about Mr. Singleton and in front of him to another coworker, because he is Black, which was clearly meant to be a provocation. Though, Mr. Singleton's professional response was to report the incident to her manager and his manager, which is what he did.

Mr. Singleton has established, and the Defendants can not provide any evidence to the opposite, that no Black coworkers were either promoted within or hired into the Operations Departments under Ms. Chenard from 2017 through January 2022, and in fact the sole three Black career coworkers in the Risk and Compliance Department, were all separated from the company by the end of January 2022, following the EEOC Charge of race discrimination against Black coworkers being dismissed in December 2021.

**b. No Reasonable Finder of Fact Could Conclude that the Alleged Conduct Was Sufficiently Severe or Pervasive to Alter the Conditions of Plaintiff's Employment and Create an Abusive Atmosphere - this is Disputed**

Mr. Singleton shows that he was subjected to a level of severe and pervasive harassment that occurred frequently enough to interfere with his job performance, and he provides evidence (**Exhibit** ⌐9⌐ ▆▆journal and affidavit) which documented the daily and continuous discriminatory actions of his managers against both himself and Ms. Goodman, the only remaining hourly Black coworkers in the department. The conduct of the Defendants in 2021 unreasonably interfered with Mr. Singleton's job performance, as they affected his computer which nearly prevented Mr. Singleton from filing any official reports in the Risk reporting system. While the system continually attempted to shut him out before being able to finalize his reports, he identified a work around, which allowed him to still file his reports, including the report he filed following the security breach he investigated in November 2021, which also presented a direct conflicts of interest for multiple managers which Mr. Singleton addressed with his report and subsequent email. Whether a work environment is actionably hostile or abusive is a function of: (1) the frequency and severity of the conduct at issue; (2) whether the conduct is threatening or humiliating as opposed to

being offensive; and (3) whether the conduct unreasonably interferes with the employee's job performance. *Harris*, 510 U.S. at 23. The isolated incidents of alleged harassment fail to establish that Plaintiff was subjected to severe or pervasive harassment. *E.E.O.C. v. Sunbelt Rentals, Inc.*, but in contrast to this case law, Mr. Singleton faced constant and daily targeting, micromanagement, unequal expectations, and discriminatory conduct from his direct manager, along with Ms. Goodman, throughout 2021 and which became especially severe following the EEOC charge dismissal in December 2021.

**F. Defendants claim Mr. Singleton Cannot Establish a *prima facie* Case of Defamation *per se* - this is Disputed**

Under Virginia law, a plaintiff seeking to recover for defamation *per se* must allege (1) the publication of false information concerning the plaintiff that tends to defame the plaintiff's reputation. *See Hatfill v. New York Times Co.*, 416 F.3d 320, 330 (4th Cir. 2005) (citing *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993)). At common law, defamatory words that "prejudice [a] person in his or her profession or trade" are actionable as defamation *per se*. *Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 82 S.E. 2d 588, 591 (1954). The Defendants did not provide mere allegations of unsatisfactory job performance, which do not generally rise to the level of defamation *per se*. *McBride v. City of Roanoke Redevelopment & Housing*, 871 F. Supp. 885, 892 (W.D. Va. 1994); *Echtenkamp v. Loudon County Pub. Schs.*, 263 F. Supp. 2d 1043, 1063 (E.D. Va. 2003); the Defendants continuously lied against Mr. Singleton's person, conduct, and reputation continuously following the EEOC charge dismissal in December 2021, and throughout his termination and subsequent EEOC charge and lawsuit.

Ms. Chenard lied and had Mr. Singleton written up for a fabricated security breach she planned and orchestrated along with Ms. Knight in December 2021, after Mr. Singleton told Ms. Ely he had no disciplinary corrective actions. Mr. Singleton immediately reported the retaliatory write up based on the fabricated security incident. In January 2022 Ms. Ely said the retaliatory write up was rescinded, but there were no repercussions for Ms. Chenard or any corrective action, even though her actions broke multiple policies including the Behavior Standards Policy, Co

The Defendants claimed in his termination paper that Mr. Singleton hid his child with Ms. Goodman from the company, and they learned about his child from the EEOC Charge Ms. Goodman filed in 2021. This is a blatant lie, as both parents took parental leave following their child's birth, and provided their birth documents to the same managers, including Ms. Chenard.

