# EXHIBIT

## 16

| | |
|---|---|
| **TO:** | Raul Torres<br>Executive Director |
| **THRU:** | Shelia Venning<br>Human Rights Manager |
| **FROM:** | Oliver Demery<br>Human Rights Investigator |
| **RE:** | Ricky Singleton v. IKEA New Washington<br>EEOC Charge No. 570-2022-01847 |

**Allegation(s) / Basis:**   Termination / Race (Black) & Retaliation

**Applicable Statute(s):**   Chapter 10.1 Prince William County Ordinance.
Title VII of the Civil Rights Act of 1964, as amended.

**Jurisdiction:**

This Charge was transferred from the EEOC to the Prince William Human Rights Commission on September 21, 2022. Prince William, Human Rights Commission, has jurisdiction since the Charge was filed in a timely manner; the alleged discriminatory act occurred within the geographical jurisdiction of Prince William County; the Respondent has the statutorily required minimum number of employees; and the alleged discriminatory acts, if proven, are prohibited by Chapter 10 of the Prince William County Human Rights ordinance or by federal or State anti-discrimination laws.

**Background:**

Respondent (IKEA) operates home furnishing stores across the U.S. including the IKEA store in Woodbridge, VA (IKEA Woodbridge).

The Charging Party (Ricky Singleton) was hired by the Respondent on or about December 22, 1997. The Charging Party held a Risk and Compliance position when his employment was terminated on or about January 21, 2022.

**Charging Party's Allegation(s):**

The Charging Party filed a charge of Discrimination against the Respondent based on his race (Black). Additionally, the Charging Party alleges that the Respondent subjected him to disparate discipline (termination) due to his race (Black) and retaliation after engaging in protected activity (being a witness in an external discrimination complaint).

Ricky Singleton v. IKEA New Washington
Report of Investigation

### Issue(s):

- Whether the Respondent terminated the Charging Party's employment based on his Race (Black)

- Whether the Respondent retaliated against the Charging Party by terminating his employment after he engaged in a protected activity.

### Respondent's Position: (Exhibit D)

The Respondent denies the charges of discrimination and/or retaliation alleged by the Charging Party.

### IKEA Trains the Charging Party on Its Personal Relationships Policy

Respondent's Policy on Personal Relationships in Employment requires coworkers to disclose all personal relationships established during employment to their line managers, Risk & Compliance manager, and HR Representative. In case of a conflict of interest caused by such a relationship, the Respondent provides a six-month window to resolve the conflict to allow sufficient time for one or both coworkers to find another position that does not create an issue under the policy. When employees do not follow their duty to disclose a conflict of interest, the Respondent, in the best interest of the Company, reserves the right to take appropriate corrective measures. To reinforce this policy, Respondent launched a nationwide training for all locations; Respondent's Woodbridge location trained its coworkers, including the Charging Party, on February 20, 2021. In its policy, a personal relationship is defined as a relationship "with a family member or another person the coworker is close to, which could compromise his or her objectivity when making business decisions." It gives examples such as:

• Relatives;
• Relationships of a private, romantic, or intimate nature, which may or may not
include co-habitation or marriage/civil union/domestic register partnership;
• Persons living with or financially dependent on the coworker; or
• Any other person the coworker has a relationship with which could impair his or
her objectivity when making job-related decisions.

The policy guidelines require coworkers to disclose the relationships so that the relationship can be assessed to identify any possible conflict. The guidelines state that the relationships between any Risk and Compliance coworker and any other store coworker should be risk assessed-and documented with approval. Not every personal relationship creates a conflict— Respondent asks coworkers to disclose them so they can be assessed and mitigated against, if necessary. The training also stated that relationships within the Risk & Compliance department were not allowed.

### IKEA Attempts to Work with the Charging Party to Mitigate the Conflict of Interest

In November 2021, a coworker, "Employee A" filed a Charge of Discrimination with the EEOC alleging Discrimination. In her Charge, she made a sworn statement that she was "engaged in a personal relationship with the Charging Party" and that they "have a child together." The EEOC did not ask the Respondent to file a position statement in response to this Charge and issued a Notice of Right to Sue letter on December 1, 2021. When Respondent received this Charge, it had written confirmation from "Employee A" that she and the Charging Party were in a "personal

2

Ricky Singleton v. IKEA New Washington
Report of Investigation

relationship," and therefore had violated the Respondent's personal relationship policy for failing to disclose. Respondent was not shocked to learn of this personal relationship with "Employee A"; Respondent was only shocked that "Employee A" admitted to the relationship after actively hiding it and denying it for so long.

