# EXHIBIT

רו

# U.S. Equal Employment Opportunity Commission

# Office of Federal Operations

Ricky Singleton
Complainant,

vs.

IKEA US RETAIL LLC
Respondent,

EEOC Case No: 570-2022-01847
PWCHRC Charge No: 570-2022-01847

---

# REQUEST FOR SUBSTANTIAL WEIGHT REVIEW

---

Name:      Ricky Singleton
Address:   15240 Mimosa Trail
           Dumfries, VA 22025
Phone:     571-490-6953
Email:     liams.sig@gmail.com

February 11, 2023


From:
Ricky Singleton
15240 Mimosa Trail
Dumfries, VA 22025
liams.sig@gmail.com


To:
Equal Employment Opportunity Commission
Washington Field Office
131 M. Street, N.E., Fourth Floor, Suite 4NWO2F
Washington, DC 20507-0110


Dear Sir / Madam,


The Complainant, Ricky Singleton, is respectfully requesting a Substantial Weight
Review from the EEOC regarding his Charge of Discrimination and Retaliation against
Respondent, IKEA US RETAIL LLC. My complaint was transferred to and investigated
by the Prince William County Human Rights Commission ("PWHRC" or "FEPA").
Complainant believes substantial material and evidence from his case was omitted and
not acknowledged for the decision.


Sincerely,


_____        _____
Ricky Singleton                              February 11, 2023
Complainant
Phone: 571-490-6953
Email: liams.sig@gmail.com

**Background:** Complainant charged Respondent with retaliation.
**Problem:** The FEPA cannot grant access to the federal court system.
**Request:** The EEOC performs a Substantial Weight Review.

## 29 CFR §1601.76 | Right of a party to request review

*"The [EEOC], on receipt of a request for review, shall conduct such review in accord with the procedures set forth in the Substantial Weight Review Procedures (EEOC Order 916)"*

Legal Citations
• 29CFR§1601.76

The EEOC has previously performed SWRs on PWCHRC cases.

## Abbreviations

| | |
|---|---|
| CP | Charging Party/ Complainant |
| EEOC | Equal Employment Opportunity Commission |
| PWCHRC | Prince William County Human Rights Commission |

# **Substantial Weight Review Request**

## **Immediate History**

1. In August 2022,  Charging Party filed his Charge of Discrimination and Retaliation with the EEOC.

2. On September 21, 2022 the EEOC transferred his charge to the PWCHRC.

3. During the fall and winter of 2022, CP reports numerous inconsistencies and biases in the investigation to the PWCHRC and EEOC.

4. On February 1, 2023 the FEPA issued its' determination.

5. Upon receiving the decision, the Charging Party sought to exercise his rights (under 29CFR§1601.76) Charging Party is requesting a Substantial Weight Review.

## **Bias in the PWCHRC Investigation and Report**

The investigator overlooks or flatly ignores hard evidence presented by the Charging Party and which exists in direct opposition to the Respondent's position and the investigator's decision. This is not an exhaustive list. It includes, but is not limited to the following:

1. CP's EEOC charge was sent for early mediation in September 2022. The charge was also transferred from the EEOC to the PWCHRC in September 2022, a local county FEPA, based in the same county as the Respondent. On receiving the charge, the investigator failed to contact the charging party. The CP called to ask about the mediation, and the investigator finally said that the Respondent didn't want to mediate this charge with the CP.

2. The Respondent and FEPA are both members of the PWC Chambers of Commerce, and the PWCHRC has participated in functions presented by the Respondent, at the

Respondent's location, for members of the Chambers of Commerce. When the CP inquired about the relationship between the PWHRC and the Respondent as members of the Chambers of Commerce. Investigator denied knowledge of the membership of either party nor prior knowledge of the Chambers of Commerce.

The mutual benefits shared by the members of the Chambers of Commerce, provide a direct conflict of interest for the PWCHRC in investigating any of their fellow members, as it is in their best interest to protect the interests of the other businesses in the Chambers of Commerce.