Christy B defamed Mr. Singleton when she accused Mr. Singleton of stealing a wallet in the security department, and she said HR Manager Dee Sellman was the person who instructed her to investigate Mr. Singleton for the stolen wallet, but these were baseless and undeserved accusations in relation to Mr. Singleton's long upstanding reputation and honor, and he shouldn't have been targeted out of the entire department.

The Defendants have admitted their own lies at multiple times throughout this case, including specifically, that they were aware of his relationship prior to the EEOC charge being filed in November 2021. The Defendants based multiple adverse actions taken against Mr. Singleton on this single lie, that they just learned of his long term relationship from the EEOC Charge of race discrimination itself, including his unlawful termination in January 2022. While the Defendants hope to attempt to convince the Court that the termination communications are privileged internal corporate communication, made without malice, for the legitimate business purpose of effectuating Mr. Singleton's termination, Mr. Singleton provides evidence which specifically defeats both their notion of their actions and statements being made without malice and that the actions and statements were made for legitimate business reasons.

Mr. Singleton had already reported Mr. Scott to Ms. Ely directly for targeting and harassment, since he first impersonated Mr. Singleton in September 2021, using his HR position access to coworker personal information, in attempting to removing Ms. Goodman from Mr. Singleton's personal information. Mr. Singleton also reported Mr. Scott on multiple occasions for hostility against both Mr. Singleton and Ms. Goodman, and requested accommodation from Ms. Ely to prevent Mr. Scott from continuing his abusive conduct and harm against Mr. Singleton's mental health.

**1. Defendants claim the Court Should Grant Summary Judgment in Favor of Defendants Because Plaintiff Has Not Demonstrated that the Alleged Defamatory Statements are False - this is Disputed**

As the Defendants agree, an actionable statement is one that is both false and defamatory. The were numerous false allegations made by the Defendants made during his termination, and later refuted directly by the Defendants themselves during the investigations of the EEOC charges filed in 2022 following Mr. Singleton's unlawful termination. Truth is an absolute defense in a defamation action and the plaintiff has the burden of proving falsity. The absence of evidence from the Defendants in this matter, proves the veracity of Mr. Singleton's claims. Had Mr. Singleton failed to acknowledge or discuss his relationship in December 2021, the Defendants have provided evidence that they had planned to terminate him on December 10, 2021. The Defendants failed at any time thereafter to give Mr. Singleton any corrective action documenting his alleged refusal to disclose his relationship. In fact, both coworkers were present during the meeting together, openly discussed their relationship, and agreed to any investigation or mitigation requested or required by the Defendants. Following the intense and hostile meeting, Mr. Singleton followed up with Ms. Ely regarding Mr. Scott's unprofessional demeanor and his blatant animosity and hostility in his questioning and addressing both coworkers throughout the meeting, and his disturbing, abusive language and conduct towards Ms. Goodman specifically.

Without formally addressing or documenting any wrongdoing of the two Black coworkers for allegedly failing to disclose their relationship at any point after the meeting in-which they agreed to any investigation and/or mitigation regarding their relationship, and in light of the fact that the first time failure to disclose their relationship was documented as an unsupported allegation leveled against them by the Defendants, was in their respective termination papers given to them simultaneously on January 21, 2022. While the Defendants' attempt to convince the Court that Mr. Singleton does not have the evidence to prove their statements as false, in this case, the absence of evidence is the evidence of the false allegations. Mr. Singleton was never given any corrective actions or documentation stating he had failed to disclose his relationship, or that he was in violation or breach of any policy at any time, prior to his termination.

The only corrective action the Defendants produced during Discovery, in response to Mr. Singleton pointing out that he never received any prior warning about his relationship or being in breach of any policies, was a write-up dated for the December 10, 2021 meeting, stating he failed to disclose his relationship in violation of the Relationship Policy, and he was terminated immediately. As the Defendants refrained to give Mr. Singleton this retaliatory write up in the meeting, or at any point after that, points to the fact that he in fact did not fail to disclose, nor fail to cooperate with management, nor refuse the Defendants the option of mitigating his relationship as they deemed fit. And, as both employees were terminated simultaneously, shows that their terminations were not to remedy any breach of the Relationship Policy in the first place, as the breach would've been remedied as soon as either coworker were terminated, and would not require both terminations, and further the Relationship Policy addresses this fact, as it states coworkers may maintain their relationship and employment once any possible conflict of interest is mitigated. The Defendants still can not explain what conflict of interest they intended to mitigate between the two Black employees in the first place.