On December 10, 2021, and January 13, 2022, Respondent managers met with the Charging Party and confronted him with their knowledge of his relationship with "Employee A." Given his position as a Risk and Compliance Coworker, he had a heightened duty to disclose a conflict of interest.

During those meetings, Raquel Ely, Market Manager, and Johnathan Scott, People & Cultural Manager, tried to reason with the Charging Party and encouraged him to work with them to resolve the conflict of interest. However, the Charging Party again refused to acknowledge the relationship. It denied having any personal relationship with "Employee A" — despite "Employee A" having sworn in a statement to the EEOC that she was in a "personal relationship" and had a child with the Charging Party.

Respondent could not continue employing him without the Charging Party's cooperation in disclosing and mitigating the conflict. As a result, the Respondent felt it had no choice but to terminate the Charging Party and did so on January 21, 2022, for violating their policies and failing to disclose his relationship.

### Record & Testimonial Evidence (Exhibit D)

- Performance reviews for the Charging Party during 2017- 2021. The Charging Party received a total score of Meets Expectations for each of the five (5) evaluations.

- The Respondent's Behavior Standards Policy provided a partial list of behavior or conduct that may result in corrective action, up to and including termination of employment...

    *Any act of dishonesty relates to the performance of work duties or investigations regarding possible violations of Company policies and/or applicable laws.*

- February 20, 2021, The Respondent's PowerPoint training regarding Conflict in Personal Relationships...

    *Relationships between these roles need to be risk assessed and documented with approval:*

    *Any Risk and Compliance coworker and any other store coworker.*

- A Charge of Discrimination was filed by "Employee A" with Washington EEOC on November 16, 2021. On the complaint, "Employee A" names the Charging Party as another person discriminated against by the Respondent. "Employee A" also stated that she had a personal relationship with the Charging Party.

3

- Respondent's Corrective Action Forms dated December 9, 2021, and January 20, 2022, where it states the Charging Party violated their Relationship Policy by not disclosing his personal relationship with "Employee A." Due to this, his employment with Respondent was terminated.

### Charging Party's Rebuttal & Witness Statement(s): (Exhibit C)

- In the Charging Party's November 6, 2022 rebuttal, he states his performance evaluations were always good and aligned with store policies and procedures. In addition, the Charging Party said he received a raise in September, a glowing performance evaluation in October, a promised yearly raise in January, and a bonus he received in November.

The Charging Party stated due to the years of discrimination and retaliation he experienced and witnessed during his tenure with Respondent. He agreed to be a witness on an EEOC Charge of Discrimination that "Employee A" filed. After filing her Charge in November 2021, "Employee A" informed the Charging Party that her Charge was dismissed at the beginning of December. She told the Charging Party that she noticed adverse actions from her manager the following day. Within two weeks, both "Employee A" and the Charging Party were called into a hostile meeting with Raquel Ely and Jonathan Scott about information addressed in the protected activity. Once the Charging Party acknowledged the meeting was an interrogation, he reserved his right to have legal counsel present to address any further questions regarding the protected act. He asked to be respectfully removed from the room. The Charging Party stated he made Ms. Ely and Mr. Scott aware that they were discriminating against him and "Employee A" and selectively targeting them from all of the other coworkers.

The Charging Party stated the key focus for Respondent was creating a narrative about relationships and conflicts of interest. The Respondent wanted to define relationships as conflicts of interest. According to the policy, the Charging Party pointed out that relationships are no conflicts of interest in and of themselves, and conflicts of interest are reported to protect the Company's assets.

The Charging Party stated that after this meeting, he was written up by his supervisor for a fabricated situation. The Charging Party stated Respondent's management had given him this reprimand to elicit an angry and unprofessional response. Management wanted the Charging Party to act out so he could be labeled and written up for responding as an aggressive, scary Black man.