3. Investigator claimed EEOC did not provide any evidence to the PWCHRC, that the CP provided to the EEOC prior to the charge being transferred to the PWCHRC, so he didn't have any of the emails or other evidence that was provided. Investigator confirmed he only had the Charge itself. CP asked how his charge could be investigated if the investigator didn't have the evidence.

4. Investigator continually attempted to sway the investigation away from the continual discrimination that the CP reported in his charge. The investigator attempts to limit the scope of the discrimination in the charge as pertaining solely to the termination itself, while discounting the discrimination that was witnessed and confirmed in the witness testimony.

5. Investigator misrepresents the CP's witness positions to discount their connection to the charge and lessen the impact of their statements supporting the charges of continual discrimination.

6. Investigator ignores and does not acknowledge direct evidence provided by the Charging Party in support of his allegations.

7. Investigator bases his findings on the Respondent's false interpretation of the policy, which was purposefully used by the Respondent, in order to target the CP. The investigator failed to acknowledge the entirety of the policy, and chose instead to focus on the Respondent's targeted interpretation and narrative. Investigator focuses on the new policy guidelines for the Relationship Policy, even though the actual Relationship Policy directly supersedes any local amendments to the policy. Investigator also failed to acknowledge that the Relationship Policy is not a signed policy and does not provide termination as an option for the policy.

8. Investigator misrepresents the CP's performance history in support of Respondent narrative. Investigator presents the fallacy that the CP received corrective actions on December 9th and January 20th, and downplays that the CP pointed out that all previous attempts to take corrective action against the CP were determined to be discriminatory and rescinded. Specifically, there were no corrective actions, falsified or otherwise, given to the Charging Party on neither December 9th nor January 20.

9. Investigator mentions Charging Party received Meets Expectations on his recent yearly Performance Reviews, but he did not acknowledge how the years prior to 2017, before Michelle Chenard became OPs Manager, CP received Exceeds Expectations on his yearly Performance reviews.

9. Numerous managers, both white and black, confided in the Charging Party over the years, that they were charged by upper management and HR to target and discriminate against the CP, as the black employee in the department.

10. Investigator did not acknowledge that in December 2021, there were three black employees in the Risk and Compliance Department. By the end of January 2021, there were no black employees who maintained their employment, even though all three were career employees, and none were expecting to leave their employment in January at the

beginning of that month. Both of the other Black employees were called as witnesses in the Charging Party's rebuttal.

11. Respondent bases the CP's termination off of information they took from another employee's protected activity, and the investigator based his decision on the fact that the Respondent based the terminations off of information the Respondent took from another employee's protected activity.

12. The investigator ignored all of the evidence I provided of my own continual protected activity and management's responses to it.


### History of Discrimination Presented in Rebuttal

The investigator did not acknowledge any of the history of the continual discrimination the CP presented in his rebuttal, nor the fact that he had hard evidence and witnesses to support the allegations. This is not an exhaustive list. It includes, but is not limited to the following:

1. Charging Party began working for the Respondent in December 1997, and remained the only black male coworker-level employee in his department throughout his career. Though, he performed work in a managerial capacity and was the acting manager of the department, without compensation, the Charging Party was never promoted to any level of management within the department for over 20 years.

2. Charging Party presented multiple managers in his rebuttal who told him of numerous favorable employment actions given to white employees upon hire, that he was actively barred from, as a black male. Managers who tried multiple attempts to get equal treatment for him, were constantly combatted against by HR and Operations Managers, who also pressured the same managers to take direct actions against the CP, without

reason or provocation, and based solely on his race, in comparison to his white colleagues who were never subjected to such targeting.

3. Charging Party detailed continual discrimination that he both experienced and reported throughout his career in his rebuttal. CP provided numerous managers involved with the discrimination, based on his race (Black), throughout his career, and the way the discrimination was not only tolerated, but propagated and accepted by numerous managers throughout the organization, over the course of his career.