Mr. Scott's continual hostile actions and behaviors against Mr. Singleton and Ms. Goodman, specifically between August 2021 and January 2022, present a personal animus against the two coworkers, and coupled with Ms. Ely's continual guise of her presenting herself to Mr. Singleton as understanding and supportive, were meant to lull him into a false sense of security with her, to provide her fellow conspirators the opportunity to carry out their discriminatory and retaliatory plots against him.

As the Defendants' actions and behavior belied the truth of Mr. Singleton's claims, for it was only after he was informed about the discriminatory management plot against him and addressed Ms. Ely and Mr. Scott directly about the plot itself and the conspirators involved, including their own parts in the conspiracy, did the two managers state or document Mr. Singleton failed to disclose and/or hid and/or denied his relationship, labeled him a liar, and broadcasted his termination to make a statement for the other coworkers, as Mr. Singleton was held in high esteem throughout the organization, and Mr. Scott and Ms. Ely sent a message that if Mr. Singleton could be terminated, then no one's job was safe, so they need to stay silent and conform.

As the Defendants stated multiple false allegations in Mr. Singleton's termination paper, and as they contradict themselves later, acknowledging they were aware of the false statements when they were made, the Court should grant Summary Judgment in favor of Mr. Singleton for his defamation per se claims.

## 2. The Defendants claim the Alleged Defamatory Statements are Subject to Qualified Privilege - this is Disputed

The Defendants provide that in order for Mr. Singleton to overcome the privilege, "the plaintiff must establish both that the statement was false and that the defendant acted with actual malice." *Union of Needletrades*, 603 S.E.2d at 924.

The Defendants acknowledge their own lies from Mr. Singleton's termination paper, which overcomes the privilege as the statements they made against him were false, and the termination paper itself clearly presents the malice in Mr. Scott's and Ms. Ely's unprecedented execution of the simultaneous terminations, requiring extensive pre-planning, coordination, and participation of multiple managers and other coworkers, to carry out the termination to plan.

The language in Mr. Singleton's termination paper, is dripping with malice, which is clearly evident by the words used, and the personal tone of the narrative, expressing that Mr. Singleton was not being terminated for any professional reasons, as it was written in a way to exude its' personal nature, and was written with a smug finality of the fulfillment of a personal vendetta, which was executed by the assassination of Mr. Singleton's character, spotless record, and reputation, and the assassination of his over twenty-six year career, which was nothing short of the utmost dedication, pride, and loyalty, and providing him no warning, recourse, or chance to prevent the terrible action and the corresponding spectacle and ordeal.

## a. Defendants claim they Properly Communicated the Statements to Only Those Who Had a Duty and Interest in the Subject Matter - this is Disputed

Multiple coworkers involved in the termination who did not have an interest or duty in the terminations of either Mr. Singleton or Ms. Goodman were included, involved, and witness to the terminations.

As the Defendants stated multiple false allegations in Mr. Singleton's termination paper, and as they contradict themselves later, acknowledging they were aware ... the false statements when they were made, the Court should grant Summary Judgment in fav... of Mr. Singleton for his defamation per se claims.

**2. The Defendants claim the Alleged Defamatory Statements are Subject to Qualified Privilege - this is Disputed**

The Defendants provide that in order for Mr. Singleton to overc... the privilege, "the plaintiff must establish both that the statement was false and that the def...ndant acted with actual malice." *Union of Needletrades*, 603 S.E.2d at 924.

The Defendants acknowledge their own lies from Mr. Singleton ... termination paper, which overcomes the privilege as the statements they made against him were f... and the termination paper itself clearly presents the malice in Mr. Scott's and Ms. Ely's imp...deterred execution of the simultaneous terminations, requiring extensive pre-planning, coordinati... and participation of multiple managers and other coworkers, to carry out the termination to y...on.

The language in Mr. Singleton's termination paper, is dripping w...h malice, which is clearly evident by the words used, and the personal tone of the narrative, expr...ng that Mr. Singleton was not being terminated for any professional reasons, as it was written in a ... ay to exude its 'personal' nature, and was written with a smug finality of the fulfillment of a pers...al vendetta, which was executed by the assassination of Mr. Singleton's character, spotless res...on, and reputation, and the assassination of his over twenty-six year career, which was ... [redacted] ...thing short of the utmost dedication, pride, and loyalty, and providing him no warning, recourse, ... chance to prevent the terrible action and the corresponding spectacle and ordeal.