At the beginning of January, the Charging Party stated Ms. Ely contacted him to meet her for a one-on-one meeting regarding the write-up. The Charging Party was surprised when he entered the office because Mr. Scott was sitting at the table with Ms. Ely, even though she had previously said she would never put the Charging Party in the position to meet with Mr. Scott again. Ms. Ely said the write-up was expunged from the Charging Party's record, and he received an apology for the whole incident, which was now labeled as a simple misunderstanding. However, after quickly closing the write-up conversation, Ms. Ely and Mr. Scott immediately continued the same line of questioning regarding a relationship with "Employee A." The Charging Party reiterated that he was uncomfortable discussing any aspect of a relationship, concerning a protected activity, without legal counsel.

Ricky Singleton v. IKEA New Washington
Report of Investigation

Following an email the Charging Party sent to Ms. Ely on Friday, January 14, she called him to have a meeting with her. Nick Demas, a White manager, was also present at this meeting. He served as a witness in the room when she terminated him.

The Charging Party stated management acted against him in the full knowledge that he did not do anything to deserve termination. The Charging Party said he reported discrimination and was a credible witness. Both are protected acts. The Charging Party stated the Respondent knew his performance did not leave any room for corrective action, and they knew they would have to create a narrative to use anything against him. The Charging Party stated that he was terminated in January. It was only due to retaliation.

- "Employee A" (Black), a former Respondent employee, provided the following information:

"Employee A" stated she filed an external discrimination complaint against the Respondent, which was dismissed on or about November 26, 2021. She said she and the Charging Party suffered constant retaliation when the Respondent was notified that the Charge was dismissed until their termination on January 21, 2022. "Employee A" stated she and the Charging Party were not in supervisory roles within the Risk and Compliance Department.

"Employee A" stated she believes the Respondent had a pattern of discriminating against the (Black) employees; this was her allegation in her November 2021 complaint. "Employee A" stated that they were targeted and ultimately terminated because she and the Charging Party are Black and spoke out about a racial discrimination pattern, especially within their department. She stated she and the Charging Party were subjected to a difference in pay, work hours, being granted leave, promotions, and micromanagement.

- "Witness A" (Black), a former employee, provided the following information:

"Witness A" stated he worked with the Respondent for three (3) years; left employment in 2013. His position was the Safety and Security Manager, and he directly supervised the Charging Party. "Witness A" stated that he didn't have any details about the Charging Party's termination. Still, he said that he believes that the Respondent has a culture of racial inequality toward African Americans relating to promotion opportunities and pay.

"Witness A" used the example of the Charging Party, who he stated was a great employee and always professional. Despite this, the Charging Party was passed over for promotion to a manager position. "Witness A," said he believed the Respondent managers "targeted" the Charging Party for some reason.

**Investigative Summary**

The Charging Party alleges that the Respondent subjected him to disparate discipline (termination) due to his race (Black) and retaliation after engaging in protected activity (being a witness in an external discrimination complaint).

On November 16, 2021, "Employee A" filed an external employment discrimination complaint against the Respondent alleging race, sex, and retaliation discrimination; the Charging Party was named as an involved party. On or about November 26, 2021, this investigation ended due to a Notice of Right to Sue being issued.

5

Ricky Singleton v. IKEA New Washington
Report of Investigation

On December 10, 2021, and January 13, 2022, Raquel Ely and Jonathan Scott questioned the Charging Party and "Employee A" about being involved in a personal relationship. The Charging Party refused to confirm or deny.

On December 21, 2021, three (3) weeks after the employment discrimination complaint investigation ended, the Charging Party was issued a reprimand (documented counseling) relating to his failure to inform a manager that he was leaving, which left a gap in coverage for the department. Per the Charging Party, the Respondent rescinded this counseling on January 13, 2021, and deemed it a "simple misunderstanding."

On January 21, 2021, the Charging Party and "Employee A" were terminated.

There was no evidence of any issues with the Charging Party's work performance as the Charging Party received good performance reviews, and there are no recent reprimands in his personal file (the last reprimand was in 2013, not including the reprimands that led to his termination). However, evidence indicates the Charging Party violated the Respondent's Conflict in Personal Relationship policy by failing to disclose his relationship with "Employee A."

Whereas the Respondent's 2018 policy does not require non-management employees in the same department to disclose their relationship, the Respondent made new guidelines to this policy. These guidelines stated that all employees in the Risk and Compliance office were required to disclose any personal relationship with a coworker. This information was communicated to the Respondent employees during training on or about February 20, 2021.