4. CP expressed the collaboration, on multiple occasions, of store managers, operations managers, and hr managers, in encouraging, supporting, and defending, discriminatory actions taken against the CP throughout his career, as a black male in the security department, in comparison to how white coworkers in the security department were treated at the same time by said managers.

5. Charging Party explained the discrimination he faced in pay, availability, scheduling, vacations, lunches and breaks, religious accommodation, performance expectations, good performance acknowledgment, and continual discrimination in how his reports of discrimination were addressed, acknowledged, and handled by management, in comparison to how management handled reports made by and against white coworkers. His allegations of discrimination, including specific incidents, were acknowledged, supported, and verified by managers and witnesses.

6. Charging Party filed numerous reports of discrimination, to and about Dee Selman, Shilpa, Carolina, Jackie DeChamp, Martin, Mike Pitchford, Christy, Maria, Aaron, Michelle (numerous), Andrew, Ashley, in his rebuttal and explained the outcomes of those discriminatory actions.

7. The CP not only spoke about the managers guilty of propagating, supporting, and defending discrimination in his rebuttal, but also a few managers who addressed his

reports of discrimination appropriately, in line with the policies and laws regarding discrimination. The CP mentioned Heather, Frederick, and Arda, as Store managers who did not ignore or abide the discrimination, but actively sought to remedy the incidents according to policy and law. These actions in response to reported discrimination, shows that they acknowledged the truth of the discrimination by holding investigations, and also shows that the discrimination was found to be true as they needed to address and rectify the situations for those involved.

8. 2006-2017: Dee Selman, Shilpa, Mike Pitchford, Carolina, and Jackie DeChamp (HR, Ops, and Store managers) ramped up discriminatory actions against CP. For example, switchboard coworkers were expected to have M-F availability, while agents were expected to have open availability seven days a week. CP was pressured into switching to an agent position in order to affect his current M-F availability, but the white coworkers in the department were allowed to remain as switchboard coworkers with their preferred availability.

Christy Babcock, a white coworker with friends in management, was placed in the security department by upper management to take team lead role and exclude CP from getting the team lead position. Charing party reported her for sexual harassment and watching him on camera, which was strictly against security policy. She was then promoted out of the department.

Aaron Komorgan, a white coworker and close personal friend of Michelle Chenard, made racial slur "sand nigger" to CP, and was terminated.

DK, as Security Manager, addressed the discrimination including unfair pay, lunches, hours setting to target black coworker, and promotions propagated against CP to management throughout his employment.

CP explained that he was unfairly targeted by not being given lunches for years. The store manager ended up reimbursing the Charging Party for the missed lunches, but as the discrimination had been going on for so many years, the store manager could not compensate him for all of them. He also stopped the responsible managers from continuing their lunch targeting of the CP.

CP detailed how these examples of the continual discrimination, reported by the CP, created and fostered a hostile, toxic, unethical working environment.

10. 2017-2022: Michelle Chenard became the OPs Manager over the Risk & Compliance Department. Michelle immediately took discriminatory actions against all black coworkers in R&C, and over the next five years filled the department with her white acquaintances, friends, and relatives, regardless of the Relationship Policy, and used those relationships to target the Charging Party and other black coworkers in the R&C department.

- Penny, a white coworker, did not need to apply for position in the department, she was placed there. She was shown preferential treatment as she had a set schedule that was not available to any of the black coworkers. While Penny maintained her choice schedule for years, the black coworkers were not given accommodations for special scheduling.

- Andrew, a white relative of Michelle Chenard, was hired externally by Michelle Chenard to take the Team Lead position in the R&C department, instead of giving the position to the Charging Party. Michelle Chenard had already planned to hire Andrew before the CP was even given his interview.

- Alex, a close personal friend of Michelle Chenard, was placed in the R&C department without an application or interview.

- Ashley, the white girlfriend of Andrew, who had been given the R&C Team Lead position instead of the CP, was hired to work in the cash office.

- Heidi, a white close personal friend of Michelle Chenard, was given the R&C Team Lead position following Andrew's departure. Then a Customer Service Manager position was held for her for months, without application or interview.