**a. Defendants claim they Properly Communicated the Statements to Only Those Who Had a Duty and Interest in the Subject Matter - this is Disputed**

Multiple coworkers involved in the termination who did not have ... an interest or duty in the termination of either Mr. Singleton or Ms. Goodman were included in ... discret and witness to the terminations.

Mr. Singleton provides evidence showing the Defendants' defamatory conduct and statements occurred prior to and within the context of his termination, in his termination paper itself, and in communications made before, during, and after his termination. The Defendants defeat their own qualified privilege when they acknowledge their claim of first learning about Mr. Singleton's relationship in the EEOC charge dismissed in December 2021, as false. It also shows malice, as the Defendants waited until after receiving the charge dismissal to address the information they deceitfully alleged they "just learned" about, his relationship and child, in November 2021.

Mr. Singleton reported a manager conflict of interest in breach of the Relationship Policy at the same time in November 2021, and the same managers involved, including Ms. Ely, made no comment or correlation to Mr. Singleton's relationship as presenting a conflict of interest or breaching the Relationship Policy.

After the charge was dismissed, Ms. Ely and Mr. Scott addressed Mr. Singleton's relationship as a conflict of interest and demanded he admit wrong doing, and at the same meeting (though still being labeled throughout as a friendly chat) stated they would not discuss any other relationships or their lack of documentation or corrective actions regarding those relationships, including the relationship he reported in November 2021, of which Ms. Ely was implicated in aiding the attempted coverup of both the conflict of interest and the security breach.

**b. Defendants claim Mr. Singleton Cannot Establish Malice by Clear and Convincing Evidence - this is Disputed**

To defeat the qualified privilege, Mr. Singleton must make a showing of malice by clear and convincing evidence. Mr. Singleton's case is based on blatant retaliation, and in Virginia, retaliation is a form of malice, and a retaliatory motive is in essence a malicious motive which destroys qualified privilege, as the privilege is lost if the statement is not made in good faith, and so, the retaliation presents the malice required to destroy the Defendants' intracorporate immunity. Therefore, the Defendants do not have the good faith protection of qualified privilege, their intracorporate immunity is destroyed in this case, their false statements are therefore defamatory, and Mr. Singleton is entitled to damages and the Court should grant summary judgement in Mr.

Singleton's favor as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, Mr. Singleton respectfully requests that the Court dismiss the Defendants' Motion for Summary Judgment, grant the Plaintiff's Motion for Summary Judgment, enter judgment in Mr. Singleton's favor, and award Mr. Singleton such other relief and damages as the Court deems just and proper.

Date of Signing: ___12|22|2025___

Ricky Singleton
15240 Mimosa Trail Dumfries, Virginia 22195
202-816-9165

Signature of Plaintiff: _____

Printed name of Plaintiff: _____

*pro se*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing List of Witnesses, was served this 22nd Day of December 2025, to Yvette V. Gatling, counsel for the Defendants, by electronic notification of the court's filing system and addressed as:

Yvette V Gatling, Esq., Littler Mandelson, P.C.
1800 Tysons Blvd Ste 500, Tysons Corner, VA 22102

Date of Signing: ___12|22|2025___

Signature of Plaintiff: _____

Printed name of Plaintiff: _____ *pro se*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
## _____ALEXANDRIA_____DIVISION

**RICKY**
**SINGLETON**
_____
**Plaintiff(s),**

v.

**IKEA US RETAIL**
**LLC, et al.,**
_____
**Defendant(s),**

Civil Action Number: ___1:24-cv-00025-PTG-LRV___

# LOCAL RULE 83.1 (N) CERTIFICATION

**I declare under penalty of perjury that:**

**No attorney has prepared or assisted in the preparation of**  Plaintiff's Opposition to Defendants' Motion for Summary Judgement and Memorandum of Support of Plaintiff's Motion for Summary Judgement.
**(Title of Document)**

**RICKY SINGLETON**
_____
Name of *Pro Se* Party (Print or Type)

*Ricky Singleton*
_____
Signature of *Pro Se* Party

Executed on: ___12/22/2025___ (Date)

## OR

**The following attorney(s) prepared or assisted me in preparation of** _____.
**(Title of Document)**

_____
(Name of Attorney)

_____
(Address of Attorney)

_____
(Telephone Number of Attorney)
Prepared, or assisted in the preparation of, this document.

_____
(Name of *Pro Se* Party (Print or Type)

_____
Signature of *Pro Se* Party

Executed on: _____ (Date)