After working for over twenty years, the Charging Party was terminated within two (2) months of the Respondent's receipt of an EEOC charge wherein he was explicitly named. The Charging Party also received a documented counseling one (1) month after the Respondent acquired the Charge, which was later rescinded.

The Charging Party failed to notify the Respondent of his personal relationship with a coworker in the Risk and Compliance department. Moreover, he refused to answer the Respondent's inquiries on whether he was involved in a personal relationship with "Employee A." Accordingly, this was deemed a violation of the Company's Behavior Standards Policy and may result in corrective action, including termination of employment.

In addition, there is insufficient evidence that the Charging Party was terminated due to his race (Black). Finally, the Charging Party could not identify a similarly situated individual outside his protected class that failed/refused to answer the Respondent's inquiries on whether they violated the Respondent's Relationship policy and were not terminated.

The Respondent provided a legitimate, nondiscriminatory reason for the Charging Party's termination. Accordingly, the Charging Party was terminated for failing to notify the Respondent of his personal relationship with a coworker in the Risk and Compliance department. Moreover, he refused to answer the Respondent's inquiries on whether he was involved in a personal relationship with "Employee A." Accordingly, this was deemed a violation of the Company's Behavior Standards Policy and may result in corrective action, including termination of employment.

6

Ricky Singleton v. IKEA New Washington
Report of Investigation

### Analysis

To make a prima facie case of disparate treatment (termination), the Charging Party must show that (a) he is a member of a protected class; (b) that he was performing at a satisfactory level with his employer, (c) that he was treated differently from similarly situated employees, not in his protected class; (d) and that the similarly situated employee was in the same chain of command as the Charging Party.

There is insufficient evidence that the Charging Party was terminated due to his race. Additionally, the Charging Party could not identify a similarly situated individual outside his protected class that failed and or refused to answer the Respondent's inquiries on whether they violated the Respondent's Relationship policy and were not terminated.

The Respondent provided a legitimate, nondiscriminatory reason for the Charging Party's termination. The Charging Party was terminated for failing to notify the Respondent of his personal relationship with a coworker in the Risk and Compliance department. Moreover, he refused to answer the Respondent's inquiries on whether he was involved in a personal relationship with "Employee A." This was deemed a violation of the Company's Behavior Standards Policy and may result in corrective action, including termination of employment.

To make a prima facie case of retaliation, the Charging Party must show that (a) he previously engaged in protected activity or opposed unlawful discrimination, (b) the agency was aware of his activity, (c) he was contemporaneously or subsequently adversely affected by some action of the agency (d) there is a connection between his activity and the adverse employment decision.

The Charging Party was terminated within two (2) months of the Respondent's receipt of an EEOC charge wherein he was explicitly named. However, the Charging Party failed to notify the Respondent of his personal relationship with a coworker in the Risk and Compliance department. Moreover, he refused to answer the Respondent's inquiries on whether he was involved in a personal relationship with "Employee A." This was deemed a violation of the Company's Behavior Standards Policy that may result in corrective action, up to and including termination of employment. The termination of employment is not associated with his participation in an EEO process but was due to his failure to disclose a personal relationship which he had the obligation to disclose.

### Determination

The evidence gathered, in this case, does not support the Charging Party's allegation that he was subjected to Discrimination based on his race or retaliated against for participating in protected activity. Accordingly, based on the above analysis, I recommend a **"No Probable Cause"** finding in the above-referenced matter.

*Oliver Demery*
Oliver Demery
Human Rights Investigator

February 1, 2023
Date

☐ Approve

7

Ricky Singleton v. IKEA New Washington
Report of Investigation

*[signature: Shelia Venning]*

**Shelia Venning**
Human Rights Manager

2/1/2023
Date

☑ Approve

*[signature]*

**Raul Torres**
Executive Director

**02/01/2023**
Date

Ricky Singleton
PO Box 7766
Woodbridge, VA 22195

RE: Ricky Singleton v. Ikea New Washington
    EEOC Charge No: 570-2022-01847

Dear Ricky Singleton:

*This letter will provide you a summary of the Respondent's Position Statement for your review.*

## I. MR. SINGLETON'S EMPLOYMENT

IKEA hired Mr. Singleton on December 22, 1997. During his tenure at IKEA Woodbridge, Mr. Singleton held several positions, but his last position was Risk and Compliance Co-Worker.