- Ronda, a white relative of Michelle Chenard, was hired as an external candidate for a R&C coworker position. Though she had little to no experience in the department, she was promoted to R&C Manager in early 2021.

- Caleb, a white relative of Heidi, was hired as a coworker into the R&C department as an external hire in 2021.

- Heather said she would address the continual discrimination and hostile, retaliatory environment, and it stopped for the remainder of her time there.

- Raquel became the Store Manager a few months after Heather's departure, and the continual discrimination Heather had addressed and stopped, resumed.

- Jonathan became the acting HR Manager overseeing the Woodbridge location following the abrupt departure of Dianna Abilmona in early 2021.

11. Michelle Chenard targeted the CP while he was on furlough during the pandemic shut down. She requested CP send his keys back to the store, but when he sent them FedEx, they were denied at the door by upper management. The Charging Party was one of the last employees in the department recalled from furlough, even though he had seniority, as all the other coworkers were recalled before the black coworkers in the department were recalled. CP had to report that he did not receive any of his paychecks during furlough to the store manager, in order to get the matter resolved.

12. The Charging Party sent Raquel Ely an email on January 14 , 2022, following the January 13 meeting, addressing the discriminatory and retaliatory behavior and actions taken against the Charging Party and Employee A, in which Raquel was involved.

## Key Individual's Cooperation and Participation

Key individuals mentioned in the Charging Party's rebuttal are omitted or misrepresented in the investigative report. This is not an exhaustive list. It includes, but is not limited to the following:

1. DK - Investigator glances over witness statement and the evidence provided in letter from 2013. Also discredits witness statement by focusing the discrimination of the investigation on the termination alone, and then explaining the witness had no knowledge of the termination itself.

2. Les - witness provided by CP was not addressed in Report of Investigation. Les was the other Black R&C team lead force retired in January 2022.

3. Michelle Chenard was completely omitted from the Report of Investigation. Following Michelle Chenard becoming Ops Manager over the R&C department, she began her continual discriminatory behavior against the Charging Party, and it was well detailed in his rebuttal. She took numerous actions against the CP, and she was continually reported for discrimination on numerous occasions.

3. Raquel - Investigator does not address the details of the events following the November EEOC charge, leading to CP's termination in January 2022.

Raquel asked the Charging Party to meet her for a friendly chat on December 10, 2021. Jonathan was present in the meeting as well, even though she hadn't said he was

going to be there. Raquel and Jonathan turned the meeting into an interrogation and accused the CP of being in a conflict of interest. The Charging Party pointed out that he had just investigated and reported a conflict of interest between Heidi and Jada in November 2021, which lead to a security breach in the Cash Office. CP explained the situation and Raquel's involvement in his rebuttal.

Charging Party sent Raquel an email following the December 10 meeting addressing Jonathan's continual aggressive behavior, including confrontational language and demeanor, and bullying,  during the meeting. When CP addressed Jonathan's aggressive behavior during the meeting, Raquel apologized for putting CP in that position and stated he would not have to be in a meeting with Jonathan ever again.

The CP was given a retaliatory write up from Michelle Chenard at the end of December following him telling Raquel he had never been written up. The CP reported the incident to Raquel and she called him into a one-on-one meeting with her on January 13 to tell him she had the write up rescinded. Jonathan was also in the room when the CP entered for the meeting, even though Raquel had already said that wouldn't happen.

Raquel stated the CP would not have to be in any more meetings with Jonathan, prior to the January 13 meeting, but she still had Jonathan as a surprise participant when the CP was brought into the meeting.  CP sent Raquel an email addressing the fact that she withheld Jonathan's presence at the January 13 meeting on purpose, and he was also aware of her participation in the discrimination and retaliation he and Employee A were subjected to following their participation in protected activity.