### A. IKEA Trains Mr. Singleton on Its Personal Relationship Policy

The IKEA US Policy on Personal Relationships in Employment requires co-workers to disclose any and all personal relationships established during employment to their line managers, Risk & Compliance manager, and HR Representative. In the event of a conflict of interest caused by such a relationship, IKEA provides a six-month window to resolve the conflict to allow sufficient time for one or both of the co-workers to find another position that does not create an issue under the policy. When employees do not follow their duty to disclose a conflict of interest, IKEA, in the best interest of the Company, reserves the right to take appropriate corrective measures. To reinforce this policy, IKEA launched a nationwide training for all locations; IKEA Woodbridge trained its co-workers, including Mr. Singleton, on February 20, 2021. In its policy, a personal relationship is defined as a relationship "with a family member or another person the co-worker is close to, which could compromise his or her objectivity when making business decisions." It gives examples such as:

- Relatives;
- Relationships of a private, romantic, or intimate nature which may or may not include co-habitation or marriage/civil union/domestic register partnership;
- Persons living with or financial dependent on the co-worker; or
- Any other person the co-worker has a relationship with which could impair his or her objectivity when making job-related decisions.

The policy guidelines require co-workers to disclose the relationships so that the relationship can be assessed to identify any possible conflict. The guidelines state that the relationships between any Risk and Compliance co-worker and any other store co-worker should be risk assessed and documented with approval. Not every personal relationship creates a conflict—IKEA just asks co-workers to disclose them so they can be assessed and mitigated against, if necessary. The training also specifically stated that relationships within the Risk & Compliance department were not allowed.

### B. IKEA Attempts to Work with Mr. Singleton to Mitigate the Conflict of Interest

In November 2021, a co-worker, "Employee A" filed a Charge of Discrimination with the EEOC alleging discrimination. In her Charge, she made a sworn statement that she was "engaged in a personal relationship with Rick Singleton," and that they "have a child together." The EEOC did not ask IKEA to file a position statement in response to this Charge and issued a Notice of Right to Sue letter on December 1, 2021. When IKEA received this Charge, it had written confirmation from "Employee A" that she and Mr. Singleton were in a "personal relationship," and therefore it had violated the IKEA personal relationship policy for failing to disclose. IKEA was not shocked to learn of this personal relationship with "Employee A"; IKEA was only shocked that "Employee A" admitted to the relationship after actively hiding it and denying it for so long.

On December 10, 2021, IKEA managers met with Mr. Singleton and confronted him with their knowledge of his relationship with "Employee A". Given his position as a Risk and Compliance Co-Worker, he had a heightened duty to disclose a conflict of interest.

During that meeting, Ms. Ely and Mr. Scott tried to reason with Mr. Singleton and encourage him to work with them to resolve the conflict of interest. Mr. Singleton again refused to acknowledge the relationship and denied having any personal relationship with "Employee A" — despite "Employee A" having sworn in a statement to the EEOC that she was in a "personal relationship" and had a child with Mr. Singleton.

Approximately a month later, on January 13, 2022, Ms. Ely and Mr. Scott again met with Mr. Singleton to discuss the mitigation process for conflicts and the options available for co-workers involved in personal relationships as defined by IKEA policy. They wanted to work with Mr. Singleton and give him the time and support to resolve the issue. Mr. Singleton dug in his heels and again refused to disclose the relationship.

Without Mr. Singleton's cooperation in disclosing and mitigating the conflict, IKEA could not continue employing him. IKEA knew—from "Employee A" own sworn statement—that he was involved in a "personal relationship" in violation of IKEA policy. IKEA wanted to work with Mr. Singleton to resolve the conflict; per standard practice, Ms. Ely and Mr. Scott were prepared to offer him six months to resolve the conflict—despite the fact that he had clearly been in a personal relationship with "Employee A" for a long period of time and had been actively hiding it. IKEA felt it had no choice but to terminate Mr. Singleton and did so on January 21, 2022 for violations of IKEA policies and for failing to disclose his personal relationship.

*Please provide any rebuttal, evidence, information and/or witnesses (provide contact information for each) to support your allegations and forward this information to the Commission by November 18, 2022. Please do not hesitate to contact me during normal business hours at (703) 792-4631 if you have any questions or require additional information.*

Sincerely,

*Oliver Demery*

**Oliver Demery**
**Human Rights Investigator**