Jonathan's behavior broke multiple policies, but Raquel overlooked this and continued management's agenda against the Charging Party and Employee A. CP also addressed when Jonathan broke the privacy policies when he attempted to impersonate CP in September 2021. After the Charging Party reported Jonathan to Raquel, there was

supposed to be an investigation, and the CP should not have had to interact with the offending manager again. Raquel broke the policies herself, when she brought the CP into the January 13 meeting with Jonathan, and CP addressed that it was discriminatory with her following the meeting.

4. Jonathan attempted to impersonate the CP when he called the HR service center in order to change the CP's personal protected information while CP was on vacation in September 2021. Jonathan had never had a direct encounter with the Charging Party, until he and Raquel attempted to ambush the CP with an interrogation on December 10, following CP's participation in protected activity. Jonathan was aggressive throughout the meeting, and, besides the CP addressing his misconduct, Raquel also had to address Jonathan numerous times to correct his behavior. Jonathan was also present in the January 13 meeting, even though he was not supposed to be involved with the CP following being reported to Raquel for his aggressive behavior and misconduct in the previous meeting and his actions in September 2021.

5. Operations, HR, and Store Managers worked together to actively create and enforce actions and policies against the CP, as the only black coworker in the department.

6. Security Managers and Team Leads - CP presented multiple security managers and team leads, in his rebuttal, who addressed the discriminatory actions they were forced to take against the CP in order to not suffer repercussions themselves.


**Discrimination**

1. Investigator provides a very narrow scope of discrimination to determine prima facie for the Charging Party. He also focuses solely on the CP's termination in establishing

prima facie, though the CP's charge was not solely about his discriminatory termination, but also the continual discrimination he faced over/throughout his career.

2. Investigator takes a narrow definition of discrimination in order to discount the CP's ability to express continual discrimination over a long period of time, under numerous managers at the location, in multiple contexts.

3. CP presents numerous employees, including managers, who were terminated for acts of discrimination against him and acts of discrimination he witnessed against others. The fact that the employees were terminated, means that the Respondent was aware of the discrimination present in its organization, and established a precedence for such discrimination to be worthy of immediate termination.

4. CP expressed how white coworkers in similar situations to him were always treated favorably, while he was targeted.

  - Julie & Cindy, white females, verbally assaulted other managers, including Raquel Ely, and made hostile, violent commotions in the Admin area against other managers. Management not only excused the behavior and gave them mental health accommodations, but they also tried to hide(coverup) the incidents. In comparison when CP, while maintaining professional demeanor and communication at all times, asked for mental health accommodations due to discrimination he faced from Jonathan and Raquel, he was terminated days later, along with Employee A.

  - Jesse and Aimee were white coworkers in the same position according to the Respondent's alleged new Relationship Policy guidelines in 2021. They continued their positions, without conflict of interest labels or mitigation, throughout 2021 and after the CP and Employee A were terminated in 2022.

5. Investigator bases his decision off of accepting the Respondent's position of the Charging Party breaking store policy. Meaning, he accepts the level of policy breaking presented by the Respondent as meriting immediate termination.

      - Immediate terminations have required extreme action in the past including targeted, direct, reported and witnessed discrimination, vandalism, theft, physical assault or threat of assault, and egregious offense.

      - The investigator acknowledges and defends the Respondent allegation that the CP not agreeing to breaking a policy, presented as an immediate terminable offense for the Charging Party.

6. Charging Party provided numerous examples of managers breaking policies in full knowledge that they were breaking the policies, in the belief that their positions allowed for them to do so.

      - Managers who have egregiously broken major policies but were protected or promoted by management, and not terminated: Jonathan, Raquel, Michelle, Ronda, Heidi, Darryl, and Fran.

7. Investigator promoted the Respondent position that omission could fall under dishonesty egregious enough to warrant immediate termination under the Behavior Standards Policy.

      -In December Charging Party reported Michelle Chenard, his white manager, for fabricating an entire security incident to give the CP a corrective action. When management rescinded the corrective action, they were also acknowledging her false allegations as a direct lie, made to harm a coworkers performance and be added to his permanent file, in the full knowledge that she was, in fact, lying about the whole situation.

- Michelle Chenard faced no repercussions for this extreme, egregious action. She never faced any repercussions for this same behavior exhibited in the past.

- Michelle has been reported for numerous direct lies against coworkers, retaliation, and fostering a hostile working environment, and management labels them as misunderstandings.

- The fact that management protects a white manager who expresses continual dishonesty by continually lying about situations and against other employees, but fired the CP for what they feel is an omission they can label as dishonesty, is discrimination in and of itself.

## Retaliation

To prove a prima facie case for retaliation, the Charging Party needs to show they (1) participated in protected activity, (2) adverse actions were taken against them following the protected activity, which would dissuade another person from participating in protected activity, and (3) there is a causal link between the two.

(1) The Charging Party was named in an EEOC Charge of Discrimination. The Charging Party also reported multiple managers and management misconduct throughout November and December 2021, and in January 2022.

(2) The Charging Party was subjected to interrogations, fabricated performance issues to negatively affect his permanent record, having his schedule changed, and termination in January 2022, following his continual reporting of discrimination and a hostile working environment to management. The termination was an adverse action in and of itself, as it was made to be a public display.

(3) The Charging Party never had any performance issues, was always a highly productive employee, and very knowledgeable about store policies. Regardless of his impeccable performance and personnel file, the Charging Party was terminated in January 2022, following being named in an EEOC Charge of Discrimination, and his repeated reporting of continual discrimination based on him being a black man. The information management used to support his termination was taken directly from the EEOC Charge made by Employee A.

- If Charging Party was terminated due to information taken from an EEOC Charge, then it means if the Charge of Racial Discrimination was never filed, then the Charging Party would not have been terminated in January 2022.

- The Respondent and the investigator acknowledge the information they use comes from protected activity, so they in turn admit retaliation.

- The Charging Party was *not terminated* for breaking the Relationship Policy or the Behavior Standards Policy. The Charging Party was terminated for sending his email on January 14, 2022, which addressed the retaliation and discrimination he'd faced from management throughout December and January following his participating in protected activity.

## **Conclusion**

From the beginning of my employment, I have been continually targeted, harassed, and discriminated against at IKEA Woodbridge. In the midst of all of the discrimination, I continued to rise above the toxicity with my work ethic and ability to understand my employee rights. Management decided to terminate the Charging Party after receiving his email on January 14, addressing the continual discrimination and Raquel's involvement.

In closing, CP was named in another coworker's protected activity and two months later both the CP and the charging coworker were terminated with no warning, no prior warnings, no corrective actions, no previous mentions of misconduct, and with no chance of preventing the termination, or changing any misbehavior to prevent the termination. The decision determined by the PWCHRC, lacked fair and honest presentation of the facts and policies presented by both parties.

I'm asking that you reconsider the decision of the PWCHRC, and I am respectfully requesting a Substantial Weight Review/Hearing.

Respectfully submitted,


Ricky Singleton                                February 11, 2023

15240 Mimosa Trail
Dumfries, VA 22025
571-490-6953
liams.sig@gmail.com

I certify that the information in this document and any attached documents is true and correct. This request has been submitted via electronic mail to Phillip Hoefs, Deputy Director, Equal Employment Opportunity Commission, to email address phillip.hoefs@eeoc.gov, to David Gonzalez, State, Local, and Tribal Coordinator, Equal Employment Opportunity Commission, to email address david.gonzalez@eeoc.gov, on 02/14/2023 at 7pm EST, and via USPS to Phillip Hoefs, Equal Employment Opportunity Commission Washington Field Office 131 M. Street, N.E., Fourth Floor, Suite 4NWO2F Washington, DC 20507-0110 and David Gonzalez, Equal Employment Opportunity Commission Washington Field Office 131 M. Street, N.E., Fourth Floor, Suite 4NWO2F Washington, DC 20507-0110 on 02/14/2023.

 

 

 

_____
Ricky Singleton, Charging Party
15240 Mimosa Trail
Dumfries, VA 22025
liams.sig@gmail.com
571-490-6953
liams.sig@gmail.com